Docket Nos. 20-MJ-5116, 20-MJ-5117, 20-MJ-5124, 20-MJ-5128, 20-MJ-5129

## AFFIDAVIT OF SPECIAL AGENT TIMOTHY R. KENNY

I, Special Agent Timothy R. Kenny, depose and state as follows:

## INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.   I have been a Special Agent with the Federal Bureau of Investigation since 2014. For much of that time, I have been engaged in gang and drug investigations.   I am currently assigned to the Federal Bureau of Investigation, Boston Office.   Based on my training and experience as a Special Agent, I am familiar with federal narcotics, firearm, and money laundering laws.   In this regard, I know that it is a violation of 21 U.S.C. §§ 841(a)(1) and 846 to conspire to distribute, and to distribute, controlled substances, including fentanyl, heroin, and cocaine; that it is a violation of 18 U.S.C. § 922(g) & (n) to be a felon or otherwise prohibited person in possession of a firearm and ammunition; and that it is a violation of 18 U.S.C. § 1956 to (1) transport funds that are the proceeds of unlawful activity with the intent to conceal the source or nature or avoid a reporting requirement, and (2) conduct a transaction with the intent to conceal or disguise the proceeds and source of funds derived from unlawful activity, including drug trafficking, and to conspire to do so.

2.      Since becoming a Special Agent with the FBI, I have participated in investigations of narcotics trafficking and money laundering, and among other things, have conducted or participated in physical surveillance, the execution of search warrants, debriefings of subjects, witnesses, and informants and consensually recorded conversations and meetings.   Through my

1

training, education, and experience, I am familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the methods of payment for such drugs.

3.     I have written and/or participated in the execution of numerous search warrants resulting in the seizures of large quantities of controlled substances, packing implements and other paraphernalia involved in the manufacture and distribution of controlled substances, large amounts of United States currency, ledger books, bank records, telephone books, receipts, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances.   I have participated in the debriefing of defendants, informants, and witnesses who had personal knowledge regarding large-scale drug trafficking organizations.   I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants and executing arrests. As a result of my assignments, I have received extensive specialized training in the field of narcotics identification, investigation, and enforcement.

4.     Based upon my training and experience, I am familiar with the methods of operation employed by narcotics traffickers operating at the local, statewide, national, and international levels, including those involving the distribution, storage, and transportation of narcotics and the collection of monies that constitute the proceeds of narcotics trafficking activities.   I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.   I am also aware that narcotics traffickers speak in vague, guarded, or coded language when discussing their illegal activities, and employ a variety of counter-surveillance techniques in order to detect if their vehicles are being followed by members of law enforcement.

2

**I.      CRIMINAL COMPLAINT AND SEARCH WARRANTS BEING SOUGHT**

5.      Since 2017 I have participated in the investigation into Mujab Jihad MUBARAK and his drug trafficking organization ("DTO") (the "MUBARAK DTO").   During my work on this investigation, I have reviewed reports prepared by agents and discussed this case and other related cases with agents and local law enforcement officers who have been involved in these investigations.    I submit this affidavit based upon personal knowledge derived from my participation in this investigation, and information that I have received from a variety of other sources, including other law enforcement officers and agents, confidential sources, public records, bank records, and consensually recorded telephone calls and meetings.   The FBI is currently investigating members and associates of the MUBARAK DTO for: felon in possession of firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1); the using, brandishing, and discharging of a firearm during the commission of a crime of violence or drug trafficking offense, in violation of 18 U.S.C. § 924(c); laundering and concealing the source and nature of money derived from drug trafficking, in violation of 18 U.S.C. § 1956; and the manufacture of controlled substances, distribution of controlled substances, possession of controlled substances with intent to distribute, and conspiracy to commit those offenses, in violation of 21 U.S.C. §§ 841(a)(1), and 846 (the "TARGET OFFENSES").

6.      I submit this Affidavit in Support of a Criminal Complaint charging MUBARAK with Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, including cocaine, heroin and fentanyl, in violation of 21 U.S.C. §§ 841, 846, and possession and use of a firearm during and in relation to, and in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).

7.      I also submit this Affidavit in support of applications for search warrants authorizing the search for and seizure of evidence of the TARGET OFFENSES (further described in Attachment B) from the following two target locations:

1.)     25 Charlton Street, Apartment C-701, Everett, MA (hereinafter, "Target Location 1"); which I believe to be the primary residence of Mujab Jihad MUBARAK, further described in Attachment A-1; and

2.)     11 Garden Road, Lowell, MA (hereinafter, "Target Location 2"); which I believe to be a secondary residence of Mujab Jihad MUBARAK, further described in Attachment A-2.

Collectively I will refer to Target Location 1 and Target Location 2 as the "Target Locations."

8.      I also submit this affidavit in support of an application for a search warrant pursuant to Federal Rule of Criminal Procedure 41 and Title 18, United States Code, Section 2703(c)(1)(A), for precision location information ("PLI") about a cellular telephone ("Target Mobile Phone") bearing VERIZON phone number 339-987-9161, subscribed to Mujab MUBARAK, 9 Moody Street, Dorchester, MA. The Target Mobile Phone is believed to be utilized by Mujab MUBARAK. The Target Mobile Phone is described in Attachment C-1 along with the information to be seized described in Attachment C-2.   Upon the issuance of the criminal complaint being sought for contemporaneously, MUBARAK will be a person to be arrested and the PLI for MUBARAK's phone will assist agents in locating him to effectuate the arrest.

9.      Lastly, I submit this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique, described in Attachments D-2, to further assist in determining the location of the Target Mobile Phone, further described in Attachments D-1.   The investigative technique described in Attachment D-2 involves the use of a Cell Site Simulator ("CSS").

4

10.     The purpose of applying for search warrants authorizing the use of a CSS is to precisely determine the locations of the Target Mobile Phone.   There is reason to believe the Target Mobile Phone is currently located within the District of Massachusetts ("MA") because MUBARAK maintains his primary address and secondary address in the District of MA, the years-long investigation has borne out that MUBARAK lives in the District of MA, and law enforcement officers have observed MUBARAK in the District of MA within the past 30 days.   Pursuant to Rule 41(b)(2), law enforcement may locate the Target Mobile Phone outside the district provided the device is within the district when the warrant is issued.

11.     Because collecting the information authorized by the cell-site simulator warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41. *See* 18 U.S.C. §§ 3121-3127.   This warrant therefore includes all the information required to be included in a pen register order.   *See* 18 U.S.C. § 3123(b)(1).   Consistent with the requirement for an application for a pen register order, I certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the FBI.   *See* 18 U.S.C. §§ 3122(b) and 3123(b).

12.     This affidavit is intended to show that there is probable cause for the requested warrants and criminal complaint and does not set forth all of my knowledge about this investigation. I have not included all of the information known to law enforcement about the investigation.

## II.     FACTUAL BACKGROUND OF MUBARAK DTO

13.     This affidavit is based on an FBI investigation that was initiated in Spring 2017.   To date, the investigation has revealed that Mujab Jihad MUBARAK, also known as "Anthony Taylor," also known as "Easy," also known as "E," also known as "Big Homie," is a leader of the targeted

conspiracy, purchases large quantities of fentanyl, heroin, and cocaine, and distributes it to his close associates in MA.   The investigation has revealed that Abdul Karim MUWAKKIL, also known as "Tyrone JONES," also known as "Ty", also known as "Little Homie," and Vito GRAY, are two of MUBARAK's co-conspirators who have assisted MUBARAK in transporting and distributing large quantities of fentanyl, heroin, and/or cocaine and with collecting and laundering the DTO's drug proceeds.   In July 2017, MUBARAK shot GRAY over a dispute related to the DTO's activities and the loss of drug proceeds that GRAY was transporting through the airport. Following the shooting, MUBARAK admitted to the shooting to a cooperating witness who captured the confession on recording. MUBARAK also explained that the shooting was related to the DTO's activities and the loss of the drug proceeds.

### A.      Mujab Jihad MUBARAK

14.     Mujab Jihad MUBARAK, date of birth XX/XX/1973, is a 47-year-old male currently residing at 25 Charlton Street, Apartment C-701, Everett, MA (Target Location 1) and 11 Garden Road, Lowell, MA (Target Location 2).   A check with the MA Board of Probation indicated that MUBARAK has an extensive criminal history including convictions for trafficking controlled substances (2003), resisting arrest (2003), motor vehicle violations (2002), possession class D (marijuana) (1999), carrying a dangerous weapon (1996), manufacturing a controlled substance (1995), possession with intent to distribute class A (heroin) (1994), and assault and battery on a police officer (1993).

### B.      Vito GRAY

15.     Vito GRAY, date of birth XX/XX/1969, is a 50-year-old male from Boston, MA.   A check of the MA Board of Probation indicated that GRAY has a criminal history containing convictions for drug distribution (1988, 1989, 1992, 1999, 2000, 2018), drug possession (1992, 1998), armed

robbery (1992), intimidation (1992), armed assault to kill (1992), and assault and battery on a police officer (1988, 1990).   GRAY was indicted by a Suffolk County grand jury in August 2018 and charged with two counts of distribution of a class A substance, subsequent offense.   The charges stemmed from GRAY's involvement with the MUBARAK DTO.   On March 6, 2019, GRAY entered a guilty plea in Suffolk County Superior Court to two counts of distribution of a class A substance and was sentenced to two years of incarceration, 109 days to serve, balance suspended for three years.

### C.   Abdul Karim MUWAKKIL

16.   Abdul Karim MUWAKKIL, date of birth XX/XX/1981, is a thirty-eight-year-old male who is currently incarcerated at the Federal Correctional Institution, Danbury, Connecticut.   A check of the MA Probation and Interstate Identification Index indicates MUWAKKIL has a criminal history including convictions for firearms violations (2016), operating a motor vehicle under the influence of intoxicating liquor (2018), and a youthful offender conviction for armed robbery and armed assault with intent to kill for which he was sentenced from 12 to 15 years in state prison (1998).   Additionally, MUWAKKIL was charged in the United States District Court for the District of MA in August 2018 with violations of 21 U.S.C. s. 841(a)(1), b(1)(B)(i) and 846 for conspiring with other persons known and unknown to knowingly and intentionally distribute, and to possess with intent to distribute 100 grams or more of heroin, cocaine, and cocaine base. These charges stemmed from this investigation and MUWAKKIL's participation in the MUBARAK DTO.   MUWAKKIL entered a guilty plea to these charges and was sentenced to five years of incarceration.

### III.   CONTROLLED PURCHASES FROM THE MUBARAK DTO AND RECORDINGS

17.     Between June 2017 and January 2018, a cooperating witness (CW-1[1]) made approximately 25 controlled purchases of heroin, fentanyl, cocaine and/or cocaine base from the MUBARAK Drug Trafficking Organization.   In coordination with MUBARAK, CW-1 made these purchases from MUWAKKIL, GRAY, and other co-conspirators, including 13 separate controlled purchases from MUWAKKIL. The most recent controlled purchase occurred in January 2018.   Investigators conducted each controlled purchase in accordance with the below described procedure.

