## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 20-CR-10300-ADB |
| MUJAB MUBARAK | |
| Defendant | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION TO REVOKE ORDER OF DETENTION

The United States of America, by and through its counsel of record, the United States

Attorney for the District of Massachusetts and Assistant United States Attorney Glenn A.

MacKinlay, and Philip Mallard, hereby opposes the Defendant Mujab Mubarak's (hereinafter the

"Defendant" or "Mubarak") Motion to Revoke the Magistrate Judge's detention order (D. 37,

38).[1]  Because the defendant offers no factual basis to revoke the Magistrate's prior Order of

Detention, and does not articulate any factual or legal error, the motion should be denied.

Mubarak is charged with various drug and firearm offenses, including discharging a

firearm that subject to him to mandatory incarceration of at least twenty-five years if convicted

as currently charged, to say nothing of the anticipated GSR of life. The evidence against the

Defendant is overwhelming and the presumption that he constitutes a danger to the community

---

[1] The Defendant filed a substantive memorandum in support of the motion to revoke. As the actual arguments made by the Defendant are contained within the memorandum, the government makes reference to it by page (D.Mem. _). The record below includes the Transcript of the Detention Hearing, which is still pending completion, the detention exhibits (Exhibits 1-18), the defendant's criminal history, and the Pre-Trial Services report documenting the defendant's criminal history and recommending that the defendant be detained as both a danger to the community and individuals, and because of the risk of flight he presents.

and the cooperating witness and a risk of nonappearance has not been rebutted to any degree. Indeed, the Defendant confessed, on video, to shooting another person, and discussing in detail the vast and lucrative drug empire that he ran.

The Defendant's lengthy criminal history, violent offenses charged in this Indictment, access to firearms (including an unsecured firearm at his proposed custodian's home), and access to large amount of bulk cash lend credence to the government's contention that the Defendant must be detained.  Releasing the Defendant into the community, with ready access to cash, and cavalier attitude towards gun laws in no way mitigates the danger and risk of flight presented by the Defendant here.[2]

## **PROCEDURAL HISTORY**

The Defendant was arrested by criminal complaint and had his initial appearance on August 7, 2020.  The criminal complaint charged the Defendant with Conspiracy to Distribute and Possess with Intent to Distribute, Controlled Substances; and Possession and Use of a Firearm During and in Relation to a Drug Trafficking Crime.

The government sought detention of the Defendant on the following grounds:

- 18 U.S.C. § 3142(f)(1)(A) and (B), because the Defendant is charged with two violations of 18 U.S.C. § 924(c), for which a maximum term of imprisonment of life is prescribed;

- 18 U.S.C. § 3142(f)(1)(C), because the Defendant is charged with a controlled substance for which the maximum penalty is greater than 10 years;

- 18 U.S.C. § 3142(f)(1)(D), because the Defendant has been convicted of two or more State offenses that would have been offenses described in subparagraphs (A) through (C) of 18 U.S.C. § 3142(f)(1), if a circumstance giving rise to Federal jurisdiction had existed;

---

[2] *See e.g.,* Mass. Gen. Laws 140, § 131L (requiring, *inter alia*, the locked storage of firearms, and setting criminal penalty for failure to properly store firearms).

- 18 U.S.C. § 3142(f)(1)(E), because the defendant is charged with a felony that involve the possession or use of a firearm; and

- 18 U.S.C. § 3142(f)(2)(A), because there is a serious risk the Defendant will not return to Court if released.

Pursuant to 18 U.S.C. § 3142(e)(3)(A) and (B), a rebuttable presumption arises because the Defendant is charged with "(A) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.)." and "(B) an offense under section 924(c)."

A Detention hearing was held on November 2, 2020, before Magistrate Judge Dein, where one witness testified and eighteen (18) exhibits were admitted. Among these exhibits were the transcript of the Defendant's recorded video confession to the shooting taking place on July 1, 2017, where the Defendant targeted a coconspirator in the drug trafficking conspiracy. Additionally, the government submitted pictures of the items recovered during the execution of search warrants at the Defendant's residence and the residence of the proposed third-party custodian. Among the items recovered included two firearms, ammunition, over $300,000 in cash, a money counter, drug ledgers, drug packaging materials and the clothing worn during the video recordings. One of the firearms was found, unsecured and loaded, stored in the nightstand of the residence of the proposed third-party custodian, which was incidentally the location where the Defendant's two motorcycles, and over $300,000 in cash was also recovered.