18.     The following chart illustrates controlled purchases made by CW-1:

| Date | Drug type | Weight (grams) |
|---|---|---|
| August 17, 2017 | Heroin/Fentanyl | 9.0023 |
| August 22, 2017 | Heroin/Fentanyl | 9.787 |
| August 29, 2017 | Heroin/Fentanyl | 9.8434 |
| September 6, 2017 | Heroin | 9.442 |
| September 20, 2017 | Heroin/Fentanyl | 9.644 |
| September 27, 2017 | Heroin/Fentanyl | 9.479 |
| September 27, 2017 | Cocaine base | 24.446 |
| October 5, 2017 | Cocaine base | 25.217 |
| October 13, 2017 | Heroin/Fentanyl | 9.479 |
| October 13, 2017 | Cocaine Hydrochloride | 25.702 |
| October 19, 2017 | Heroin/Fentanyl | 9.878 |
| October 19, 2017 | Cocaine | 25.582 |
| November 3, 2017 | Heroin/Fentanyl | 19.113 |
| November 8, 2017 | Firearm and Ammunition | N/A |
| November 24, 2017 | Heroin/Fentanyl | 9.902 |
| December 10, 2017 | Heroin/Fentanyl | 20.09 |

---

[1] CW-1 has been cooperating with law enforcement since March of 2016.  I know CW-1's identity.  CW-1 has a criminal history containing arrests for firearms offenses, drug offenses, larceny offenses, assault and battery, and motor vehicle offenses, including convictions for trafficking cocaine, possession with the intent to distribute class B, possession with the intent to distribute class A, larceny, and assault and battery. CW-1 has been providing information concerning the criminal activities of numerous Boston-area gang members and drug traffickers. The information concerning many of the gang members and drug traffickers provided by CW-1 has been independently verified by law enforcement.  CW-1 is actively conducting controlled purchases of controlled substances and firearms.   I consider the information provided by CW-1 to be reliable.  CW-1 has received financial assistance in connection with his/her cooperation in this case and has received over $50,000 in compensation.   CW-1 is willing to testify in this matter.

| January 12, 2018 | Heroin | 10.712 |

19.     Each of the controlled purchases were initiated by calling or texting MUWAKKIL or GRAY.   CW-1 negotiated for the purchase of a specific quantity of a specific controlled substance for a set price.   In most instances, the calls and texts were consensually recorded and/or confirmed via pen register data and/or telephone toll records.   Once the amount of the drugs, the price, and the meet location was established, CW-1 and CW-1's vehicle were searched, CW-1 was provided with a transmitter, audio and/or video recording equipment, and official agency funds ("OAF") with which to make purchases.   CW-1 was then surveilled by law enforcement officers as CW-1 went to meet with MUWAKKIL, GRAY, and/or other co-conspirators. Whenever possible, conversations that occurred during the controlled buys were monitored through the use of the transmitter.   Once the buy was completed, CW-1 was surveilled back to a predetermined meeting location where CW-1 turned over any purchased drugs and/or remaining funds, the recording equipment, and transmitter.   CW-1 was searched a second time and debriefed.   Drugs obtained were thereafter inspected, field tested when possible, and processed into evidence so that they could be sent to the Northeast Regional Laboratory for further testing.

**A.     June 1, 2017 and June 8, 2017 controlled purchases from Vito GRAY**

20.     On May 30, 2017, under the direction of law enforcement officers, CW-1 met with GRAY in the area of 285 Martin Luther King Boulevard, Roxbury, MA.   This meeting was not recorded. Investigators debriefed CW-1 regarding the meeting.   During the meeting, GRAY stated, "Easy [(MUBARAK)] told me you were home."   CW-1 expressed to GRAY that he owed MUBARAK money.   GRAY told CW-1, "Easy's not worried about that, we're getting money."   GRAY provided CW-1 with a phone number and prices for various amounts of heroin ($600 for 10 grams). GRAY later called CW-1 and lowered the price to $500 for 10 grams of heroin.

21.     On June 1, 2017, CW-1 called GRAY and arranged to purchase 10 grams of heroin for $500 from GRAY.   The call was recorded.   GRAY directed CW-1 to Washington Park, located on Martin Luther King Boulevard.   At approximately 2:00 pm, CW-1 traveled to Washington Park under surveillance.   CW-1 met with GRAY who was seated on a bench near a basketball court.   CW-1 handed GRAY $500 OAF.   GRAY instructed an unknown male to retrieve 10 grams of heroin.   The unknown male went to the other side of the basketball court and retrieved an item.   The unknown male then returned to CW-1 and handed CW-1 a clear plastic bag containing suspected heroin.

22.     Following the transaction, CW-1 proceeded to a predetermined location and turned over the bag of suspected heroin.   Investigators field-tested the suspected heroin and received a positive reaction for the presence of heroin.   Further testing at the New England Field Division laboratory revealed the suspected heroin contained heroin and weighed 8.838 grams.   CW-1 was debriefed following the transaction and I reviewed the audio/video recording.   The recording corroborated CW-1's account.

23.     On June 8, 2017, CW-1 exchanged phone calls with GRAY and arranged to purchase 10 grams of heroin for $500.   The calls were recorded.   GRAY instructed CW-1 to go to Washington Park.   At approximately 3:00 pm, CW-1 arrived at Washington Park under surveillance.   CW-1 met with GRAY and handed GRAY $500 OAF.   GRAY told CW-1 that "Nephew" would bring CW-1 the heroin.   GRAY got into a waiting Chevrolet Tahoe and departed the area.   A short time later, an unknown male (Nephew) arrived and handed CW-1 a clear plastic bag containing suspected heroin.

24.     Following the transaction, CW-1 proceeded to a predetermined location and turned over the bag of suspected heroin.   Investigators field-tested the suspected heroin and received a

positive reaction for the presence of heroin.  Further testing at the New England Field Division laboratory revealed the suspected heroin contained heroin and weighed 8.283 grams.  CW-1 was debriefed following the transaction and I reviewed the audio/video recording.  The recording corroborated CW-1's account.

### B.     July 1, 2017 MUBARAK shoots co-conspirator Vito GRAY

25.     On July 1, 2017, at approximately 3:25 pm, Boston Police Department Emergency Dispatchers received 911 calls regarding a shooting in a parking lot off Dale Street near the Shelburne Community Center.   One caller described that a black male, approximately 46-48 years old, arrived in a black 2012 Honda Accord[2] and shot a black male wearing a white shirt and yellow shoes in the back.

26.     Officers arrived and processed and photographed the scene.  Officers recovered one (1) .40 caliber Smith and Wesson casing and a tennis shoe.   Officers responded to the Boston Medical Center and interviewed Vito GRAY, who had self-admitted to the hospital following the shooting. GRAY told officers that he was shot in the parking lot off of Dale Street but that he did not see who shot him and would not be able to identify anyone.

27.     According to Boston Medical Center records, GRAY sustained two (2) gunshot wounds to the upper back.  Officers attempted to speak with GRAY following his release from the Boston Medical Center but were unable to locate him.   Officers placed the investigation into an inactive status on July 11, 2017.

---

[2] Following the August 11, 2017 meeting between CW-1 and MUBARAK (further described below), CW-1 dropped MUBARAK off at 336 Adams Street and MUBARAK entered a black 2012 Honda Accord, MA license plate: 136SH5.   According to the MA Registry of Motor Vehicles, the vehicle is owned by Claudine GRAHAM, date of birth: XX/XX/1974, 336 Adams Street, Apartment 17, Dorchester, MA.   Investigators have identified GRAHAM as a girlfriend of MUBARAK and have observed MUBARAK at 336 Adams Street on many occasions.

28.     On January 9, 2020, investigators interviewed the 911 caller regarding the shooting.   The caller's identity is known to me but the name is being withheld from this affidavit to protect the caller.   The caller stated that he was in the parking lot and observed two vehicles enter the parking lot simultaneously.   One vehicle was a black Honda Accord.   The second vehicle was a silver Sport Utility Vehicle (SUV).   The caller observed the driver of each vehicle exit their respective vehicles and begin to argue.   The caller described the driver of the Honda Accord as a black male, approximately 5'9" tall, heavy-set, with a big black beard and no hair on the top of his head ("UNSUB1").[3]   The caller described the driver of the silver SUV as a light-skin black male, approximately 6'3" tall, with a big nose and small mustache ("UNSUB2").[4]   The caller observed UNSUB1 return to the black Honda Accord and remove a firearm from the driver's side door area. UNSUB1 then shot UNSUB2 in the back as UNSUB2 turned to run.   UNSUB1 got into the silver SUV (UNSUB2's vehicle) and drove out of the area.

### C.     August 7, 2017 meeting with MUBARAK

29.     On August 7, 2017, CW-1, met with MUBARAK in Boston, MA.   This meeting was not recorded.     Investigators   debriefed   CW-1   following   the   meeting.     CW-1   reported   that MUBARAK described his drug trafficking organization and confessed that he shot GRAY over a disagreement related to their drug trafficking and money laundering activity.   MUBARAK provided CW-1 with his telephone number: 781-562-9267.   CW-1 explained to investigators that

---

[3] The caller's description of UNSUB1 is consistent with MUBARAK's age, height, shape, and appearance.   During the interview on January 9, 2020, the caller was shown a photo array with MUBARAK's photograph, but was unable to identify MUBARAK.   And after pausing on MUBARAK's photograph and another photograph, selected the photograph of another individual who bore an extremely close resemblance to MUBARAK and MUBARAK's photograph. While the caller failed to identify MUBARAK, the caller had a very brief opportunity to observe the shooting and the observation took place approximately thirty months prior to the interview.

[4] The caller's description of UNSUB2 is consistent with GRAY's height and appearance.

he owed MUBARAK a $2,000 drug debt and that paying the debt would allow CW-1 to have further discussions with MUBARAK regarding his drug trafficking organization.

### D.     August 11, 2017 meeting with MUBARAK

30.     On August 11, 2017, CW-1 conducted a controlled meeting with MUBARAK with the purpose of repaying money owed to MUBARAK from a prior drug transaction. This meeting was audio and video recorded. At approximately 3:26 pm, CW-1 picked up MUBARAK at 336 Adams Street in Dorchester, MA. CW-1 and MUBARAK traveled while under surveillance to a shopping center in Boston so that MUBARAK could purchase a cell phone. When CW-1 and MUBARAK returned to 336 Adams Street, MUBARAK entered a black Honda Accord bearing MA license plate: 136SH5.   CW-1 was debriefed following the meeting and I have reviewed the audio/video recording.

31.     During the meeting, MUBARAK told CW-1 the following information about shooting co-conspirator Vito GRAY: "He hit me with the story like when we get there like tell me that the jakes [(detectives)] ran up on him and took the money…. The DEA grabbed him at the airport and run up on him and the bitch at the airport… He told me he gave this bitch 30, he took 20 and when he got to the airport that the DEA ran up on him and took it."[5]

32.     MUBARAK continued, "The story was just bullshit.   You gotta have paperwork… These other little niggas that hustle with me, I sent them niggas out of town one day, they got bagged with like 100 racks or something, 80 G's… That wasn't nothing man, them niggas got arrested

---

[5] I am aware that on January 23, 2017, GRAY and Niesha WALLACE were stopped by Agents of the Drug Enforcement Administration ("DEA") at Boston Logan International Airport as they set to board JetBlue Flight #487 from Boston, MA to Los Angeles, California.   Both GRAY and WALLACE provided voluntary consent for the officers to search their carry-on bags.   Agents located $29,250 in WALLACE's bag and $20,000 in GRAY's bag.   After a brief interview, the money was seized and both GRAY and WALLACE were released.

doing what I told them to do… They didn't get arrested, they just took the money, you know what I'm saying… give you a receipt and tell you to come back and claim it if it's yours… but you can't come back and claim it, you fucking leave it there you know what I'm saying and keep moving, so but he knew that you know what I'm saying and he was trying to run the same line, but his shit was bullshit cause he don't got the receipts… it's like come on dog, you running game man and he trying to run a game on the Big Homie."

33.     I believe, based on my training and experience that MUBARAK is telling CW-1 that MUBARAK had other money couriers that were stopped with $80,000 or $100,000 and they were able to provide court documentation of the seizure.   I further believe that MUBARAK thinks that GRAY falsified the paperwork from the DEA in order to keep the $50,000 for himself.

34.     MUBARAK continued, "I didn't shoot the nigga [(GRAY)] about that dog. I didn't give a fuck about the 50 G's… that nigga made so much money with me right, it wasn't worth me killing him for 50 thousand dollars… The Little Homie [(MUWAKKIL)] says to the nigga [(GRAY)], 'Big Homie told me man to tell you that the numbers changed and that nigga for you not to collect the money from your workers no more, that to have them turn that into me, like I'm coming to hit them and they going to turn the money into me and you fall back for a minute you know what I'm saying. As a matter of fact he told me he will talk to you, you know what I'm saying?...   So he [(GRAY)] tells the little nigga [(MUWAKKIL)], 'fuck him [(MUBARAK)] nigga, I ain't giving him shit, he don't deserve that'… so the little nigga Ty, he points a finger in Vito face like, 'fuck you nigga, fuck you tell that nigga [(MUBARAK)] what he deserves, nigga when all this is his shit. Nigga we ain't got no money in this shit, nigga we ain't re-up nigga, this nigga [(MUBARAK)] brought us into this shit nigga, this nigga whatever he says he want for it that what

he want for it till he say it change back… how the fuck you know ain't something happening with this nigga to change the number."

35. Based on this conversation, I believe that MUBARAK tasked MUWAKKIL to approach GRAY and tell him that he was not to collect any more money from his drug redistributors. From that point on MUWAKKIL would make the drug deliveries and pick up the illegal proceeds and GRAY was to "fall back" or take a break while MUWAKKIL handled the business.