On November 24, 2020, a grand jury returned an Indictment charging the Defendant with the following:

- Conspiracy to Distribute and Possess With Intent To Distribute Heroin, Cocaine Base and Fentanyl, in violation of 21 U.S.C. 841(a)(1)(B), and 846;

- Discharging, Brandishing, Using, and Carrying a Firearm During and In Relation To, and Possession of a Firearm In Furtherance of a Drug Trafficking Offense, in violation of 18 U.S.C. 924(c)(1)(A)(iii);

- Using and Carrying a Firearm During and in Relation to, and Possessing a Firearm in Furtherance of a Drug Trafficking Offense, in violation of 18 U.S.C. 924(c)(1)(A)(i);

- Felon in Possession of Firearm and Ammunition, in violation of 18 U.S.C. 922(g)(1); and

- Felon in Possession of Ammunition, in violation of 18 U.S.C. 922(g)(1).

On December 1, 2020, Magistrate Judge  Dein issued an order of Detention (D.34).  The government filed a notice pursuant to 21 U.S.C. § 851, on December 10, 2020 (D. 40).  The Defendant filed the instant Motion to Revoke (D. 37), and supporting memorandum (D. 38) on December 10, 2020.

## **FACTUAL BACKGROUND**

### I.    **EVIDENCE AT DETENTION HEARING**

An evidentiary hearing was held on November 2, 2020, where Special Agent Michael Little, and a defense witness testified and the government admitted 18 Exhibits.  The government has sought a copy of the transcript of the hearing, but as of the date of this filing, it has not yet been completed by the stenographer.  As such, the government summarizes the evidence from the documentary exhibits admitted at the hearing.  See e.g., Exhibit 1 (Complaint Affidavit); Exhibits 2-4 (transcripts of recordings).  Exhibit 1 was the Affidavit submitted in support of a criminal complaint, and Exhibits 2 and 3 were transcripts of pertinent recordings with the Defendant, and the Defendant's lieutenant, Muwakkil.

In short, the government's presented evidence on three topics: the Defendant's drug enterprise, the Defendant's shooting of one of his subordinates for suspected theft, and the

weapons and cash seized from the Defendant's vehicle, his residence, and the residence of the

proposed third-party custodian during the execution of search warrants.

A.       **The Defendant's Drug Enterprise**

With respect to the historical drug enterprise, the Complaint Affidavit outlined the

numerous drug purchases made from members of the Defendant's drug organization.  Those

purchases are described in detail throughout the affidavit.  See Exhibit 1, pp. 8-9.  During the

various recorded meetings with the Defendant, he explained that he sat above the individuals

from whom the cooperating witness ("CW") was purchasing from and that they all worked for

him.  The Defendant himself explained the organization quite clearly:

> The little nigga [(MUWAKKIL]] been running the show for a long time, he made
> a job for himself, you know what I am saying, I offered jobs to all you niggas, the
> little nigga found him a spot and created a job dog, and the shit work for me, and I
> put him in it.... The shits a machine dog, it's a system dog and I know when you
> don't pay... There's a book nigga you know what I am saying, my peoples got the
> books nigga and your names in the book.... You ain't turn it in nigga, shits going
> out but it ain't coming back in, what the fucks going on big dog, you fucking up
> somewhere, then you being disloyal to the crew.

Exhibit 1, p. 15.  Muwakkil, the Defendant's primary underling, agreed with the description of

the organization:

> Yeah, like, like I'm a, I'm a man of rank. You know what I'm saying? Like I
> believe in that. Like the Big Homie's ([MUBARAK]) my boss, that's how I treat
> it… that's the boss, that's it. Everything else is everybody else.

Exhibit 1, p. 25.