31. MUBARAK then explained MUWAKKIL's role in the drug trafficking organization to CW-1, "The little nigga [(MUWAKKIL)] been running the show for a long time, he made a job for himself, you know what I am saying, I offered jobs to all you niggas, the little nigga found him a spot and created a job dog, and the shit work for me, and I put him in it....   The shits a machine dog, it's a system dog and I know when you don't pay... There's a book nigga you know what I am saying, my peoples got the books nigga and your names in the book.... You ain't turn it in nigga, shits going out but it ain't coming back in, what the fucks going on big dog, you fucking up somewhere, then you being disloyal to the crew."

32. I believe that by referring to a "book" and "books," MUBARAK is explaining that there are drug ledgers kept by his "crew" and those ledgers will reflect if people in the crew are paying back the money that they earn for the drugs they are given by the DTO.

33. Later in the recording, MUBARAK provides specific details about his shooting of GRAY: "I snatch him by his mother fucking throat, and I got this pistol on me, and we in the barber shop in Grove Hall nigga, he ain't…He thought I wasn't coming for my bag (money), what the fuck is wrong with you nigga and he be like what you gonna do shoot me in here, I like mother fucking right, you know, but I'm like naw, come outside matter of fact and I'll shoot you outside... know

what I'm saying, Bitch you better give me my mother fucking money... You know what I did to him.   The rest is history."

34.     I have reviewed the audio/video recording of this meeting and observed the distinctive clothing and items worn and carried by MUBARAK during the meeting.   Specifically, MUBARAK can be seen wearing a black t-shirt with an "Air Jordan" logo, a black and white baseball hat with a "rooster" logo, and gold-rimmed sunglasses and carrying a black and gray-checkered, Louis Vuitton satchel.

| | |
|---|---|
|  | Black t-shirt with "Air Jordan" logo. |

| | |
|---|---|
|  | Black t-shirt with grey "Air Jordan" logo. |
|  | Black and gray checkered Louis Vuitton satchel. |



Black and gray checkered satchel.

Black and white baseball hat with "rooster" logo



Black and white baseball hat with "rooster" logo

Gold-rimmed sunglasses

### E.   August 17, 2017 meeting with MUWAKKIL

35.   On August 17, 2017, CW-1 was contacted by MUWAKKIL who told CW-1 that MUBARAK asked him to meet with CW-1. Surveillance was established by the investigative team at the location of the meeting. CW-1 was provided with an audio/video recording device. At approximately 12:04 p.m., a white 2011 Mercedes bearing MA license plate: 3ZWP20 and registered to MUWAKKIL, 45 Iffley Road, Apartment 3, Jamaica Plain, MA ("the white Mercedes"), approached CW-1.   CW-1 and MUWAKKIL engaged in a lengthy conversation with

MUWAKKIL concerning MUBARAK's drug trafficking organization.   CW-1 was debriefed following the meeting and I have reviewed the audio/video recording.

36.      During the meeting, CW-1 and MUWAKKIL introduced themselves and CW-1 said, "Um, Easy [(MUBARAK)], I don't know what he told you."   MUWAKKIL responded, "He told me everything."   CW-1 then asked, "what's the numbers?" (the price on certain quantities of drugs). MUWAKILL explained, "Well, the number's five for the whole stick… for 10."   I believe, based on my training and experience that MUWAKKIL is explaining the price for a "stick" or ten grams of heroin is "5" or $500.

37.      MUWAKKIL then explained, "Everything we do right now is based off our word. Nothing to do with the Big Homie [(MUBARAK)]." CW-1 responded, "Ok.   Alright.   Yeah he said that. He said deal with you."   MUWAKKIL continued, "It has nothing to do with him.   It's all on me." MUWAKKIL continued, "You know what I'm saying, I don't do this for money… I do it cuz I like him," and later, "And I can't get paid for this for him.   I can't."

38.      MUWAKKIL expands further on his role in the MUBARAK DTO.   MUWAKKIL states, "What I'm saying to you is, when, when you asked me did he [(MUBARAK)] tell you everything… He tells me everything."   MUWAKKIL then discussed the roles of other members of the MUBARAK DTO.   MUWAKKIL stated, "Just know that, if there comes a time that I send someone to you… that they're me." CW-1 replied, "Ok.   So if you send somebody it's like I'm dealin' with you.   Alright, gotchu."   I know, based on my training and experience, that MUWAKKIL meant that if he sends a drug runner to supply CW-1, the drug runner represents him and will honor the deal MUWAKKIL has with CW-1.

39.      MUWAKKIL spoke about the design of the DTO.   CW-1 said, "He [(MUBARAK)] told me… he said he's [(MUWAKKIL)] my right hand, he's my better hand.   I said, man, how come

I never met him?"   MUWAKKIL responded, "Because that's the design… the big thing for me is, I go into whatever he [(MUBARAK)] asks me to go in to.  I don't give a fuck about that… Because I don't need to know the backhand… He send me somewhere and it's not-it's not safe… He got a big picture… There was a reason for that."   MUWAKKIL later boasts about the success of the DTO, "We got a good thing going… And I-I'm motivated about it… You know what I'm saying   Like I'm happy about it… I'm in a good place with this thing… And I'm sayin' it because I-I can see where we could go.   Now it's not guaranteed, but I can see where we can go because of the fact that I know the components that are there… I know what we have working.   And what you're sayin' is, we're steps away from just being able to do just that."

40.     MUWAKKIL explains MUBARAK's role in making the DTO run, "Let him [(MUBARAK)] just do this… add a percentage… let him, everything he does grab, add a percentage, he [(MUBARAK)] gets, he takes something off the top soon as he grabs it… because that's his job… he earns that way."   CW-1 states, "Yeah he [(MUBARAK)] told me-he told me that like you all are building… he said the blueprints there but he said, patience and shit man." MUWAKKIL agrees, "It's a patience man."

41.     MUWAKKIL later explains to CW-1 that his participation in the MUBARAK DTO is necessary to ensure his financial future.   MUWAKKIL states, "When I tell you that we're buildin', I'm not in this tryin' like, I'm really lookin' at everything because we really, really have to do this shit well in order for us to make, like, make a livelihood off this shit."   MUWAKKIL continues, "Motherfucker's got- if you put your life into these streets.  See we don't get no pensions… We get an opportunity to be connected to whatever is happenin' on these streets.   And that's a choice… We gotta choose that.  If a nigga don't choose it, he can't get his earnings… Nigga's gotta keep, he's gotta earn his keep… Are you a wolf or are you a sheep?"

21

42.     Additionally, MUWAKKIL discusses prices for larger quantities of drugs.   MUWAKKIL explains, "For 160… aight this is what I do… Someone gets 160 grams from me and they get it on the hip, like I mean they get it right now, all in whole, they are gonna pay me 68 for it right now… Right now today they are gonna give me 68 hundred for it right now on the fly."

43.     I believe, based on my training and experience, that MUWAKKIL explained that he sells 160 grams of heroin for $6,800.   I further believe, based on my training and experience, that MUWAKKIL agreed that to allow CW-1 to take the drugs on consignment, "on the hip," and owe $6,800.

44.     MUWAKILL continues on to state, "If you had a finger, right, finger going to be ten grams… the lowest, if you broke it down, hypothetically, you break 10 grams down and let's say you selling 40's… Right now a 40, say you make it a .3 on the scale, you see .3, that's 40 dollars… Aight, now I divide that by .3 because that's what I'm putting on the scale… That gives me 33 times 40, so we get 33 times 40, I'm not saying 40 I'm saying 35, I'm hypothetical, always go short."

45.     I believe, based on my training and experience that MUWAKKIL explained that he can create three $40 bags of heroin from each gram.   Using this method on ten grams of heroin would result in a total of 33 forty dollars bags - $1320.00 in drug profits.

46.     Then, CW-1 asked about the consistency of the drug quality.   MUWAKKIL replied, "No, no, no, listen.   Watch this.   I don't do nothin' that the Homie (MUBARAK) wouldn't approve of… I don't need extra… So I'm tellin' you I'm never gonna play you."

47.     I believe, based on my training and experience that MUWAKKIL explained to CW-1 that he would never alter the quality of the drugs without the expressed approval of MUBARAK, the leader of the drug trafficking organization.

### F.      September 27, 2017 Controlled Purchase from MUWAKKIL

48.      On September 27, 2017, CW-1 advised agents that the previous day CW-1 had placed a consensually recorded phone call to MUWAKKIL and agreed to meet him to purchase ten (10) grams of heroin for $500 and twenty-eight (28) grams of crack cocaine $1250.   At approximately 3:40 p.m., CW-1 made a consensually recorded phone call to MUWAKKIL informing him that CW-1 was on the way to meet MUWAKKIL at 85 Stoughton Street, Boston, MA.

49.      CW-1 arrived at 85 Stoughton Street, rang the bell, and was buzzed into the building. CW-1 entered MUWAKKIL's apartment and provided MUWAKKIL with $1,750 OAF. MUWAKKIL then handed CW-1 heroin that was already in his hand, went into the living room, and gave CW-1 cocaine base that he took off a scale.   At approximately 4:30 pm, agents observed CW-1 exit the building.

50.      Following the transaction, CW-1 proceeded to a predetermined location and turned over the bags of suspected heroin and cocaine base.   Investigators field-tested the suspected heroin and received a positive reaction for inositol and an inconclusive reaction for the presence of heroin. Investigators also field-tested the suspected cocaine base and received a positive result for cocaine. Further testing at the New England Field Division laboratory revealed the suspected heroin contained heroin and weighed 9.479 grams, and the suspected cocaine base contained cocaine base and weighed 24.446 grams.   CW-1 was debriefed following the transaction and I reviewed the audio/video recording.

51.      During the controlled purchase, MUWAKKIL and CW-1 discussed the shooting of Vito GRAY and the reasons that MUBARAK shot GRAY.   CW-1 asks, "Any, any word on Vito?" MUWAKKIL responds, "No, I spoke, I spoke to Vito the other day."   CW-1 asks, "Oh so you all, you all mending?"   MUWAKKIL responds, "Fucks no… I don't do that… No I don't do that…

When you break a good thing, when you break a good thing, it's broken.   There's nothing you can do."   CW-1 asks, "Yeah, I mean are you just taking on E's [(MUBARAK's)] thing or is…" MUWAKKIL states, "That's me."   CW-1 states, "You fuck with him, you fuck with me.   You fucking with him, you fucking with me."   MUWAKKIL responds, "Well, well that too.   That too.   But not even for him.   Not even for the Big Homie."

52.     CW-1 goes on to ask if GRAY is back working in the MUBARAK DTO, "He's back, is he [(GRAY)] back on the team?"   MUWAKKIL states, "No, no."   CW-1 follows, "That's, that's a wrap forever?"   MUWAKKIL states, "As far as I'm concerned."

53.     MUWAKKIL then explains why GRAY can never return to the MUBARAK DTO, "It's just the level on which it was taken.   See it would be different if it was just, you know what I mean, it would be different if it was like 'hey fuck you' or something like that, you know what I'm saying?... Even if it was just, you know cause sometimes, you know, men are men… And I, you know both of 'em [(GRAY and MUBARAK)], they were homies so I didn't treat it, you know, when I get in a room I just be like… You know what I'm saying?   That's just how it is.   But when you get to a point where you bring it to that level… like you wanna crack this man's skin and shed his blood… That's the level where it's all off for me.   Like I'm through."

54.     MUWAKKIL continues, "You mean to tell me like you wanna take this man away from his family.   Like you've seen his kids, you've held his kids, you know what I'm saying, like you played Uncle Vito."   CW-1 later adds, "We on like some super testing and shit like if I, if I, if I get over on this one, he [(MUBARAK)] just, if he would have let that slide, he [(GRAY)] woulda, he woulda abused E.   Like if that woulda slid."   MUWAKKIL agrees, "Listen, no not only would he [(GRAY)] really abused him, right, and just now that, now that game would have been in play, the extortion game."

55.     Later, MUWAKKIL discusses his role as it relates to MUBARAK, "Yeah, like, like I'm a, I'm a man of rank.   You know what I'm saying?   Like I believe in that.   Like the Big Homie's my boss, that's how I treat it… that's the boss, that's it.   Everything else is everybody else."

56.     MUWAKKIL then discusses that GRAY gave up financial security by turning on MUBARAK and the MUBARAK DTO.   MUWAKKIL states, "When you, when you're in a position where… his (GRAY's) position was very clear.   He did not worry about bills.   At all. Like, like at all.   Like when I say like, you know that's a different feeling when you wake up and you just know that the bills are gonna be paid."