This also was not a drug enterprise making a small amount of money.  The Defendant

himself estimated that each subordinate should be able to make $10,000 or $20,000 in a day, if

they were handling the controlled substances properly due to their quality.

> I guess I ain't got the right motherfuckers, I mean, I need some niggas that wanna
> get it, you know what I'm saying? I just don't wanna put anybody on that don't

> appreciate you. They don't appreciate you a lot of times… you give them niggas all them fucking pucks and shit. And they give the run around and they just fucking it up. But I need these niggas to go, you know what I'm saying?... shit, fuck that, niggas should be having 10, 20 thousand dollar days…

Exhibit 1, p. 26. The operating principal was simple: MUBARAK would obtain small "pucks" of controlled substances of extremely high quality that the subordinates can break down and sell. MUBARAK would receive $120,000 per puck, but the subordinates could make $300,000, selling those pucks on the street.  As the Defendant described it in his own words:

> I'll give you ten of these motherfucking pucks nigga, you know what I'm saying, like twenty of these things and shit. This shit's worth it nigga. You know what I'm saying? Tell the nigga this is worth three hundred thousand nigga… Give me my one twenty, you keep the rest nigga you know what I'm saying.

Rather than continue to summarize the nuances and detail of the Defendant's drug organization, the Exhibits themselves capture the Defendant's own description of the extensive and lucrative drug distribution network he ran. In fact, the Defendant provided instructions on how to ensure the CW was maximizing his profits from the drugs he was to going to be purchasing:

> That's, that's your number.  That's your, these are your numbers you have to work with.  You might not sell it for a hundred a gram.  You might let it go for fifty a gram.  But the other nigga, he has the work from the fifty up to a hundred cause it's at least worth a hundred to a nigga if he sell it uh you know what I'm saying on the bust down however he do it,  you know what I'm saying?... So it's just, the window's there, you know what I'm saying?... So it's like a nigga would say you know, alright, even if he sold it for like eighty dollars a gram.  Nigga, eighty times the fucking, I'm only charging you thirty-two dollars, so whatever you sell it for over that is all yours you know what I'm saying."

Exhibit 1, p. 27.

###    B.    The Shooting of Vito Grey

 During the same meetings where the Defendant explained his drug enterprise to the CW, the Defendant also admitted to shooting a member of his drug enterprise because a large sum of

money had been confiscated from that individual.   The Boston Police responded to the shooting

and the victim was admitted to the hospital with a gunshot wound.  See Exhibit 1, p. 11.

The Defendant was captured on recording explaining how the confrontation proceeded in

vivid detail, and was recorded doing so multiple times.  First, Defendant explained the

circumstances of the problem with the victim:

> He hit me with the story like when we get there like tell me that the jakes [(detectives)] ran up on him and took the money…. The DEA grabbed him at the airport and run up on him and the bitch at the airport… He told me he gave this bitch 30, he took 20 and when he got to the airport that the DEA ran up on him and took it.

Exhibit 1, p. 13.  MUBARAK continued,

> The story was just bullshit.[3]  You gotta have paperwork… These other little niggas that hustle with me, I sent them niggas out of town one day, they got bagged with like 100 racks or something, 80 G's… That wasn't nothing man, them niggas got arrested doing what I told them to do… They didn't get arrested, they just took the money, you know what I'm saying… give you a receipt and tell you to come back and claim it if it's yours… but you can't come back and claim it, you fucking leave it there you know what I'm saying and keep moving, so but he knew that you know what I'm saying and he was trying to run the same line, but his shit was bullshit cause he don't got the receipts… it's like come on dog, you running game man and he trying to run a game on the Big Homie.

Exhibit 1, p. 14.

After hearing about the excuses, the Defendant decided to exact his revenge.  The

Defendant was keen to note that "I didn't shoot the nigga [(GRAY)] about" losing the money.

See Exhibit 1, p. 14. Rather, as the Defendant calmly explained, "He was just being fresh dog,"

Exhibit 2, p. 8, "I didn't give a fuck about the 50 G's… that nigga made so much money with me

right, it wasn't worth me killing him for 50 thousand dollars."  Exhibit 1, p. 14.  The Defendant

then described the sequence once he got involved:

---

[3] Though the Defendant was incredulous and did not believe the victim, the money was in fact confiscated by law enforcement.  See Exhibit 1, p. 13, n. 5.