57.     MUWAKKIL went on to describe the breadth of MUBARAK's illegal profits, "He [(MUBARAK)] get rentals…" CW-1 asks, "And, and E's [(MUBARAK's)] paying them?" MUWAKKIL responds, "That's right, they came from the bag… that's, all that's purchased by the bag.   That gets paid for by the bag.   It don't come out of, all his, all his (GRAY's) money is his [(GRAY's)] money… he is charging, because of the type of person he is, he [(GRAY)] would still have the Big Homie pay for his car… we go on flights anywhere… expecting the Big Homie to pay that… all that's coming out of the Big Homie's expenses…. And he's paying it."

58.     Later in the meeting, CW-1 tells MUWAKKIL, "It's not how much money you make, it's what you do with the money you make… E [(MUBARAK)] told me that one."

59.     MUWAKKIL returns to talking about the motive behind MUBARAK shooting GRAY, "So, so I told the Big Homie, and you know all of us knew, say listen, this is the time right here, this is it, unfortunately it comes from somebody… unfortunately it comes… unfortunately it comes from somebody that's close to us like why…. Then it's like, you have to do something.   Like at that point you have to do something because like everybody's watching… And I told him, I said,

that's the pivotal point that's gonna stop us from business… And if we don't do something to him [(GRAY)]… we gonna be fools."

60.     I believe, based on my training and experience, that MUWAKKIL explained that if MUBARAK did not punish GRAY the entire DTO would have suffered.

### G.     November 21, 2017 meeting where MUBARAK outlines scope of DTO

61.     On November 21, 2017, CW-1 met with MUBARAK in Boston, MA.   The meeting was audio and video recorded.   CW-1 was debriefed following the meeting and I have reviewed the audio/video recording.

62.     During the meeting, MUBARAK expresses his displeasure with the performance of the members of his DTO.   MUBARAK states "I guess I ain't got the right motherfuckers, I mean, I need some niggas that wanna get it, you know what I'm saying?   I just don't wanna put anybody on that don't appreciate you.   They don't appreciate you a lot of times… you give them niggas all them fucking pucks and shit.   And they give the run around and they just fucking it up.   But I need these niggas to go, you know what I'm saying?... shit, fuck that, niggas should be having 10, 20 thousand dollar days…"   I know, based on my training and experience and review of the recording, that MUBARAK is unhappy with the amount of illegal profits generated by his co-conspirators.   MUBARAK believes that the co-conspirators should be able to earn $10,000 to $20,000 a day based on the quality and amount of the drugs he is supplying.

63.     MUBARAK also explains the value of the drugs he supplies and the potential profit to be made, "I'll give you ten of these motherfucking pucks nigga, you know what I'm saying, like twenty of these things and shit.   This shit's worth it nigga.   You know what I'm saying?   Tell the nigga this is worth three hundred thousand nigga… Give me my one twenty, you keep the rest nigga you know what I'm saying."

64.     I know, based on my training and experience, that MUBARAK is explaining that he will give a co-conspirator ten (10) or twenty (20) 160 grams quantities of drugs ("pucks") that can be broken down and sold on the street for $300,000.   MUBARAK further states that he only expects the co-conspirator to pay him $120,000.

65.     During the meeting, MUBARAK explains that Vito GRAY participated in the DTO and received the same deal.   CW-1 asks, "So, what was, what was Vito like?"   MUBARAK responds, "He had that deal.   He was, his shit was structured like that.   He was good you know I'm saying."

66.     MUBARAK further details how he structures the quantities and pricing of the drugs. MUBARAK states, "I give a nigga like twenty of them motherfuckers, you know I'm saying?" CW-1 asks, "Twenty what?"   MUBARAK responds, "Twenty of them one sixties."   CW-1 asks, "One sixty… a hundred and sixty grams?"   MUBARAK continues, "Give a nigga like, thirty, I give you like thirty-two hundred grams.   Three thousand two hundred (3,200) grams… that shit's like, you know, three keys [(kilograms)] or some shit… I say, you give me a hundred and twenty eight thousand ($128,000) and you keep the change.   Now, at a hundred dollars a gram, that shit's worth three hundred and twenty thousand ($320,000)…"

67.     MUBARAK continues to discuss the potential for CW-1 to make large amounts of cash. MUBARAK states, "That's, that's your number.   That's your, these are your numbers you have to work with.   You might not sell it for a hundred a gram.   You might let it go for fifty a gram. But the other nigga, he has the work from the fifty up to a hundred cause it's at least worth a hundred to a nigga if he sell it uh you know what I'm saying on the bust down however he do it, you know what I'm saying?... So it's just, the window's there, you know what I'm saying?... So it's like a nigga would say you know, alright, even if he sold it for like eighty dollars a gram. Nigga, eighty times the fucking, I'm only charging you thirty-two dollars, so whatever you sell it

for over that is all yours you know what I'm saying."   I know, based on my training and experience that MUBARAK is explaining that he will sell co-conspirators 160 gram quantities of heroin/fentanyl.   MUBARAK will provide the co-conspirator twenty (20) 160 grams "pucks" for a total of 3,200 grams.   MUBARAK will charge the co-conspirator $32 per gram.   The co-conspirator can charge their customers up to $100 per gram, thereby turning a significant profit.

68.     MUBARAK then tells CW-1 about how important it is that every member of DTO is financially successful.   MUBARAK states, "That's how you see these niggas around me and shit these niggas, we on the same, part of the same situation.   That shit, it's for real.   See niggas don't think… I do it, I execute it.   I really sit down and I make that shit a reality.   Niggas just be like, they talking about it but they don't, never concern it.   But nigga, when I execute that shit, I eat, this nigga eat, the nigga we give it to, that nigga eat.   The nigga he give it to… everybody's eating, you know what I'm saying.   Down the whole chain…. And so, as long as everybody's eating, that shit goes smooth you know what I'm saying."   I know, based on my training and experience, that MUBARAK is expressing how he provides everyone in the conspiracy the opportunity to make money ("eat").

69.     MUBARAK stresses to CW-1 that he's the boss of the organization and does not obtain the controlled substances on consignment.   MUBARAK says, "I don't get fronted nigga.   I buy that shit so I own everything nigga.   So nigga, I don't buy bullshit work nigga.   I own all my masters… you know what I'm saying.   I don't work for nobody.   No Dominican.   No fucking Mexican.   Nobody standing behind me talking about nigga hurry up and slow down and all that dumb shit.   This shit independent black-owned man."

70.     MUBARAK discusses how important it is to take care in storing and protecting the drug supply.   MUBARAK says, "Niggas can't be leaving that shit in no bitch's house and she calling

the police or her brother stealing that shit, nigga you gotta guard that shit with your life.   Man you gonna take that shit, act like your life depend on it… You take this shit, I want my money."   I believe, based on my training and experience that this indicates that MUBARAK stores his drug supply at a location he feels is secure, such as his residence.

## IV.    FURTHER INVESTIGATION OF MUBARAK

71.    Since 2017, law enforcement officers have been investigating MUBARAK for drug trafficking and money laundering activity.   In the course of conducting surveillance during the investigation, agents have never observed MUBARAK travel to a place of employment.   Since January 1, 2020, investigators have conducted surveillance on MUBARAK on over 50 separate occasions and have never observed MUBARAK travel to a place of employment.

72.    Investigators obtained leasing documents from The Batch Yard apartments, 25 Charlton Street, Everett, MA, where Target Location 1 is located.   According to the leasing documents, MUBARAK leased apartment C-701 on February 28, 2019 for one year with a security deposit of $2,567.00 and monthly rent and parking fees totaling $2,667.00.   The lease application submitted by MUBARAK included an "employment information" section and a "previous employment" section.   In the employment information section, MUBARAK claims to work at "KO Stone Inc" with a monthly income of "$7400" and additional income of "$88800".   Note, $7,400 multiplied by twelve months is equal to $88,800 - it is likely MUBARAK listed $88,800 to reflect his supposed yearly income.   MUBARAK did not list any additional previous employment information.

73.    I am aware that MUBARAK renewed his lease at Target Location 1 for an additional year on February 9, 2020.   I have reviewed these leasing documents and observed that beginning in February 2020, MUBARAK's monthly rent increased to $2,917 ($2,617 base rent and $300

parking).   Further, the leasing documents indicate that MUBARAK bears the additional costs of water, sewer, gas, and electric.

74.     The leasing documents included three paystubs that MUBARAK submitted to verify his income.   The paystubs appear to be from "KO STONE, INC., 210A New Boston Street, Woburn, MA 01801" for employee "Mujab J. Mubarak, 9 Moody St., Boston, MA 02124."   The paystubs are sequentially numbered (7173, 7174, 7175) and relate to three pay periods (January 27, 2019 – February 2, 2019; February 3, 2019 – February 9, 2019; and February 10, 2019 – February 16, 2019).   Combined, the paystubs indicate that MUBARAK earned $6,786.80 over a three-week period.   The paystubs fail to disclose MUBARAK's position with the company.

75.     Investigators have located a website for K.O. Stone, Inc. at "https://kostone.net".   The company is described as a "Rapid Response Construction Support Service".   The website provides contact information including an email address (angela@kostone.net) and telephone number (781-281-7993).   Investigators have visited the listed address of 210A New Boston Street, Woburn, MA and observed a small office labeled "KO Stone" within a large commercial building.

76.     A search of the MA Secretary of State's corporate database revealed a result for KO STONE, INC., location of principal office 210 New Boston Street, Woburn, MA 01801.   The business filed Articles of Organization in 2013 listing the president as Kevin STONE, Sr. of 37 Fairmount Street, Nashua, New Hampshire 03063 and the registered agent, treasurer, and director as Angela CAMERON of 38 Blanchard Road, Wilmington, MA 01887.   Investigators have not attempted to interview STONE or CAMERON for fear that they would alert MUBARAK to the inquiries from law enforcement.

77.     MUBARAK listed telephone number 339-987-9161 on the leasing documents. Investigators obtained MUBARAK's cellular telephone records for telephone number 339-987-

9161 for the periods of July 19, 2019 through January 19, 2020 and of January 1, 2020 through July 5, 2020.   An analysis of the cell phone records reveals that MUBARAK called Kevin STONE (telephone number: 978-606-5399[6]), owner of K.O. Stone, Inc., one time over the entire reviewed period.   That contact was on August 8, 2019.   Further analysis reveals that MUBARAK had one contact with Angela CAMERON (telephone number: 617-828-4558),[7] registered agent, treasurer, and director of K.O. Stone, Inc., over the entire reviewed period.   That contact was a call from CAMERON to MUBARAK on March 16, 2020.

78.     While the business KO Stone, Inc. appears to actually exist, based on physical surveillance revealing no travel to a place of employment, and phone record analysis, investigators do not believe MUBARAK actually maintains steady lawful employment with KO Stone, Inc. or anywhere else.   I believe that MUBARAK fraudulently claims to be fully employed by KO Stone, Inc. and launders illegal proceeds from his drug trafficking activity through that purported income.

A.     Financial Investigation

79.     A financial investigation has identified at least four bank accounts in the name of or controlled by Mujab MUBARAK.   Between March 31, 2017 and December 28, 2018, there were $165,808 in cash deposits into these accounts.

80.     A financial investigation has further revealed that MUBARAK and other co-conspirators utilize Western Union to transfer money.   I believe this demonstrates attempts by MUBARAK and his co-conspirators to launder money derived from drug trafficking.

---

6 According to Experian, the Insurance Services Office, and Thomson Reuters CLEAR, Kevin STONE, 7 Archstone Circle, Reading, MA is the subscriber of telephone number 978-606-5399.

7  According to the Insurance Services Office and Thomson Reuters CLEAR, Angela CAMERON, 38 Blanchard Road, Wilmington, MA is the subscriber of telephone number 617-828-4558.

81.     Between July 31, 2016 and July 21, 2017, Abdul Karim MUWAKKIL sent six transactions totaling $4,450 from four Western Union Agent locations in Massachusetts to MUBARAK, and four others.

82.     Between 02/19/2016 and 07/23/2017, Claudine GRAHAM, a known girlfriend of MUBARAK, sent seven transactions totaling $3,980 from three Western Union Agent locations in Massachusetts to MUBARAK and another individual.   MUBARAK received the transaction at Western Union Agent PLS Check Cashers CC451 located at 15039 Prairie Avenue, Lawndale, California.