I snatch him by his mother fucking throat, and I got this pistol on me, and we in the barber shop in Grove Hall nigga, he ain't…He thought I wasn't coming for my bag (money), what the fuck is wrong with you nigga and he be like what you gonna do shoot me in here, I like mother fucking right, you know, but I'm like naw, come outside matter of fact and I'll shoot you outside... know what I'm saying, Bitch you better give me my mother fucking money... You know what I did to him.  The rest is history.

Exhibit 1, p. 14-15.

## C.    Items Recovered During the Execution of Search Warrants

At the detention hearing the government introduced testimony and photographs of various items that were seized during the execution of search warrants.  Two search warrants were executed: at the Defendant's residence, and at the residence of Djwan Scott in Lowell.

At the Defendant's residence, investigators located evidence of the Defendant's drug enterprise, and ammunition.  In the Defendant's truck, investigators located a loaded firearm. The photographs admitted as evidence included the following from the Defendant's residence:

- Exhibit 5, drug ledger, loaded firearm, and sunglasses worn during recordings, found in the Defendant's truck;
- Exhibit 6, ammunition found in the bedroom;
- Exhibit 7, stacks of cash totaling over $20,000, a drug ledger, and a money counter found in the living room;
- Exhibit 8, cut used to adulterate narcotics found in the kitchen;
- Exhibit 9, luxury watches found in the bedroom;
- Exhibit 10, hat worn during recordings, press and clamps, found in a closet;
- Exhibit 11, a bag containing a second money counter found in the kitchen;
- Exhibit 12, scales, and puck press found in the kitchen;
- Exhibit 13, drug ledger found in trash in the kitchen.

At the residence of Djwan Scott, investigators located over $300,000 in cash in a duffel bag. See Exhibit 14.  In the nightstand, investigators located a loaded and unsecured firearm registered to Scott, whose license to carry had expired, and ammunition.  See Exhibit 15.  In the bathroom, an additional stack of unexplained cash was found.  See Exhibit 16.  The Defendant's

high-end luxury motorcycles were recovered from the garage, see Exhibit 17, along with a

recently purchased ladies Rolex.  See Exhibit 18.

## II.      THE ORDER OF DETENTION

On December 1, 2020, Magistrate Judge Dein issued an order detention under Sections

3142(f)(1), and 3142(f)(2), finding "by clear and convincing evidence that no condition or

combination of conditions will reasonably assure the safety of any other person and the

community" and "by a preponderance of evidence that no condition or combination of conditions

of release will reasonably assure the defendant's appearance as required."  D. 34.  In ordering the

Defendant detained, the Judge noted that the weight of the evidence, lengthy period of potential

incarceration, prior criminal history, history of violence and use of weapons, and lack of stable

employment.  See D. 34.

Magistrate Judge Dein noted the following explanation for the detention order:

> The defendant was originally charged in a criminal complaint, and was
> subsequently indicted and charged with conspiracy to distribute and possess with intent to
> distribute heroin, cocaine base and fentanyl in violation of 21 U.S.C. §§ 846,
> 841(b)(1)(B)(iii) & (iv); discharging, brandishing, using and carrying a firearm during
> and in relation to, or in furtherance of a drug trafficking offense in violation of 18 U.S.C.
> § 924(c); and being a felon in possession of a firearm and ammunition in violation of 18
> U.S.C. § 922(g)(1).  After initially consenting to the entry of a voluntary order of
> detention without prejudice (Docket No. 13), the defendant subsequently filed a motion
> for a detention hearing and release (Docket Nos. 17 & 18). A detention hearing was held
> remotely on November 2, 2020 at which time the government presented the testimony of
> FBI Agent Michael Little and the defendant presented the testimony of Djwan Scott, the
> defendant's ex-girlfriend who is a nurse. At the conclusion of the hearing the defendant
> requested time to assemble medical records to establish that he suffered from asthma and
> diabetes, conditions that made it more likely that he would become seriously ill if he
> contracted COVID-19. The defendant has apparently been unable to assemble the
> medical records (see Docket No. 33) and on November 30, 2020 filed an Emergency
> Motion for Immediate Release on the grounds that he has tested positive for COVID-19
> and has been transferred to a quarantine unit (Docket No. 31). He is concerned that he
> will not receive appropriate medical care if needed. The defendant has reiterated his
> original proposal that he be released to Ms. Scott's home and that she serve as a third-
> party custodian. Ms. Scott has a separate bedroom and bathroom where the defendant can
> quarantine, and the defendant believes that she can assist him if he suffers an asthma