83.     Between January 5, 2016 and August 31, 2017, MUBARAK sent 38 transactions totaling $33,500 from eight Western Union Agent locations in the United States to eight individuals.

84.     Between April 16, 2016 and August 10, 2016, MUBARAK received five transactions totaling $5,900 at three Western Union Agent locations in the United States from four individuals including Claudine GRAHAM, Abdul Karim MUWAKKIL, and Vito GRAY.

85.     A review of the Massachusetts Registry of Motor Vehicles reveals that MUBARAK has registered the following vehicles:

      a.     2013 Harley Davidson FLHX Street Glide motorcycle, VIN: 1HD1KBM17DB680386, MA license plate: 2C7906, National Automobile Dealers Association ("NADA") suggested list price as of 01/13/2020: $20,509.00 (lien holder name: ESB and/or its assigns);

      b.     2013 Harley Davidson FLTRX Road Glide motorcycle, VIN: 1HD1KHM18DB634035, MA license plate: 2D3682, NADA suggested list price as of 01/13/2020: $20,509.00 (No liens exist for this title);

      c.     2020 GMC Light Duty Sierra 2500 HD, VIN: 1GT49REY1LF112866, MA license plate: 1AND87, NADA suggested list price as of 01/10/2020: $61,302.00 (lien holder name: Ally Financial).

86.     According to title documents, MUBARAK purchased the 2020 GMC Light Duty Sierra 2500 HD on November 25, 2019, for a total price of approximately $79,000.   After trading-in a vehicle and paying off the outstanding lien, MUBARAK provided a down payment of $19,500 cash for the 2020 GMC Sierra.

87.     According to title documents, MUBARAK purchased the 2013 Harley Davidson FLHX Street Glide motorcycle, VIN: 1HD1KBM17DB680386, on or about June 8, 2013, for $25,461.88. According to the sale document, MUBARAK paid $10,000 in cash, and financed the balance.

88.      According to title documents, MUBARAK purchased the 2013 Harley Davidson FLTRX Road Glide motorcycle, VIN: 1HD1KHM18DB634035, MA license plate: 2D3682, on or about May 13, 2017, for $18,000. According to the sale document and RMV forms, it appears that this vehicle was purchased entirely with cash.

89.     Based upon the investigation, review of documents, recordings and extensive surveillance showing that MUBARAK is not gainfully employed, and inconsistent statements regarding his employment, I believe that MUBARAK is laundering his illegal proceeds from drug trafficking and purchased the above-listed vehicles with proceeds from drug trafficking.

90.     Investigators have reviewed airline records of the travel of Mujab MUBARAK during the period of 10/15/2016 through 01/14/2020.   The records indicate that MUBARAK booked approximately 82 flights during the period.   The dates, times, carriers, flight numbers, origin airport codes, and destination airport codes are displayed below:

| Date of Departure | Time of Departure | Lifting/flying carrier | Flight Number | Origin Airport Code | Destination Airport Code |
|---|---|---|---|---|---|
| 11/07/2016 | 09:00 AM | VX | 0363 | BOS | LAX |
| 11/09/2016 | 11:43 AM | B6 | 0488 | LAX | BOS |
| 12/26/2016 | 08:05 AM | B6 | 427 | BOS | BWI |
| 01/23/2017 | 09:00 AM | VX | 363 | BOS | LAX |

| | | | | | |
|---|---|---|---|---|---|
| 01/26/2017 | 11:20 PM | VX | 370 | LAX | BOS |
| 01/29/2017 | 06:43 PM | AA | 0173 | RDU | DFW |
| 01/29/2017 | 10:10 PM | AA | 1023 | DFW | LAX |
| 01/29/2017 | 06:10 PM | AA | 0793 | RIC | CLT |
| 01/29/2017 | 08:10 PM | AA | 1975 | CLT | LAX |
| 02/03/2017 | 02:15 PM | AA | 2462 | LAX | DFW |
| 02/03/2017 | 08:25 PM | AA | 1606 | DFW | RDU |
| 03/07/2017 | 09:00 AM | VX | 363 | BOS | LAX |
| 03/13/2017 | 06:20 AM | UA | 203 | BOS | ORD |
| 03/13/2017 | 09:25 AM | UA | 219 | ORD | HNL |
| 03/19/2017 | 04:00 PM | UA | 14 | HNL | EWR |
| 03/20/2017 | 10:00 AM | UA | 1422 | EWR | BOS |
| 03/08/2017 | 11:20 PM | VX | 370 | LAX | BOS |
| 03/29/2017 | 03:10 PM | B6 | 1231 | BOS | LGA |
| 04/02/2017 | 09:00 AM | AA | 166 | BOS | LAX |
| 04/07/2017 | 01:30 PM | AA | 202 | LAX | BOS |
| 05/23/2017 | 10:00 AM | DL | 6059 | BOS | LGA |
| 05/25/2017 | 12:59 PM | AA | 1775 | BOS | CLT |
| 05/25/2017 | 04:14 PM | AA | 5170 | CLT | MYR |
| 06/01/2017 | 11:20 AM | AA | 5154 | MYR | CLT |
| 06/01/2017 | 01:10 PM | AA | 0400 | CLT | BOS |
| 06/02/2017 | 02:50 PM | AA | 147 | BOS | LAX |
| 06/04/2017 | 04:00 PM | AA | 5119 | MYR | CLT |
| 06/04/2017 | 06:29 PM | AA | 1806 | CLT | BOS |
| 06/06/2017 | 09:00 AM | VX | 363 | BOS | LAX |
| 06/08/2017 | 08:20 AM | AA | 146 | LAX | BOS |
| 06/11/2017 | 07:04 PM | UA | 2047 | BOS | EWR |
| 06/12/2017 | 07:21 AM | UA | 1001 | BOS | EWR |
| 06/20/2017 | 09:00 AM | VX | 363 | BOS | LAX |
| 07/13/2017 | 09:00 AM | VX | 363 | BOS | LAX |
| 07/17/2017 | 11:20 AM | AS | 1365 | BOS | LAX |
| 07/19/2017 | 10:40 PM | AA | 2507 | LAX | BOS |
| 07/28/2017 | 05:45 PM | VX | 367 | BOS | LAX |
| 07/29/2017 | 09:10 PM | B6 | 687 | BOS | LAX |
| 08/01/2017 | 04:06 PM | AA | 1360 | LAX | BOS |
| 09/01/2017 | 05:50 PM | VX | 367 | BOS | LAX |
| 09/21/2017 | 12:35 PM | AA | 333 | BOS | LAX |
| 09/24/2017 | 08:20 AM | AA | 146 | LAX | BOS |

34

| 10/25/2017 | 08:58 PM | B6 | 1583 | BOS | RDU |
|---|---|---|---|---|---|
| 10/28/2017 | 07:06 PM | B6 | 0184 | RDU | BOS |
| 10/29/2017 | 11:50 AM | DL | 6254 | RDU | BOS |
| 12/05/2017 | 12:00 PM | B6 | 2783 | BOS | RDU |
| 01/03/2018 | 11:08 AM | B6 | 2783 | BOS | RDU |
| 01/12/2018 | 10:56 AM | B6 | 2127 | BOS | BWI |
| 01/14/2018 | 07:36 PM | B6 | 1326 | BWI | BOS |
| 01/27/2018 | 09:12 PM | B6 | 1583 | BOS | RDU |
| 01/28/2018 | 07:55 PM | DL | 0923 | RDU | BOS |
| 03/17/2018 | 09:02 PM | B6 | 1583 | BOS | RDU |
| 03/24/2018 | 09:02 PM | B6 | 1583 | BOS | RDU |
| 05/20/2018 | 09:54 AM | B6 | 1383 | BOS | RDU |
| 06/10/2018 | 03:09 PM | DL | 5231 | BOS | JFK |
| 06/18/2018 | 09:05 AM | AS | 1363 | BOS | LAX |
| 06/22/2018 | 09:25 PM | DL | 1162 | LAX | JFK |
| 07/14/2018 | 09:05 PM | B6 | 1583 | BOS | RDU |
| 07/30/2018 | 02:35 PM | DL | 1126 | BOS | RDU |
| 08/01/2018 | 03:26 PM | B6 | 0984 | RDU | BOS |
| 08/08/2018 | 06:42 PM | B6 | 815 | BOS | BUF |
| 08/08/2018 | 12:21 PM | B6 | 1216 | BUF | BOS |
| 08/12/2018 | 05:30 AM | DL | 2079 | BOS | DTW |
| 08/12/2018 | 08:20 AM | DL | 1622 | DTW | LAS |
| 09/15/2018 | 10:30 AM | B6 | 0977 | BOS | LAS |
| 09/22/2018 | 07:40 AM | B6 | 2317 | BOS | JFK |
| 11/06/2018 | 07:10 AM | AS | 1351 | BOS | SFO |
| 11/16/2018 | 05:00 AM | AA | 794 | SFO | CLT |
| 11/16/2018 | 01:30 PM | AA | 471 | CLT | BOS |
| 11/17/2018 | 01:05 PM | AA | 6010 | SMF | LAX |
| 11/17/2018 | 03:38 PM | AA | 1628 | LAX | BOS |
| 01/09/2019 | 09:49 PM | DL | 1764 | LAX | BOS |
| 01/15/2019 | 07:45 AM | DL | 1707 | BOS | LAX |
| 01/23/2019 | 03:36 PM | AA | 1628 | LAX | BOS |
| 09/25/2019 | 06:20 AM | DL | 928 | BOS | JFK |
| 09/25/2019 | 08:35 AM | DL | 450 | JFK | STI |
| 10/01/2019 | 06:19 AM | DL | 312 | STI | JFK |
| 10/01/2019 | 12:30 PM | DL | 5884 | JFK | BOS |
| 11/19/2019 | 05:45 AM | DL | 2552 | BOS | ATL |
| 11/19/2019 | 10:07 AM | DL | 0900 | ATL | SJO |

| 11/23/2019 | 11:49 PM | AA | 288 | SJO | JFK |
| 11/24/2019 | 09:25 AM | AA | 1140 | JFK | BOS |

91.     The airport codes correspond to the following locations:

| Code | Location |
| --- | --- |
| BOS | Boston, MA |
| LAX | Los Angeles, CA |
| RDU | North Carolina |
| DFW | Texas |
| RIC | Richmond Int'l, VA |
| CLT | North Carolina |
| ORD | Chicago, Il |
| HNL | Honolulu, HI |
| EWR | Newark, NJ |
| MYR | South Carolina |
| BWI | Baltimore, MD |
| BUF | Buffalo, NY |
| DTW | Detroit, MI |
| SFO | San Francisco, CA |
| SMF | Sacramento, CA |
| JFK | NY, NY |
| STI | Dominican Republic |
| ATL | Atlanta, GA |
| SJO | San Jose, CA |
| LGA | NY, NY |
| LAS | Las Vegas, NV |

92.     During 2019, MUBARAK traveled twice to Los Angeles in January, Santiago, Dominican Republic in September/October, and San Jose, Costa Rica in November.   It is my belief that these records demonstrate extensive airline travel, which is inconsistent with the income MUBARAK reported in The Batch Yard lease documents.   I believe that MUBARAK launders his illegal proceeds from his drug trafficking activity through his extensive travel, and as exemplified by the incident involving GRAY, transports bulk cash derived from drug trafficking between locations.

36

93.     Further, the records indicate that MUBARAK traveled from Boston to Los Angeles on January 23, 2017 - the same day that DEA Agents stopped Vito GRAY and Niesha WALLACE in Boston Logan International Airport with approximately $50,000 of MUBARAK's illegal drug proceeds as they attempted to board a flight to Los Angeles.

       **B.     MUBARAK's Citizens Bank Accounts**

94.     I have reviewed records of MUBARAK's Citizens Bank accounts: a checking account ending in 0924, and a savings account ending in 7504, which were opened on January 10, 2019. The records pertained to the period of January 10, 2019, through February 6, 2020.   The accounts were opened in MUBARAK's name and he is the sole signatory for the accounts.

95.     Review of the statements reveals that the 0924 account received no direct deposits from any employer, and eight (8) checks from KO Stone totaling approximately $5,916.49 deposited. The account also revealed numerous transfers to/from the account ending in 7504.

96.     Review of the statements reveals that the 7504 account received no direct deposits from any employer, and twenty-two (22) checks from KO Stone totaling approximately $17,254 deposited.