attack and can bring him to a hospital if necessary. (Docket No. 31 ). The government has filed an opposition (Docket No. 32).

After careful consideration of the evidence and arguments of counsel, this court finds that the government has met its burden of proving by clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person (including a confidential witness) and the community, and by a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required. While this court is very concerned about the defendant's health, the evidence before the court is that Wyatt is providing appropriate medical treatment to inmates. As of November 30, 2020, 23 detainees tested positive for COVID, and testing continues. The facility is following protocols established by the Rhode Island Department of Health and CDC. The facility has established procedures to provide the appropriate level of medical care needed. Moreover, the defendant has been incarcerated at Wyatt since August 2020, and there is no evidence that his medical needs, including any potential treatment for asthma or diabetes, have gone unmet. Therefore, the situation at Wyatt does not warrant the defendant's immediate release.

At the detention hearing the government introduced 18 exhibits in support of its contention that Mubarak, along with Karim Muwakkil and Vito Gray, were engaged in the business of purchasing and distributing large quantities of fentanyl, heroin and cocaine.  In 2017, Mubarak shot Gray over a dispute relating the loss of drug proceeds that Gray was transporting, and confessed to the shooting to a cooperating witness. There is a recording of this confession.  There was evidence of approximately 25 controlled buys during the government's lengthy investigation. At the time of Mubarak's arrest, a search of his truck revealed a firearm and ammunition (Ex. 5 & 6).  A search of his residence revealed over $24,000 in cash, a money counter, drug ledgers, a press, and drug packaging materials among other evidence of drug trafficking. At Ms. Scott's home, where the defendant was living, agents found $300,000 in cash, 2 motorcycles belonging to the defendant, and an unsecured firearm and ammunition belonging to Ms. Scott.

Mubarak, age 47, is a life-long resident of Massachusetts. He has four children who reside with their mothers and with whom he maintains contact. He travels domestically and internationally. Prior to his incarceration on August 6, 2020 he was employed through Local 175 in Methuen, MA for two years, prior to which he worked as a laborer on and off in odd jobs. Despite this lack of lucrative employment, as noted above searches of the defendant's residence and the residence of Ms. Scott with whom he was living at the time of his arrest revealed substantial amounts of cash.

Mubarak has an extensive criminal history beginning at age 14. He has adult convictions for, *inter alia,* trafficking controlled substances for which he received a 5 year committed sentence (2003), resisting arrest (2003), motor vehicle violations (2002), possession class D (marijuana) (1999), carrying a dangerous weapon (1996), manufacturing a controlled substance (1995), possession with intent to distribute class A (heroin) (1994) and assault and battery on a police officer (1993). His record is replete

with defaults. The defendant apparently legally changed his name in 2006-07, so it is unclear whether this criminal record is complete. (See Docket No. 31 at 114).

Despite extensive interactions with law enforcement, the defendant has been unable to conform his behavior to the requirements of the law. In light of the defendant's use of firearms and his participation in drug trafficking, the danger to the community is very great if he were to be released. In addition, given the potential lengthy sentence the defendant is facing, and his history of defaults, the risk that the defendant will not appear for trial is also very great.

For these reasons, the defendant is ordered DETAINED pending trial. His motions for release (Docket Nos. 17-18, 31) are DENIED.