97.     Review of the records of the checking account ending in 0924 and savings account ending in 7504, for the period of January 10, 2019, through February 6, 2020 revealed the following:

    a.     MUBARAK deposited 30 checks from KO Stone, Inc. into the two accounts totaling approximately $23,170.

    b.     During the period of 1/10/19 through 2/6/20, 43 checks were deposited into the two Citizens Bank accounts totaling approximately $33,739.

    c.     The checking account ending in 0924 received 60 cash deposits totaling approximately $68,622.

    d.     The savings account ending in 7504 received 8 cash deposits totaling approximately $12,212.

e.   Combined, the checking account ending in 0924 and the savings account ending in 7504 received approximately $80,434 in cash deposits.

98.   The checking account ending in 0924 had the following deposits and withdrawals:

| Period | Deposits | Withdrawals |
|---|---|---|
| 1/10/19 to 2/6/19 | 14,981.02 | 13,393.02 |
| 2/7/19 to 3/6/19 | 18,767.14 | 14,180.54 |
| 3/7/19 to 4/4/19 | 9,840 | 13,946 |
| 4/5/19 to 5/6/19 | 6,497.89 | 8,115.05 |
| 5/7/19 to 6/6/19 | 10971.5 | 10722.28 |
| 7/6/19 to 8/6/19 | 6,163.75 | 7,723.07 |
| 8/7/19 to 9/6/19 | 6,599.19 | 6,245.46 |
| 9/7/19 to 10/4/19 | 3,747.92 | 3,302 |
| 10/5/19 to 11/6/19 | 4,786.11 | 4754.72 |
| 11/7/19 to 12/5/19 | 2354.29 | 3087.81 |
| 12/6/19 to 1/7/20 | 10,424.37 | 10,227.14 |
| 1/8/20 to 2/6/20 | 2,720.00 | 2,932.64 |
| Total Approximate $ | $97,853.18 | $98,629.73 |

99.   The checking account ending in 0924 had the following deposits

| Date | Amount | Note | Type / Check | Cash Deposited |
|---|---|---|---|---|
| 1/10/2019 | 2,000.00 | Deposit | Cash Deposit | 2,000.00 |
| 1/10/2019 | 1,800.00 | Deposit | Cash Deposit | 1,800.00 |
| 1/24/2019 | 9,000.00 | Deposit | Cash Deposit | 9,000.00 |
| 1/25/2019 | 340.00 | ATM Deposit - Mz3248 Citizens Morrissey Blvd, Dorchester | Cash Deposit | 340.00 |
| 1/31/2019 | 200.00 | ATM Deposit - Mz3519 Citizens Brigham Circle, Boston MA | Cash Deposit | 200.00 |
| 2/5/2019 | 1,000.00 | ATM Deposit - Mz3586 Citizens Codman Sq., Dorchester MA | Cash Deposit | 1,000.00 |
| 2/5/2019 | 600.00 | ATM Deposit - Mz3586 Citizens Codman Sq., Dorchester MA | Cash Deposit | 600.00 |

| 2/13/2019 | 500.00 | ATM Deposit - Mz3843 Newton Highlands 1, Newton MA | Cash Deposit | 500.00 |
|---|---|---|---|---|
| 2/19/2019 | 920.00 | ATM Deposit - Mz3519 Citizens Brigham Circle, Boston MA | Cash Deposit | 920.00 |
| 2/20/2019 | 1,402.00 | Deposit | Cash Deposit | 1,402.00 |
| 2/20/2019 | 820.00 | ATM Deposit - Mz3248 Citizens Morrissey Blvd, Dorchester | Cash Deposit | 820.00 |
| 2/25/2019 | 2,580.00 | Deposit | Cash Deposit | 2,580.00 |
| 2/25/2019 | 1,740.00 | Deposit | Cash Deposit | 1,740.00 |
| 2/25/2019 | 540.00 | ATM Deposit - Mz3665 Citizens Morrisey Blvd 3, Dorchester | Cash Deposit | 540.00 |
| 2/25/2019 | 300.00 | ATM Deposit - Mz3665 Citizens Morrisey Blvd 3, Dorchester | Cash Deposit | 300.00 |
| 3/4/2019 | 4,000.00 | Deposit | Cash Deposit | 4,000.00 |
| 3/6/2019 | 1,000.00 | Deposit | Cash Deposit | 1,000.00 |
| 3/6/2019 | 1,000.00 | Deposit | Cash Deposit | 1,000.00 |
| 3/11/2019 | 600.00 | Deposit | Jordan's Furniture Check | 0 |
| 3/13/2019 | 500.00 | Deposit | Cash Deposit | 500.00 |
| 3/13/2019 | 440.00 | ATM Deposit - Mz3586 Citizens Codman Sq., Dorchester MA | Cash Deposit | 440.00 |
| 3/19/2019 | 1,000.00 | Deposit | Cash Deposit | 1,000.00 |
| 3/26/2019 | 2,700.00 | Deposit | Cash Deposit | 2,700.00 |
| 3/28/2019 | 2,600.00 | Deposit | Cash Deposit | 2,600.00 |
| 4/3/2019 | 1,000.00 | ATM Deposit - Mz3635 Uphams Corner 1, Dorchester MA | Cash Deposit | 1,000.00 |
| 4/3/2019 | 1,000.00 | ATM Deposit - Mz3635 Uphams Corner 1, Dorchester MA | Cash Deposit | 1,000.00 |
| 4/9/2019 | 880.00 | ATM Deposit - Mz3776 Stop & Shop Mass Avenue 3, Dorches | Cash Deposit | 880.00 |

| 4/15/2019 | 400.00 | ATM Deposit - Mz3439 Citizens Fields Corner, Dorchester | Cash Deposit | 400.00 |
|---|---|---|---|---|
| 4/23/2019 | 1,000.00 | Deposit | Cash Deposit | 1,000.00 |
| 5/8/2019 | 1,690.00 | Deposit | Cash Deposit | 1,690.00 |
| 5/20/2019 | 500.00 | Deposit | Cash Deposit | 500.00 |
| 6/3/2019 | 3,804.00 | Deposit | Cash Deposit | 3,804.00 |
| 7/29/2019 | 104.52 | Deposit | Partial Deposit of KO Stone Check | 0 |
| 7/29/2019 | 0.58 | Deposit | Cash Deposit | .58 |
| 7/31/2019 | 1,000.00 | Deposit | Cash Deposit | 1,000.00 |
| 8/5/2019 | 200.00 | Deposit | Partial Deposit of KO Stone Check | 0 |
| 8/9/2019 | 400.00 | Deposit | Partial Deposit of KO Stone Check and SOS Corp Check | 0 |
| 8/21/2019 | 692.01 | ATM Deposit - Mz3595 Stop & Shop Everett, Everett MA | KO Stone Check | 0 |
| 8/21/2019 | 400.00 | ATM Deposit - Mz3595 Stop & Shop Everett, Everett MA | Cash Deposit | 400.00 |
| 9/4/2019 | 980.00 | ATM Deposit - Mz3515 Malden Center, Malden MA | Cash Deposit | 980.00 |
| 9/4/2019 | 20.00 | ATM Deposit - Mz3515 Malden Center, Malden MA | Cash Deposit | 20.00 |
| 9/17/2019 | 295.00 | ATM Deposit - Mz3595 Stop & Shop Everett, Everett MA | Cash Deposit | 295.00 |
| 9/23/2019 | 471.72 | ATM Deposit - Mz3586 Citizens Codman Sq, Dorchester MA | KO Stone Check | 0 |
| 9/23/2019 | 282.00 | ATM Deposit - Mz3586 Citizens Codman Sq, Dorchester MA | Cash Deposit | 282.00 |
| 10/4/2019 | 911.65 | Deposit | KO Stone Check | 0 |
| 10/16/2019 | 320.00 | ATM Deposit - Mz3595 Stop & Shop Everett, Everett MA | Cash Deposit | 320.00 |
| 10/17/2019 | 300.00 | ATM Deposit - Mz3636 Uphams Corner 2, Dorchester MA | Cash Deposit | 300.00 |
| 10/18/2019 | 1,770.00 | Deposit | Cash Deposit | 1,770.00 |

| | | | | |
|---|---|---|---|---|
| 10/21/2019 | 300.00 | ATM Deposit - Mz3595 Stop & Shop Everett, Everett MA | Cash Deposit | 300.00 |
| 10/31/2019 | 705.00 | ATM Deposit - Mz3595 Stop & Shop Everett, Everett MA | Cash Deposit | 705.00 |
| 11/4/2019 | 1,118.83 | Deposit | KO Stone Check, and $500 cash | 0 |
| 11/18/2019 | 500.00 | ATM Deposit - Mz3209 Citizens Winter Hill 3, Somerville | Cash Deposit | 500.00 |
| 11/19/2019 | 800.00 | ATM Deposit - Mz3439 Citizens Fields Corner, Dorchester | Cash Deposit | 800.00 |
| 12/3/2019 | 700.00 | Deposit | Cash Deposit | 700.00 |
| 12/9/2019 | 1,182.49 | Deposit | KO Stone Check, and $934 cash | 934.00 |
| 12/11/2019 | 860.00 | ATM Deposit - Mz3672 Citizens Fields Corner 2, Dorchester | Cash Deposit | 860.00 |
| 12/13/2019 | 600.00 | Deposit | Cash Deposit | 600.00 |
| 12/31/2019 | 3,020.00 | Deposit | Cash Deposit | 3,020.00 |
| 12/31/2019 | 1,080.00 | ATM Deposit - Mz3891 Stop & Shop Everett, Everett MA | Cash Deposit | 1,080.00 |
| 12/31/2019 | 900.00 | ATM Deposit - Mz3891 Stop & Shop Everett, Everett MA | Cash Deposit | 900.00 |
| 12/31/2019 | 200.00 | ATM Deposit - Mz3852 Citizens Codman Square, Dorchester | Cash Deposit | 200.00 |
| 1/2/2020 | 300.00 | Deposit | Cash Deposit | 300.00 |
| 1/6/2020 | 1,000.00 | ATM Deposit - Mz3551 Stop & Shop Mlden Charles, Malden | Cash Deposit | 1,000.00 |
| 1/6/2020 | 980.00 | ATM Deposit - Mz3551 Stop & Shop Mlden Charles, Malden | Cash Deposit | 980.00 |
| 1/7/2020 | 203.38 | ATM Deposit - Mz3891 Stop & Shop Everett, Everett MA | Prime Auto Group Check | 0 |
| 1/10/2020 | 640.00 | ATM Deposit - Mz3891 Stop & Shop Everett, Everett MA | Cash Deposit | 640.00 |
| 1/23/2020 | 600.00 | ATM Deposit - Mz3219 Tewksbury 1, Tewksbury MA | Cash Deposit | 600.00 |
| 1/24/2020 | 680.00 | ATM Deposit - Mz3891 Stop & Shop Everett, Everett MA | Cash Deposit | 680.00 |

| | | | | |
|---|---|---|---|---|
| 1/29/2020 | 500.00 | ATM Deposit - Mz3885 Citizens Codman Sq 3, Dorchester M | Cash Deposit | 500.00 |
| 1/31/2020 | 300.00 | Deposit | Cash Deposit | 300.00 |

100.    The savings account ending in 7504 had the following deposits and withdrawals

| Period | Deposits | Withdrawals |
|---|---|---|
| 1/10/19 to 3/31/19 | 5343.21 | 43.02 |
| 4/1/19 to 6/30/19 | 23,094.28 | 18979.14 |
| 7/1/19 to 9/30/19 | 10204.74 | 18978.55 |
| 10/1/19 to 12/31/19 | 0 | 641.69 |
| Total Approximate $ | $38,642 | $38,642 |

101.    As can be seen from the chart of deposits into the account ending in 0924 listed above, MUBARAK made numerous cash deposits at ATMs located in Everett, MA and Malden, MA. Use of these ATMS is consistent with MUBARAK's continuing residence and storage of funds and cash at Target Location 1.   The Everett and Malden ATMs are less than 2 miles from Target Location 1.   Additionally, the amount of cash deposited in both accounts exceeded $80,400 in approximately 12 months.   This amount of cash is in addition to the money represented in checks from KO Stone, and other payors (which total $33,739).

102.    Also significant is the fact that the amounts of cash deposited in each transaction do not exceed a couple hundred for ATM transactions, and a few thousand during each branch deposit. I believe the pattern of the deposits is consistent with MUBARAK structuring the cash deposits into the accounts to not generate suspicion due to large cash amounts being transacted, and to avoid the requirement of a currency transaction report being filed for transactions in amounts exceeding $10,000.