D. 34.

## III.   DEFENDANT'S MOTION TO REVOKE

On December 10, 2020, the Defendant filed his Motion to revoke the Order of Detention, D. 37, and Memorandum in Support. D. 38.  In the motion, the Defendant does not dispute the gravamen of the government's evidence: that he is captured on the recordings describing the vast drug empire that he ran, and that he is captured on recording admitting that he shot a member of his drug enterprise.  Cf. D. 37, 38.  The Defendant also does not claim that any of the factual findings of the Magistrate Judge were erroneous, or even attempt to address the factual basis for the order of detention.  Cf. D. 37, 38.  Rather, the Defendant simply claims that "there are conditions of release that will assure his appearance" and that he does not pose a danger because of the fact that at the time he originally filed the motion to revoke, he was diagnosed with COVID-19.  See D. 38 ("The only thing that the defendant will be physically and mentally able to do, if he is released, is to receive treatment.").

## STANDARD OF REVIEW

After an order of detention issues, the Bail Reform Act offers a defendant two choices: a motion for review of the detention order under 18 U.S.C. § 3145(b), or a motion to reopen the detention hearing under 18 U.S.C. § 3142(f). See United States v. Reynolds, 609 F.Supp.2d 108,

110 (D.Me. 2009) (citing <u>United States v. Rebollo-Andino</u>, 312 Fed.Appx. 346, 347-48, 2009 WL 565697, *1-2 (1st Cir. Mar. 6, 2009)).  Under Section 3145(b), the District Court reviews a Magistrate Judge's detention order under Section 3145(b) *de novo*, but is not required to conduct a hearing. <u>See</u>, <u>e.g.</u>, <u>United States v. Tortora</u>, 922 F.2d 880, 883 n.4 (1st Cir.1990) (standard for district court's review of magistrate's detention findings under Section 3145(b) is *de novo*); <u>Rebollo-Andino</u>, 312 Fed.Appx. at 348 (unpublished) (district court was not required to convene hearing on defendant's motion for *de novo* review under Section 3145(b)); <u>United States v. Pierce</u>, 107 F.Supp.2d 126, 127 (D. Mass. 2000) ("Section 3145(b) of Title 18 does not provide for a hearing as a matter of right and this Court declines to grant one"); <u>United States v. Foley</u>, 07-10390-RGS, 2009 WL 458558, *3, n.3 (D. Mass. Feb. 24, 2009) (declining to convene evidentiary hearing).

Since the Defendant does not request an evidentiary hearing (and offers no basis for why a second one would be necessary), the Court should decline to convene an evidentiary hearing and consider detention *de novo* by reviewing the record below.  <u>See</u>, <u>e.g.</u>, <u>Pierce</u>, 107 F.Supp.2d at 127; <u>Foley</u>, 97-10399-RGS, 2009 WL 458558, *2-3; <u>United States v. Hernandez</u>, 14-10367-RGS, 2015 WL 4448094, *1 (D. Mass. July 20, 2015).  Accordingly, "[w]here, as here, a court examines the detention order without taking new evidence, a degree of deference to the factual determinations of the Magistrate tempers the independent review."  <u>United States v. McForbes</u>, 109 F.Supp.3d 365, 367 n.2 (D.Mass. 2015) (Hillman, J.).

## **ARGUMENT**

Under the Bail Reform Act of 1984, detention of a defendant is required if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The government is

required to demonstrate, by a preponderance of the evidence, that a defendant poses a risk of flight or, by clear and convincing evidence, that he is a danger to the community. United States v. Patriarca, 948 F.2d 789, 792–793 (1st Cir.1991).  In considering the government's motion to detain the defendant, the Court must determine whether any condition or combination of conditions will reasonably assure "the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).[4]

## I.      THE DEFENDANT IS A DANGER TO THE COMMUNITY AND A RISK OF FLIGHT

Consistent with the determination of the Magistrate Judge, the evidence adduced at the detention hearing provided sufficient basis on essentially all of the bail factors to support detention of the defendant.