103.    The cash deposits are also placed into accounts which receive checks payable to MUBARAK from apparently legitimate enterprises.   I believe this pattern of transaction activity

is consistent with layering the deposits of illicit cash into an account alongside seemingly legitimate check deposit transactions.  Through this pattern, the illicit transactions are covered and disguised by purportedly legitimate funds and are comingled.   As a result, identifying the true source of income being cash is made more difficult, requiring a detailed review of bank records to determine the funds are actually originating in substantial part from numerous small cash deposits.

104.    Also, the bank records reveal that MUBARAK maintains an extremely low balance in the accounts depositing an amount that is quickly spent, without carrying large balances over.   This activity is consistent with an individual fearing potential seizure of the funds by law enforcement.

105.    Based upon my review of the bank records, I believe that the account activity is consistent with MUBARAK continuing to launder the proceeds of his drug trafficking conspiracy. I also believe that this recent bank activity signifies that MUBARAK is continuing to traffick in controlled substances, and must continue to launder his illicit income, disguising its true nature and source in order to spend the proceeds without attracting attention of law enforcement.

### C.    Evidence of Mubarak's residence at Target Location 1

106.    Based on surveillance observations, business records and the investigation to date, I believe MUBARAK resides at Target Location 1 and uses the location to conduct money laundering activity and store evidence of money laundering and drug trafficking.   25 Charlton Street, apartment C-701, Everett, MA is a 7th floor apartment of The Batch Yard apartment buildings. The 7th floor is accessible by elevator and by the interior stairwell.   The exterior door to apartment C-701 is white and contains a silver door handle and locking mechanism on the left-hand side. The apartment is clearly marked "701" by a sign on the wall to left of the door.

107.    Since December 2019, law enforcement officers have conducted surveillance of MUBARAK at Target Location 1.   The surveillance has revealed that MUBARAK sleeps at the

Target Location on most nights.  Investigators have observed two motorcycles (MA license plates: 2C7906 and 2D3682) registered to MUBARAK parked within the parking garage at Target Location 1.  More recently, investigators have observed two winter motorcycle covers on the ground in the parking spot where investigators have previously observed the motorcycles. Investigators have further observed a black 2020 GMC Sierra, MA license plate: 1AND87, parked within the parking garage on numerous occasions within the last 30 days.

108.    According to business records obtained from The Batch Yard apartments, on February 9, 2020, MUBARAK signed a one-year lease renewal for 25 Charlton Street, C-701, Everett, MA. According to the lease agreement, MUBARAK paid a security deposit of $2,567.00 and agreed to a monthly rent of $2,617.00 with a monthly parking fee of $300.00.   The lease agreement indicates that the lease term is to conclude on February 27, 2021.   Further, since the lease agreement, The Batch Yard has issued MUBARAK three separate "Smoking Violation" notices (June 6, 2019, July 27, 2019, and December 4, 2019), demonstrating his continuing occupancy of the apartment.

109.    Based on the surveillance observations, the leasing documentation, and my knowledge of the investigation, I believe that MUBARAK resides at Target Location 1 and stores personal belongings and paperwork, including evidence of drug trafficking activity and money laundering, at Target Location 1.

### D.    Evidence of MUBARAK's residence at Target Location 2

110.    Based on surveillance observations, public records, and the investigation to date, I believe MUBARAK's uses Target Location 2 as a secondary residence and it will contain evidence of money laundering and drug trafficking.   The premises of 11 Garden Road, Lowell, MA is a single-family home with gray siding and white trim. The premises of 11 Garden Road contain a detached

44

garage to the left-hand side when facing the home, which is to be included in the search.   The home is marked "11" on the white trim above the stairs to the front porch.

111.   Since 2017, law enforcement officers have conducted surveillance of MUBARAK at Target Location 2.   During 2017 and through March 2018, MUBARAK slept at Target Location 2 on most nights as investigators consistently observed MUBARAK and/or his black 2016 Toyota Tundra, MA license plate: 736FZ1 at Target Location 2 overnight.   Since December 2019, investigators have conducted surveillance of Target Location 2 and observed MUBARAK and/or his black 2020 GMC Sierra at Target Location 2 on several occasions overnight.   During July 2020, investigators have observed MUBARAK and/or his black 2020 GMC Sierra at Target Location 2 on at least seven occasions, including in the early morning hours.   Investigators observed MUBARAK come and go from Target Location 2 including when the home owner, DJWAN SCOTT, was not present at Target Location 2.

112.   According to public records, Target Location 2 was purchased by DJWAN SCOTT, date of birth: XX/XX/1976, in June 2013 for $415,000.00 with a loan amount of $373,500.00.   The investigation into the MUBARAK DTO has revealed that SCOTT is one of MUBARAK's long-time female associates.   In January 2020, investigators observed a white 2018 Mercedes E300, MA license plate: 3JN684 at Target Location 2.   According to the MA Registry of Motor Vehicles, the vehicle is registered to SCOTT at Target Location 2.

113.   Based on the surveillance observations since 2017, including the recent observations of MUBARAK at Target Location 2, I believe that MUBARAK is maintaining Target Location 2 as a secondary residence and continues to store personal belongings and paperwork at Target Location 2.

### E.    Continuing Activity of MUBARAK DTO

114.    Investigators reviewed telephone records for the telephone number MUBARAK provided on The Batch Yard leasing application (339-987-9161) for the period between January 1, 2020 and July 5, 2020.   The telephone records indicate that MUBARAK is in frequent contact with several individuals involved in drug trafficking.

115.    Notably, MUBARAK was in contact with Lance GERALD, date of birth: XX/XX/1987, also known as "Loc" or "Loco", at a telephone number ending in 0451[8], 279 times over the approximately seven-month period.   Within the past six months, I have received information from a Confidential Informant[9] ("CI-1") that GERALD is a long-time and trusted associate of MUBARAK and engages in drug trafficking with MUBARAK.

116.    A check of the MA Probation and Interstate Identification Index indicates GERALD has a criminal history including convictions for affray (2017), disturbing the peace (2017), resisting arrest (2014, 2017), assault and battery with a dangerous weapon (2017), assault and battery on a police officer (2007, 2017), distribution of a class B controlled substance (2007), school zone violation (2007), possession with intent to distribute a class B controlled substance (2007), distribution of a class D controlled substance (2007), possession of a firearm (2006), possession of ammunition (2006), and escape from a penal institution (2006).

---

[8] According to Thomson Reuters CLEAR, telephone number ending in 0451 is subscribed to by Lance GERALD, of Roxbury, MA.

[9] CI-1 has been cooperating with law enforcement since 2015.   I know CI-1's identity.   CI-1 has a criminal history containing arrests and/or convictions for firearms offenses, drug offenses, larceny offenses, assault and battery, and motor vehicle offenses.   CI-1 has been providing information concerning the criminal activities of numerous Boston-area gang members and drug traffickers.   The information concerning many of the gang members and drug traffickers provided by CI-1 has been independently verified by law enforcement.   I consider the information provided by CI-1 to be reliable.   CI-1 has received financial assistance in connection with his/her cooperation in this case and has received consideration on criminal charges.

117.    Additionally, GERALD was arrested on March 13, 2020 following an investigation by the Boston Police Department (I#202020180).   This case is currently pending in Roxbury District Court.

118.    On March 13, 2020, Boston Police Department officers observed GERALD, who was driving a silver Mercedes with MA license plates, conduct a suspected street-level drug transaction with Deshawn AARON in the area of Fairland Street and Moreland Street.   Officers observed AARON depart the area in a gray BMW sedan.   GERALD remained in the area.   Officers subsequently approached and questioned GERALD about their observations.   Following a physical struggle, officers conducted a search of GERALD and recovered four plastic bags containing suspected crack cocaine and a plastic bag containing suspected Percocet pills.   Officers conducted a search of GERALD's motor vehicle and recovered two large heat-sealed bags of marijuana.   As a result of the incident, GERALD was charged with assault and battery on a police officer, resisting arrest, distribution of a class D controlled substance (marijuana), possession with intent to distribute a class D controlled substance (marijuana), trafficking crack cocaine (approximately 29 grams), and possession with intent to distribute a class B controlled substance (Percocet).

119.    Officers also conducted a motor vehicle stop of the gray BMW driven by AARON. AARON told officers that he had just purchased marijuana for $30 from his friend, "Loc". Officers conducted a search and located a quantity of marijuana in AARON's right sock. AARON was thereafter released without incident.

120.    Additionally, MUBARAK was in contact with Christopher CHRISTIE, date of birth:

XX/XX/1981, at telephone number ending in 7985[10], 442 times over the approximately seven-month period.

121.    A check of the MA Probation and Interstate Identification Index indicates CHRISTIE has a criminal history including convictions for distribution of a class B controlled substance (2001, 2002, 2003, 2016), theft by deception (New Hampshire - 2012), transporting drugs in a motor vehicle (New Hampshire – 2012), possession with intent to distribute a class B controlled substance (2003), operating a motor vehicle with a suspended license (2003), assault and battery (2003), and disorderly conduct (2001).

122.    Additionally, CHRISTIE was arrested on January 16, 2020 following an investigation by the Boston Police Department (I#202004333).   The case is currently pending in Boston Municipal Court.

123.    On January 16, 2020, Boston Police Department officers observed CHRISTIE, who was in the driver's seat of a black BMW with Georgia license plates, conduct a street-level drug transaction with Marcel BELL in the area of Cumberland Street and Huntington Avenue in Boston. Following these observations, officers interacted with BELL and ultimately recovered a plastic bag containing suspected crack cocaine from BELL's pants' pocket.   Post-Miranda, BELL told officers that he bought the crack cocaine for $45 on the corner of Cumberland Street and Huntington Avenue from "C.C.", who was driving a dark car.   This description of events matched the observations of the officers.

124.    Officer then conducted a motor vehicle stop of the black BMW and identified CHRISTIE as the operator.   Officers placed CHRISTIE under arrest and seized $2,157 from CHRISTIE

---

[10]  According to Experian, the Insurance Services Office, and Thomson Reuters CLEAR, telephone number ending in 7985 is subscribed to by Christopher CHRISTIE, of Saugus, MA.

during booking.   CHRISTIE was charged with distribution of a class B controlled substance –
subsequent offense.

125.    I believe, based on the information provided by CI-1 regarding GERALD's association
with MUBARAK and his DTO, GERALD's and CHRISTIE's extensive criminal histories, to
include prior convictions for drug trafficking offenses, the recent and frequent contact between
GERALD/CHRISTIE and MUBARAK, and the investigation overall, that the telephone records
demonstrate that MUBARAK continues to engage in drug trafficking activity and money
laundering.

## V.    BASIS TO BELIEVE THAT TARGET LOCATIONS CONTAIN EVIDENCE OF TARGET OFFENSES

126.    Based on evidence gathered through physical surveillance, a review of bank records, flight
records and residential records, and my analysis of consensually recorded telephone calls,
meetings and controlled purchases in which MUBARAK and his associates negotiated,
coordinated, and carried out drug deals and discussed the laundering of illegal proceeds of drug
trafficking, I believe that Mujab MUBARAK and his co-conspirators maintain ledgers and
documents to record the drug trafficking activities, including customers, product sold, product
purchased, payments made to suppliers and couriers, and other information.   I further believe
based on my analysis of MUBARAK's bank accounts and financial records, that MUBARAK
maintains documents to record proceeds from his drug trafficking activities and documents that
reflect how he laundered or stored the drug proceeds.