### A.      NATURE AND CIRCUMSTANCES OF THE CHARGED OFFENSES

The nature and circumstances of the offenses overwhelmingly support detention.  The government purchased over 230 grams of fentanyl, heroin, cocaine and cocaine base from the Defendant's drug trafficking organization.  The Defendant himself outlined the organization and described his role as sitting above all of the individuals from whom the cooperating witness made the purchases, and detailed hundreds of thousands of dollars that were being made by his organization. The government recovered over $300,000 of those profits during the execution of the search warrants.

---

[4] As noted by the Senate Judiciary Committee: "This reference to safety of any other person is intended to cover the situation in which the *safety of a particular identifiable individual, perhaps a victim or witness*, is of concern, while the language referring to the safety of the community refers to the danger that *the defendant might engage in criminal activity to the detriment of the community*." S. Rep. No. 98-147, at 39 (1983) (emphasis added; footnotes omitted); *see also* United States v. Patriarca, 948 F.2d 789, 792–793 (1st Cir.1991).

The Defendant made it clear that he was supplying these individuals and told the cooperating witness that he was in charge.  As a result, a fair evaluation of the drug weight, even by a conservative estimate of the Defendant's own description of the enterprise, is in the multiple kilograms.  While the drug weight and related guidelines sentence range of life alone would be sufficient to support detention, here, the Defendant personally committed violence in furtherance of his drug organization, and admitted to the shooting on recording shortly afterwards.

Beyond that, the government located a firearm in the Defendant's truck, ammunition in his residence and another unsecured firearm in his second residence where he stored cash and his motorcycles.  The Defendant faces a significant sentence potentially as an armed career criminal from the ammunition found in his residence alone.  From this, it is clear that the Defendant not only is willing to commit violence in furtherance of his enterprise, has done so in the past, and remains capable and willing to do so in the future.  In short, the nature of this case and the circumstances overwhelmingly support detention.

## B.    WEIGHT OF THE EVIDENCE

The government contends that the weight of the evidence is overwhelming.  The drug conspiracy is largely captured on recording and the evidence comes from the Defendant himself.  The Defendant and his subordinates described the enterprise in great detail, and the CW made numerous purchases.  Furthermore, the shooting was admitted to by the Defendant, and the subordinate, and details of the police investigation at the time support the Defendant's involvement.  There is no dispute that the Defendant is the one depicted in the recordings, and if the were, the government seized essentially the entire outfit and accessories worn by the Defendant in the recordings.

## C.    HISTORY AND CHARACTERISTICS OF THE DEFENDANT

The Defendant has a lengthy history of drug offenses and violent crimes.  As the pretrial

services report indicated, and the Magistrate noted in her decision:

> He has adult convictions for, *inter alia,* trafficking controlled substances for
> which he received a 5 year committed sentence (2003), resisting arrest (2003),
> motor vehicle violations (2002), possession class D (marijuana) (1999), carrying a
> dangerous weapon (1996), manufacturing a controlled substance (1995),
> possession with intent to distribute class A (heroin) (1994) and assault and battery
> on a police officer (1993). His record is replete with defaults.

D. 34.  The Defendant was found guilty of the most recent conviction for which he served five-

years in 2005.  As such, the government acknowledges that approximately seven years transpired

between the likely release from the five-year sentence and the 2017 shooting and recordings.

However, this lack of recent convictions is readily explained by the Defendant's high-rank and

role in the drug organization that he was running, which insulated him from law enforcement.

From his high position, literally financing the purchase of controlled substances for, in

his own words, a multi-million dollar drug ring, he had little contact with persons that he did

know, and as a result, little likelihood of interdiction by law enforcement.  The fruits of that

high-rank were reflected in the search warrants. Drug ledgers indicating tens of thousands to be

collected (which the government believes to be the "book" referenced by the Defendant in the

recordings), see Exhibits 1, 7 & 13,  and hundreds of thousands of dollars in cash, luxury

watches, an extremely high-end truck, multiple high-end motorcycles, two money-counters, and

$24,000 in cash literally lying around his luxury apartment. All of this while barely employed

through "Local 175" in Methuen.