127.    Because MUBARAK uses Target Location 1 and Target Location 2 as his primary
residences, and due to his statements during consensually recorded meetings wherein he discusses
the importance of securing his drug supply and evidence of his illegal activity, as described above,

49

I believe there is probable cause that all of the items in the below paragraph and in Attachment B

(attached hereto and incorporated herein) will be found in the Target Locations.

    a.     In addition, based upon my training, experience, and the training and experience of other agents with whom I have worked and spoken, I know that: Drug traffickers often possess and store firearms in their residences in order to protect themselves, their supplies of drugs, and/or drug proceeds;

    b.     Narcotics traffickers must maintain, on hand, large amounts of U.S. currency in order to maintain and finance their on-going narcotics business;

    c.     It is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.  That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them and maintained even after the drugs are sold and/or used.

    d.     It is common for drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses, and/or other locations which they maintain dominion and control over for ready access and to conceal these items from law enforcement authorities;

    e.     Narcotics traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates or business entities to avoid detection of the assets by government agencies;

    f.     Even though these assets are in the names of others, the narcotics traffickers actually own and continue to use these assets, and exercise dominion and control over them;

    g.     It is common for persons involved in narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers.  These items are maintained by the narcotics traffickers within their residences, businesses or other locations which they maintain dominion and control over;

    h.     Narcotics traffickers often utilize electronic equipment such as computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, records and/or store the

information described above.   I have also encountered beepers, cell phones, smart phones, billing records pertaining to beeper accounts and cell phone accounts, telephones, and ledgers containing beeper code numbers, customers and stash locations, all of which facilitate drug distribution;

i.    When drug traffickers amass significant proceeds from the sale of drugs, they attempt to legitimize these profits through money laundering activities.   To accomplish these goals, drug traffickers utilize, among other mechanisms, domestic and international banks and their attendant accounts, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency.   Traffickers often co-mingle narcotics proceeds with money generated from legitimate businesses;

j.    Narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies.   In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government.   The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms.   Retained copies of these returns are commonly kept by the traffickers in their residences and businesses;

k.    Traffickers commonly maintain books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

l.    Traffickers take or cause to be taken photographs of themselves, their associates, and their property, and that these traffickers usually maintain these photographs in their possession;

m.    Individuals involved in drug trafficking use various tools, instruments, materials and other paraphernalia to facilitate their trafficking, including weighing the drugs, packaging the drugs, and cutting the drugs.   These types of materials include, but are not limited to: scales, cutting materials, and packaging materials.   These types of materials are often maintained at locations associated with drug traffickers even after drugs are sold or used.

128.   Based on this training and experience, my analysis of consensually recorded telephone calls, meetings, and controlled purchases, and drugs seized from co-conspirators who have been involved in drug trafficking with Mujab MUBARAK and the co-conspirators, I believe that drug proceeds, documents, and other evidence of drug trafficking and money laundering will be found at Target Location 1 and Target Location 2.

## VI.    CELL PHONES AND COMPUTER DEVICES

129.    Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.   Based on my training and experience, I know that many cellular telephones have the capabilities described above.

130.    Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.   Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.   Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

131.    Seizure of cellular phones containing this information that are being used by MUBARAK

52

will provide information and evidence relating to the TARGET OFFENSES, coconspirators and accomplices. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who engage in the TARGET OFFENSES typically use cellular telephones to communicate with each other, the suppliers of controlled substances and firearms, their customers, and with other coconspirators, and that they communicate both via voice calls and via email and/or text messaging. I also know that persons who illegally deal in firearms and narcotics, and commit acts of violence regularly keep records of their illegal activities and the coordination of their illegal activity. These records can include, but are not limited to, contact lists of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific descriptions of firearms, controlled substances and ammunition to be obtained for specific customers, and communications between persons coordinating the commission of violent acts.

132.    Individuals engaged in illegal firearms activities often take photographs of the firearms and transmit those photographs to their coconspirators and customers, and negotiate prices and availability of certain types of firearms with sources of supply and customers. Records of firearms and narcotics trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone. From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on cellular telephones.

133.    From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers and cellular phones to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing

pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

134.    Additionally, I know that members of racketeering conspiracies, and dealers in controlled substances and firearms often use cellular telephones in order to communicate quickly and economically with their coconspirators, suppliers and customers via the internet. I am also aware that individuals frequently use cellular telephones and computers to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to dealing in controlled substances and illegal firearms trafficking, including amounts, prices, makes, models, prices, caliber and other related information; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where conspirators met, and acts were taken in furtherance of the TARGET OFFENSES.

135.    Based upon my training and experience, and information provided to me by others involved in the forensic examination of cellular telephones, I know that electronic data on cellular telephones and computers can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone or computer; within volatile memory, such as RAM; or on removable media, such as memory cards.

136.    Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet.   This is true because:

a.  Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b.  Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.  Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.  Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images

55

and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls

within the scope of the warrant.

    i.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

137.    Based on my knowledge and training and the experience of other agents with whom I have spoken,  I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized.   This is true because of:

    a.    The volume of evidence: storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information.   Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.   Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.   This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on site.

    b.    Technical requirements: analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.   The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.   Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files.   Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.   Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or

seize the computer equipment for subsequent processing elsewhere.

138.    The TARGET LOCATIONS may contain computer equipment whose use in the TARGET OFFENSES or storage of the things described in Attachment B to the requested warrants is impractical to determine at the scene.   Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge.   In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant.   If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

139.    The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B.   If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

## VII. PRECISION LOCATION INFORMATION AND CELL SITE SIMULATOR

140.    Over the course of the investigation, and in an effort to locate and arrest MUBARAK on the criminal complaint for which I am currently applying, investigators have identified MUBARAK's cellular phone number.    In January 2020, investigators received business records from Bozzuto Management Company, doing business as The Batch Yard, an apartment complex in Everett, MA.   The records include a lease agreement wherein MUBARAK leased apartment C-701 through February 2021.   MUBARAK listed cellular telephone number 339-987-9161 as

his telephone number on the lease application.   I have queried records for the Target Mobile Phone and believe it to be serviced by VERIZON**,** a company that accepts process at process at 180 Washington Valley Road, Bedminster, New Jersey 07921 or by fax to 1-888-667-0026.

141.   Based on my training and experience, I believe the Target Mobile Phone likely belongs to MUBARAK as it was listed by him on the lease agreement as his telephone number.   I have confirmed with an employee of The Batch Yard that MUBARAK has been reached at the Target Mobile Phone.

142.   Furthermore, MUBARAK has been observed on multiple occasions by law enforcement in MA and is believed to reside in MA.

143.   For the reasons listed above, I believe the Target Mobile Phone is being utilized by the MUBARAK in the District of MA.   I also believe that the requested historical and prospective information associated with the Target Mobile Phone will greatly assist the FBI in effecting the arrest of MUBARAK.   Specifically, the requested historical records will enable the FBI to identify patterns of life for MUBARAK.   These patterns of life will include general areas where he frequents and his frequent contacts, both of which will assist in locating him for the purpose of effecting his arrest.   Additionally, the prospective GPS "pings" and prospective Pen Register / Trap and Trace devices with cell site information will assist the FBI by providing real-time location updates for the Target Mobile Phone and information regarding what phones are in contact with the Target Mobile Phone.   Both of these components will assist the FBI during the searches for MUBARAK – a Person to be Arrested.

144.   If the FBI is unable to locate the Target Mobile Phone based simply on the requested historical and prospective information, I believe the authority to utilize a CSS will drastically increase the chances of locating it and MUBARAK.   If the FBI is able to locate the Target Mobile

Phone without the use of a CSS, the device will not be utilized.

145.     Lastly, as soon as MUBARAK has been located and arrested, the FBI will immediately discontinue the use of the requested prospective information and the authority to utilize a CSS on the Target Mobile Phone.

146.     Based on my training and experience, and for all the reasons set forth herein, probable cause exists to believe that the location information described in Attachments C-1 and the investigative technique described in Attachments D-2 will enable the FBI to locate and arrest MUBARAK.

## VIII.   APPLICABLE CELLULAR TECHNOLOGY

147.     In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications.   When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication.   These signals include a cellular device's unique identifiers.

148.     I know that mobile phone providers have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the mobile phones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records.   E-911 Phase II data provides relatively precise location information about the mobile phone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.   Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the mobile telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone

connected.   These towers are often a half-mile or more apart, even in urban areas, and can be ten or more miles apart in rural areas.   Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.   Accordingly, cell-site data is typically less precise that E-911 Phase II data.

149.    To facilitate execution of the requested CSS warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the Target Mobile Phone or receiving signals from nearby cellular devices, including the Target Mobile Phone.   Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others.   The device may send a signal to the Target Mobile Phone and thereby prompt it to send signals that include the unique identifiers of the devices.   Law enforcement may monitor the signals broadcast by the Target Mobile Phone and use that information to determine the Target Mobiles Phones' location, even if they are located inside a house, apartment, or other building.

150.    The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity.   Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices.   In order to connect with the Target Mobile Phone, the device may briefly exchange signals with all phones or other cellular devices in its vicinity.   These signals may include cell phone identifiers.   The device will not complete a connection with cellular devices determined not to be one of the Target Mobile Phone, and law enforcement will limit collection of information from devices other than the Target Mobile Phone.   To the extent that any information from a cellular device other than the Target Mobile Phone is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the

Court, other than distinguishing the Target Mobile Phone from all other cellular devices.

151.    The execution of these warrants will not result in the seizure of any tangible property or any wire or electronic communication (as defined in 18 U.S.C. § 2510).   To the extent that the warrant authorizes the seizure of any stored wire or electronic information, that seizure is expressly authorized by 18 U.S.C. § 2703(c)(1)(A).

## VII.    AUTHORIZATION REQUEST

152.    Based on the foregoing, I believe there is probable cause to believe that the Target Mobile Phone is being utilized and possessed by Mujab MUBARAK.    Because of this, I further believe there is probable cause that the location information described in Attachments C-2 and the investigative technique described in Attachments D-2 will enable the FBI to locate and arrest him.

153.    I request that the Court issue the proposed search warrants, pursuant to Title 18 United States Code, Section 2703(c) and Federal Rule of Criminal Procedure 41.   The proposed CSS warrant also will function as a pen register order under 18 U.S.C. § 3123.

154.    I also request that the Court direct VERIZON to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachments B-1 unobtrusively and with a minimum of interference with services, including by initiating signals to determine the location of the Target Mobile Phone on their networks, and at such intervals and times as directed by the government.   The government will compensate VERIZON for reasonable expenses incurred in furnishing such facilities or assistance.

155.    I further request that, pursuant to the preclusion of notice provisions of 18 U.S.C. §§ 2703(b)(1)(A) & 2705(b), the Court order VERIZON not to notify any person (including the subscribers or customers to whom the materials relate) of the existence of this application, the warrant, or the execution of the warrant, for the earlier of one year from the date of the Court's

Order or upon notice by the government within 30 days of the conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b).   The electronic service providers may disclose this Order to an attorney for the purpose of receiving legal advice.   Non-disclosure is appropriate in this case because the Court's Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the existence of the investigation.   There is accordingly reason to believe that notification of the existence of the Order will seriously jeopardize the investigation, including by giving targets an opportunity to flee, continue flight from prosecution, and/or intimidate potential witnesses.   *See* 18 U.S.C. § 2705(b).

156.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant authorizing the use of a CSS to delay notice until 30 days from the end of the period of authorized surveillance.   This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.   Providing immediate notice to the subscribers or users of the Target Mobile Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to change patterns of behavior, notify confederates, and/or flee from prosecution.   *See* 18 U.S.C. § 3103a(b)(1).   There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

157.    I further request that the Court authorize execution of the warrants at any time of day or night, owing to the potential need to locate the Target Mobile Phone outside of daytime hours.

158.    I further request that the Court order that all papers in support of these applications, including the affidavit and the search warrants, be sealed until further order of the Court, except

that the government may produce them in criminal discovery and provide the precise location data search warrant to the electronic service providers.   These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

159.    A search warrant may not be legally necessary to compel the investigative technique described in Attachments D-2.   Nevertheless, I submit this warrant application out of an abundance of caution.

## CONCLUSION

160.    Based on all of the foregoing, there is probable cause to believe that Mujab MUBARAK conspired to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841, 846, and used and possessed a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

161.    Based on all of the foregoing, there is probable cause to believe that the premises identified as Target Location 1 (more fully described in Attachment A-1), and that the premises identified as Target Location 2 (more fully described in Attachment A-2), will contain evidence of the TARGET OFFENSES, more fully described in Attachment B.

162.    Based on the foregoing, upon the issuance of the criminal complaint and warrant (Crim.

No. 20-MJ-5124) there is probable cause to believe that MUBARAK is a person to be arrested

within the meaning of Federal Rule of Criminal Procedure 41(c)(4), and the PLI and CSS for the

Target Mobile Phone will assist investigators in effectuating that arrest.


Signed electronically and sworn to via telephone in accordance with Federal Rule of Criminal

Procedure 4.1 on August 5, 2020.

> */s Timothy R. Kenny*
> TIMOTHY R. KENNY
> Special Agent
> Federal Bureau of Investigation

 Electronically subscribed and telephonically sworn to before me this 5th day of August, 2020.


> *Judith Gail Dein*
> HON. JUDITH G. DEIN
> UNITED STATES MAGISTRATE JUDGE