## D.    NATURE AND SERIOUSNESS OF DANGER POSED BY RELEASE

The Defendant poses an extremely serious and present danger.  To start, the Defendant

has gladly pumped millions of dollars of fentanyl and heroin into Boston through his drug

organization.  He has profited extensively and reaped the rewards of the lucrative trade, personally improving his position while hundreds, if not thousands, experience the misery and death associated with substance abuse disorder. His numerous trips, designer watches, luxury motor vehicles, and clothing bespeak an individual with little remorse for the death that his drug organization dealt in the streets of Boston for years.

This Court also is in the unique position to hear the Defendant's affirmatively acknowledge how dangerous he is, and boast about the circumstances of a shooting that he personally participated in.  See Exhibit 2, and 3 (explaining motivation behind shooting Vito Gray being not the loss of money, but the disrespect).  Clearly the defendant is willing to commit violence and he certainly has access to firearms, as noted by the multiple firearms recovered during the search warrant executions. Given the circumstances here, the Defendant poses a grave risk to society in general, and the cooperating witness in particular. If the Defendant was willing to shoot Vito Gray for $50,000 and the potential loss of respect in streets, he certainly poses a threat to the cooperating witness who threatens his liberty with a potential GSR of 360 months to life.  Moreover, the risk of flight presented by the Defendant is demonstrated by his numerous trips and the large amount of bulk cash he clearly has access to.

E.     LENGTH OF DETENTION

The only new argument apparently raised by the defendant in his motion to revoke is that his anticipated detention during the pretrial phase will be lengthy.  See D.Mem. XX ().  The length of current or anticipated detention is not a proper consideration and, therefore, the defendant's principal argument is irrelevant.  See United States v. Digiacomo, 746 F. Supp. 1176, 1182 (D.Mass. 1990) (Wolf, J.); see also United States v. Hare 873 F.2d 796, 799 (5th

Cir.1989) (the length of a current or potential future detention cannot be considered under this section since it is not material to the issue of risk of flight or dangerousness).[5]

Furthermore, the government notes that the only substantive motions filed in the case, were filed by the Defendant.  Even so, though it has been only a little over two months since his initial appearance.  As such, the age of the case provides no basis to reconsider the detention order.

## II.     COVID-19

As of January 15, 2021, there are **54 active case** of COVID-19 among the 500+ detainee population at Wyatt.  See In re: Wyatt Detention Facility, 20-MC-00004, ECF #80 (D.R.I. Dec. 29, 2020) (attached as Exhibit A).  The facility has ably managed over 300 cases of COVID-19, including the Defendant's, and administered over 6000 tests.  Given the facility's extensive experience and successful history of addressing and mitigating the risk of COVID-19, the circumstances do not present a separate basis for release.

<u>**CONCLUSION**</u>

The Defendant presents a significant danger to the community, a serious risk of flight, and a serious risk of obstructing justice.  No conditions can assure the safety of the community, prevent the obstruction of justice, or assure the Defendant's return to Court.  The fact that the Defendant tested positive for COVID-19 two months ago, does not alter the calculus, and the

---

[5] In Digiacomo, the court addressed whether the prospect of protracted pretrial detention is a factor which may properly be considered as weighing in favor of release.  Digiacomo, 746 F. Supp. at 1182.  The court concluded it would not be appropriate to consider the inevitability of prolonged pretrial detention, and that it was the Speedy Trial Act Trial Act, 18 U.S.C. 3161 et seq., and not the detention provision of the Bail Reform Act that is the vehicle chosen by Congress to regulate the length of pretrial delays.  Id.

Defendant does not refute the accuracy or significance of the government's evidence in any way.

As such, the Defendant's must be detained.

<div style="margin-left: 40%;">

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

</div>

By:    */s/ Philip A. Mallard*
       Philip A. Mallard
       Assistant U.S. Attorney
       United States Attorney's Office
       1 Courthouse Way, Suite 9200
       Boston MA 02210
       617-748-3674

<div style="text-align: center;">

## CERTIFICATE OF SERVICE

</div>

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<div style="margin-left: 40%;">

*/s/ Philip A. Mallard*
Philip A. Mallard
Assistant U.S. Attorney

</div>

Date:  January 18, 2021