UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 20-cr-10300-ADB |
| | ) | |
| MUJAB MUBARAK | ) | |
|   Defendant. | ) | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

The United States hereby submits its opposition to the motion to suppress of defendant Mujab Mubarak ("Defendant" or "Mubarak").[1] The Defendant seeks to "suppress all evidence seized pursuant to search warrants issued on August 5, 2020 authorizing the searches of 25 Charlton Street, Apartment C-701 in Everett and 11 Garden Road in Lowell" (ECF #105). The Defendant's motion first claims that the search warrants were not supported by probable cause (D.Mot. 8) and that the good faith exception should not apply to the warrants that were issued (D.Mot. 13). Then, he makes two claims that the agents exceeded the scope of the warrants: by searching and seizing certain vehicles (D.Mot 13-14) and seizing and searching cellular phones (D.Mot. 15-16). Not one of the Defendant's claims have merit and the motion should be denied.

## FACTUAL BACKGROUND RELEVANT TO MOTION TO SUPPRESS

On August 5, 2020, Special Agent Timothy Kenny submitted applications for four search warrants and a criminal complaint to the U.S. Magistrate Judge Hon. Judith Dein. See D.Exs. 1 & 2. The "Target Offenses" under investigation included: firearm possession and use, carrying, and discharge during and in relation to a drug trafficking crime (18 U.S.C. §§ 922(g)(1), 924(c)); manufacturing, importation, distribution, and possession with intent to distribute controlled substances, and conspiracy to do the same (21 U.S.C. §§ 841(a)(1), 846), and laundering of monetary instruments (18 U.S.C. § 1956).

The search warrant applications specified two Target Locations to be searched, both of which were residences of the Defendant: the first an apartment and garage spaces in Everett at 25 Charlton Street

---

[1] References are to: Defendant's motion by page (D.Mot. _); the government's exhibits are by number and page where appropriate (G.Ex. _, _); the Defendant's exhibits are by number and page (D.Ex. _, _); and the Affidavit of Special Agent Timothy Kenny submitted in support of the search warrants at issue by paragraph number and page where appropriate (Aff. ¶_, p. _). The affidavit is publicly filed as ECF#1-2 (the "Affidavit"). The government notes that there is paragraph numbering error on page 15 the affidavit, resulting in two sets of paragraphs numbered 31 through 35 (pp. 13-19).

(Docket No. 20-5116) ("Target Location 1"), and the second, a single family residence in Lowell at 11 Garden Road (Docket No. 20-5117) ("Target Location 2").  The applications and warrants incorporated Attachments, that described the Target Locations, and a common Attachment B that specified the evidence, fruits, and instrumentalities to be seized.

### A.      The Affidavit Submitted in Support of Search Warrants

In support of these warrant applications, Agent Kenny submitted the 65-page Affidvit.  To avoid needless reiteration, the government offers a brief summary of the information set forth in the Affidavit and specific references are made in the Argument section below.

The Affidavit described the Defendant's Drug Trafficking Organization (the "DTO") and its members, including the Defendant (Aff. ¶14); Abdul Muwakkil, the Defendant's lieutenant, and Vito Gray (Aff. ¶¶15, 16). A cooperating witness (CW-1) had made more than a dozen historical controlled purchases from the DTO.  See Aff. ¶¶17-71. There was also information concerning the shooting of Gray that took place on July 1, 2017 (Aff. ¶¶25-28). The Affidavit then recounted a series of meetings with the Defendant taking place on August 7, 2017 (Aff. ¶29); on August 11, 2017 (Aff. ¶¶30-34); and on November 21, 2017 (Aff. ¶¶61-70), two of which were recorded.  The Affidavit also described meetings and purchases with Muwakkil that took place on August 17, 2017 and September 27, 2017 (Aff. ¶¶35-47).  These meetings established that the Defendant held the top position in an active, violent, and highly profitable DTO that had amassed – and continued to amass – wealth.

### 1.      Meeting on August 11, 2017 with the Defendant

CW-1 met with the Defendant on August 11, 2017. See Aff. ¶¶ 30-35, pp. 13-18 (paragraphs do not proceed in sequence).  During that meeting, the Defendant described some of the DTO's record-keeping operations and engagement in violence.  Specifically, the Defendant described shooting Gray after law enforcement seized approximately $50,000 from Gray at the airport. The Defendant noted other trips that DTO associates had taken in the past where police had seized $80,000 to $100,000 of the DTO's cash. See Aff. ¶32 ("they got bagged with like 100 racks or something, 80 G's"). The Defendant explained that the seizure of money from Gray– in and of itself – was not a sufficient basis to kill Gray (particularly given other associates' past similar experiences), and stated that larger issues of disrespect were at play. See Aff.

¶30 ("that nigga made so much money with me right, it wasn't worth me killing him for 50 thousand dollars").  The Defendant also described the DTO's maintenance of a ledger or "book" concerning money owed.  See Aff. ¶30-33.  Notably, images from the recording showed the Defendant's attire that day, including a "Black t-shirt with 'Air Jordan' logo"; "Black and Gray checkered Louis Vuitton satchel"; "Black and white baseball hat with 'rooster' logo"; and a pair of "Gold-rimmed sunglasses" (Aff. ¶ 34).

### 2.     Meetings on August 17, 2017 and September 27, 2017 with Muwakkil

CW-1 met with Muwakkil on August 17, 2017 (Aff. ¶¶35-47).  That meeting provided further information about the DTO's operations and the Defendant's high-level role within it.  In particular, Muwakkil explained his role and the Defendant's position at the top of the DTO.  For much of the meeting, CW-1 and Muwakkil discussed drug pricing, namely, what price the Defendant had communicated to Muwakkil for CW-1 to pay for heroin.  The price for a "stick," or ten grams of heroin, was "5" or $500, and Muwakkil later explained that he would provide CW-1 with 160 grams for $6,800.

On September 27, 2017, CW-1 purchased 9.4 grams of heroin and 24 grams of cocaine base from Muwakkil (Aff. ¶¶48-60).  Muwakkil acknowledged the Defendant's role, the DTO's vast profits, and the Defendant's funding of DTO operations (Aff. ¶¶55-57).  Muwakkil told CW-1 that he encouraged the Defendant to shoot Gray based on the disrespect Gray had shown to the DTO.  See Aff. ¶59.

### 3.     Meeting on November 21, 2017 with the Defendant

CW-1 met again with the Defendant on November 21, 2017.  See Aff. ¶¶61-70. The Defendant complained about his subordinates and claimed that they should be making $10,000 to $20,000 per day based on the quantity and quality of controlled substances that he was providing.  See Aff. ¶62.  The Defendant then laid out the DTO's distribution scheme and his vision for CW-1's role within it.

The Defendant supplied drugs in quantities he referred to as "pucks", which were 160-gram amounts, and would supply each coconspirator with ten or twenty such pucks. Aff. ¶64-68. Twenty "pucks" were 3,200 grams.  While they could be sold for approximately $320,000 (at $100 per gram), the Defendant only expected to be paid roughly $128,000.  Aff. ¶62.  This arrangement left a large "window" for profit,

especially if the drugs were broken down (i.e., cut or adulterated) into greater quantities.[2]  The Defendant purchased the drugs up front in cash ("I don't get fronted nigga. I buy that shit so I own everything nigga"), ensured their quality ("I don't buy bullshit work nigga"), and held the position at the top of the organization ("I don't work for nobody").  See Aff. ¶69.  Because he purchased high-quality drugs outright, the Defendant ensured the profitability of everyone working in the DTO.[3]

### 4.    Records and Financial Investigation

After CW-1's controlled purchases and meetings, there was an extensive financial investigation that took place.  In particular, the Defendant owned three high-value vehicles that were believed to have been purchased with drug proceeds: two 2013 Harley Davidson motorcycles valued at $20,500 each; and a 2020 GMC Sierra 2500 HD truck (the "GMC truck") valued at $61,300, that the Defendant purchased in November 2019. See Aff. ¶¶85-87. The Defendant put down a total of $47,500 in cash for the vehicles. See Aff. ¶¶85-87.  The timing of purchases and value of these vehicles was significant:

- The "GMC truck was purchased in November 2019 for $79,000, of which the Defendant put down $19,500 in cash and financed the balance (Aff. ¶86).  The GMC truck was seen parked in the parking garage at Target Location 1 frequently (Aff. ¶107), and it was seen at Target Location 2 on seven occasions in the month of July 2020, including in the early morning hours. See Aff. ¶112.

- One of the motorcycles was purchased in May 2017 for $18,000 (during the time period of the controlled purchases), paid for entirely in cash.  See Aff. ¶88.  The other motorcycle was purchased in 2013 for $25,461, of which the Defendant paid $10,000 in cash and financed the balance. See Aff. ¶87.  Agents observed both motorcycles parked in the garage at Target Location 1 and, at times, saw the motorcycle covers on the ground in the parking area where the motorcycles had previously been observed.  See Aff. ¶107.

Agents also reviewed the rental records for the Everett apartment (i.e., Target Location 1).  Those records showed that the Defendant had paid approximately $2,600 to $2,900 per month for rent and parking in the garage since 2019 (Aff. ¶¶72-76), and renewed his lease in 2020 (approximately $50,000 in rent total during this period). In the rental application, the Defendant claimed to be employed at "KO Stone" with a

---

[2] See Aff. ¶67 ("So it's just, the window's there, you know what I'm saying?... So it's like a nigga would say you know, alright, even if he sold it for like eighty dollars a gram. Nigga, eighty times the fucking, I'm only charging you thirty-two dollars, so whatever you sell it for over that is all yours you know what I'm saying.").

[3] See Aff. ¶68 ("But nigga, when I execute that shit, I eat, this nigga eat, the nigga we give it to, that nigga eat. The nigga he give it to… everybody's eating, you know what I'm saying. Down the whole chain…. And so, as long as everybody's eating, that shit goes smooth you know what I'm saying.").

monthly income of $7,400, or $88,000 per year (Aff. ¶¶72-76). Among the documents were purported paystubs from KO Stone (Aff. ¶¶72-76). The investigation showed that the Defendant did not work at KO Stone, or at least did not work there enough to justify his expenditures. Physical surveillance confirmed he was not working there on a daily basis.[4] The frequency and length of the Defendant's air travel also suggested he did not work there, and also that he continued to transport bulk quantities of cash on flights.[5]

A review of the Defendant's bank records from Jan. 2019 to Feb. 2020 also disproved any notion of gainful employment, suggesting instead that he continued to deal in large quantities of controlled substance, transact in proceeds derived from drug trafficking, and accumulate assets with proceeds as well. The Defendant only deposited $23,170 in income from his purported employer (Aff. ¶¶94-97). By contrast, there were over $80,000 in cash deposits, consistent with drug proceeds (Aff. ¶¶97-100). Some of these deposits were being made at locations in close proximity to Target Location 1, and in quantities under $10,000 (Aff. ¶¶97-105). The cash was also promptly withdrawn from the account after their deposit, thus resulting in a low balance that remained under $10,000 – i.e., activity consistent with laundering drug proceeds (Aff. ¶¶97-105).

**B.       The Search Warrants and Incorporated Attachments**

On August 5, 2020, the two search warrants issued. The warrant for Target Location 1 (Docket No. 20-5116) authorized the search of: "25 Charlton Street, Apartment C-701, Everett, MA" and specifically included "storage areas associated with unit, **garage spaces**, and containers" "that are owned or under the control of the occupants of such premises. G. Ex. 1 (emphasis added). The warrant for Target Location 2 (Docket No. 20-5117) authorized the search of "11 Garden Road, Lowell, MA", and specifically included "the entirety of the detached garage structure**.**" G. Ex. 2.

---

[4] During physical surveillance of the Defendant on over 50 separate occasions between January 1, 2020, and August 5, 2020, agents did not see the Defendant at a place of employment. Aff. ¶¶ 71, 78. Review of the Defendant's phone records showed that there were only two calls between the Defendant and persons associated with KO Stone during the period of July 2019 through July 2020 (one in August 2019 and one in March 2020).  See Aff. ¶¶75-77.

[5] During the period of October 2017 through January 2020, the Defendant took 82 flights, inconsistent with actual employment at KO Stone, and consistent with bulk cash courier trips, that the Defendant previously had described to the CW (Aff. ¶¶90-92).  This signified to investigators that the transport of bulk quantities of cash drug proceeds were continuing to be generated and transported by the Defendant and the DTO (Aff. ¶¶90-92)

Both search warrants incorporated the same "Attachment B", which permitted the seizure of "records, data, or tangible objects, in whatever form that constitute evidence, fruits, or instrumentalities of" the Target Offenses.  Attachment B went into greater particularity, listing additional categories of records, data, tangible items, and other evidence that law enforcement was authorized to seize.  Attachment B also specifically listed the clothing items worn by the Defendants in recordings: the "Black and grey checkered satchel", "Gold-rimmed sunglasses", "Black t-shirt with grey 'Air Jordan' logo," and "Black and white baseball hat with 'rooster' logo."  Additionally, Paragraph II of Attachment B specified the seizure of "All computer hardware, computer software, and storage media," meaning "mobile phone[s]," and "smartphone, cell/mobile phone, or wireless communication, device" that were themselves to be searched for the categories of evidence described in Paragraph I, of Attachment B.  See D.Exs. 1 & 2 (Attachment B).[6]

C.      **Execution of the Search Warrants**

On August 6, 2020, law enforcement executed the search warrants and an arrest warrant for the Defendant.  The Defendant was taken into custody at Apartment C-701 at 25 Charlton Street, Everett.  The Defendant waived his *Miranda* rights and stated he had sold the two motorcycles a week earlier for $13,000 for each motorcycle.  See G.Ex. 1.

Among the items found in Apartment C-701 were the following (G.Exs. 1, 2): a drug ledger; a black and white baseball hat with 'rooster' logo; a press used to form drugs into a cylindric "puck" shape; a box containing "MANNITE CICOGNA" bars (field-tested positive for Mannitol, a common cutting agent used in drug trafficking); two money counters; cut off plastic baggies; a vacuum sealer and vacuum sealer bags; digital scales containing residue; ammunition, including rounds of .357 ammunition (consistent with firearm later located in 2020 GMC truck); multiple cellular phones; a silver Rolex watch; an Audemar Piguet watch; the Defendant's passport; extensive records relating to bank and financial accounts; employment records and paystubs showing very little employment income; and a total of $24,457 in cash.

---

[6] Attachment B also specified a procedure for the Return of Seized Equipment after it was seized, and forensically imaged, and searched.  The equipment was to be returned if "the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time."

After the search of the apartment, law enforcement searched the garage space, located the GMC truck in the garage space, and searched it. See G.Ex. 3.  Inside the truck, there was a .357 Derringer-style pistol loaded with 4 rounds of .357 ammunition, the Black and grey checkered satchel (by Louis Vuitton), a round of .357 ammunition in the Louis Vuitton bag, and the "Gold-rimmed sunglasses. G.Ex. 4.

At Target Location 2 the following items were found (G.Exs. 5-7): the two Harley Davidson motorcycles in the garage; a bag containing approximately $346,000 in cash; a H&K 9mm handgun loaded with ammunition, unlocked and accessible in a nightstand; two boxes of 9mm ammunition totaling 80 rounds on top of a dresser; and a black bag containing $19,110 in cash in a bathroom hidden behind towels.

## ARGUMENT

## I.      THE SEARCH WARRANT AFFIDAVIT ESTABLISHED PROBABLE CAUSE TO SEARCH TARGET LOCATIONS 1 & 2

The search warrant affidavit established probable cause that evidence of the Target Offenses would be found at the Target Locations. A search warrant application must show probable cause to believe that (1) a crime has been committed—the "commission" element, and that (2) the enumerated evidence of the offense will be found at the place to be searched—the "nexus" element. Feliz, 182 F.3d at 86. To establish probable cause, the warrant's facts need only "warrant a man of reasonable caution" to believe that evidence of a crime will be found. Id.  The Defendant does not challenge the existence of probable cause as a general matter. Rather, Defendant challenges only whether the nexus element was satisfied: both as to the premises containing evidence fruits and instrumentalities (D.Mot. 8 ("the affidavit failed to show the required nexus between the illegal activity and the two residences")) and whether the information was too remote in time to support continued belief the items would be there.  D.Mot. 12 ("three years elapsed between this statement and the warrant application").

"When a defendant challenges a search that was conducted pursuant to a warrant, the defendant bears the burden to show by a preponderance of the evidence that the warrant was unlawful." United States v. Brandao, 270 F.Supp.3d 485, 488 (D.Mass. 2017).  "The standard of probable cause is the probability, not a prima facie showing, of criminal activity." United States v. Ciampa, 793 F.2d 19, 22 (1st Cir.1986). Plainly speaking, "probable cause exists when the totality of the circumstances create 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Almonte-

Baez, 857 F. 3d 27, 31 (1st Cir. 2017). To be sure, "probable cause" "is not a high bar" and "may be premised on either direct or circumstantial evidence or some combination of the two" and United States v. Adams, 971 F.3d 22, 32 (1st Cir. 2020).

In considering probable cause, the magistrate "has to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, … there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) (citation omitted).  Probable cause is "not readily, or even usefully, reduced to a neat set of legal rules," Illinois v. Gates, 462 U.S. 213, 238 (1983), because the standard "is not a creature of certainty and does not require either the level of proof needed secure a conviction or even an 'unusually high degree of assurance.'" United States v. Centeno-Gonzalez, 989 F.3d 36, 45 (1st Cir. 2021) (citations omitted). The evaluation "leaves ample room for reasonable inferences based on common experience: an affidavit submitted to show probable cause need not point to some straight-line connection but, rather, may rely on the affiant's connecting of a series of dots in a commonsense way." Adams, 971 F.3d at 32.

A district court reviewing a magistrate judge's search warrant authorization will examine the affidavit in a "practical, commonsense fashion" and accord "considerable deference" to the determination that information in an affidavit establishes probable cause. United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) (citing United States v. Zayas–Diaz, 95 F.3d 105, 111 (1st Cir. 1996)); United States v. Tiem Trinh, 665 F.3d 1, 10 (1st Cir. 2011). Similarly, this Court "must give 'considerable deference to [any] reasonable inferences the issuing magistrate may have drawn from the facts set out in the affidavit," "reversing only if the affidavit contained no substantial basis for concluding that probable cause existed." United States v. Gonzalez-Arias, 946 F.3d 17, 23 (1st Cir. 2019); United States v. Leon, 468 U.S. 897, 915 (1984).

### A. The Affidavit Provided Probable Cause to Believe that Evidence of the Offenses would be Found at the Target Locations

The Affidavit established that the Defendant resided at both locations specified in the search warrants—25 Charlton Street, Apartment C-701, Everett, MA and 11 Garden Road, Lowell, MA. The Defendant does not necessarily challenge that the Affidavit established the DTO's existence or that both locations were places he lived. Rather, he argues that there was no basis to believe the items sought for in

the warrants would be found there. In making this argument, the Defendant neglects the nature of the evidence to be searched, and the fair and reasonable inferences of where such evidence might be found.

This Court will review the magistrate's finding solely "to ensure that" there was "a substantial basis for concluding that probable cause existed." United States v. Joubert, 778 F.3d 247, 251-52 (1st Cir. 2015) (citations omitted). The evaluation is of a sufficient is nexus between the offenses and the location, requires the judge to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before h[er]... there is a fair probability that contraband or evidence of a crime will be found in a particular place." Feliz, 182 F.3d at 86.  "In this context, common sense says that a connection with the search site can be deduced 'from the type of crime, the nature of the items sought,' plus 'normal inferences as to where a criminal would hide' evidence of his crime." United States v. Bregu, 948 F.3d 408, 417 (1st Cir. 2020). "The nexus between the objects to be seized and the premises searched need not, and often will not, rest on direct observation, but rather can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide evidence of a crime." Id. at 88.  Indeed, "interpreting a search warrant in the proper 'commonsense and realistic fashion,' … may result in the inference of probable cause that criminal objects are located in a particular place, such as a suspects residence, to which they have not been tied by direct evidence." Feliz, 182 F.3d at 86.

To start, "common-sense" suggests that clothing and accessories the Defendant wore in the recordings likely would be at the Defendant's residences.[7] Feliz, 182 F.3d at 86. Furthermore, the First Circuit has observed that "in drug cases, there is often probable cause to believe that evidence of the crime will be found where the suspected drug dealer lives." United States v. Dixon, 787 F.3d 55, 60 (1st Cir. 2015), cert. denied, 136 S. Ct. 280 (2015).[8]  "After all, common sense indicates that a drug pusher would want to hide these drug-connected things in a 'safe yet accessible place,' like a house"; "a stash house would not cut it, experience tells us, because it is a dangerous venue, often filled with criminals looking to

---

[7] That is, the "Black t-shirt with 'Air Jordan' logo"; "Black and Gray checkered Louis Vuitton satchel"; "Black and white baseball hat with 'rooster' logo"; and a pair of "Gold-rimmed sunglasses."

[8] See United States v. Bain, 874 F.3d 1, 23 (1st Cir. 2017) ("We also have a line of precedent that addresses when police have probable cause to search the homes of people known to be selling drugs."); United States v. Fletcher, 2017 WL 5585716, at *4 (D. Mass. 2017) (Stearns, J.) (and cases cited).

steal whatever they can from there." <u>United States v. Rivera</u>, 825 F.3d 59, 65 (1st Cir. 2016).  Moreover, it was "a commonsense inference to be sure" that the bulk quantities of drug proceeds, firearms to protect them, and documentary evidence of the Defendant's laundering activity, and purchases would be kept at his residences.  <u>See id.</u> ("affidavit also permits an inference that Rivera would have a firearm at his home to protect his drug cash and spoils from any would-be robbers").

Common sense aside, the Defendant himself unwittingly confirmed the First Circuit's reasoning about drug dealers' storage practices.[9]  In his "machine" or "system" (Aff. ¶31, p. 15), the Defendant was the top dog (Aff. ¶69), and not a small-time street dealer; he did not handle sales himself. Rather, as the Defendant explained, the DTO's network of subordinates would receive large quantities of the drugs and they would be at liberty to handle them as they saw fit, so long as the price per puck was paid.  <u>See</u> Aff. ¶¶29-70).  The Defendant himself described the DTO's recordkeeping, and its importance to how the DTO operated (Aff. ¶30-33), confirming Agent Kenny's general expertise and belief that detailed ledgers would be kept by a DTO of this size and sophistication.[10]  As such, it is understandable that the Defendant's residences were not the venue for transactions or meetings. Rather, the affidavit established that the DTO was so large, established, and profitable that vast amounts of the DTO's proceeds, records, and instrumentalities most likely were kept in the Defendant's possession and kept close at hand.

The Affidavit also set forth specific information about the DTO and the Defendant's ongoing efforts to use and launder drug proceeds. This included the rental of Target Location 1 itself, which law enforcement believed involved false statements made by the Defendant about his employment and was funded by drug proceeds; the recent purchase of the GMC truck; bank transactions; and the absence of any legitimate employment (Aff. ¶¶ 71-92).  The Defendant also continued to take flights, consistent with the bulk cash transportation trips that Gray and other associates of the DTO took at the Defendant's direction.[11]

---

[9] <u>See</u> Aff. 70 ("[n]iggas can't be leaving that shit in no bitch's house and she calling the police or her brother stealing that shit, nigga you gotta guard that shit with your life. Man you gonna take that shit, act like your life depend on it").

[10] "The shits a machine dog, it's a system dog and I know when you don't pay... There's a book nigga you know what I am saying, my peoples got the books nigga and your names in the book.... You ain't turn it in nigga, shits going out but it ain't coming back in, what the fucks going on big dog, you fucking up somewhere." Aff. ¶31, p. 15.

[11] <u>See</u> Aff. ¶32 ("These other little niggas that hustle with me, I sent them niggas out of town one day, they got bagged with like 100 racks or something, 80 G's… That wasn't nothing man, them niggas got arrested doing what I told them to do…They didn't get arrested, they just took the money, you know what I'm saying.")

The Defendant also continued to transact in significant quantities of unexplained cash that agents reasonably believed to be drug proceeds, and continued to own three motor vehicles that were themselves believed to have been purchased with drug proceeds. Agents observed the Defendant coming and going from both Target Locations throughout 2019 and 2020 and saw the GMC truck and motorcycles at the residences on multiple occasions, confirming the Defendant's continued ownership of vehicles purchased with drug proceeds.

Based on the scope of the DTO and its profitability, the $80,000 cash that the Defendant deposited was also a small fraction of the cash the Defendant inferably kept on hand even if there was no additional drug income since 2018.[12]  The Defendant had also made these cash deposits at ATMs located in and around Everett, MA, "consistent with Mubarak's continuing residence and storage of funds and cash at Target Location 1 [25 Charlton Street]" given that the ATMs were "less than 2 miles from Target Location 1." Target Location 2 was a location where the illicitly obtained GMC truck was observed and where the Defendant was known to spend nights and early mornings.  The Defendant was also observed coming and going from Target Location 2 when the homeowner was not present, consistent with his control and access to the premises.  See Aff. ¶111. Consequently, it was reasonable to expect that this secondary residence, Target Location 2, would also contain the same or similar evidence expected to be found at the primary residence, including the potential for cash, clothing and records. It was therefore reasonable to believe that the cash proceeds from the DTO, and records related to this activity, would be at the Defendant's residences.  See Rivera, 825 F.3d at 65.  Therefore, the Affidavit provided probable cause to establish a nexus between the Defendant's criminal activity and the two Target Locations.

**B.      The Probable Cause was Timely**

The Defendant nevertheless argues that the Affidavit "does not justify suspicion to search the Target Locations three years later." D.Mot. 12.  He claims that evidence from 2017 and 2018—***combined with recent*** flight logs, financial records, and call logs with individuals with prior drug offenses—cannot sustain the search warrants. But as the Defendant's motion itself notes, "[c]ourts have held that in cases

---

[12] Indeed, the Defendant's organization generated so much cash that he was not concerned about the loss of $100,000 in cash, each subordinate could earn $10,000 to $20,000 per day, and he would take in $120,000 from every twenty pucks.

involving drug distribution, evidence submitted in support of probable cause may be more temporally remote than in other types of cases." D.Mot.12, quoting <u>Feliz</u>, 182 F.3d at 87.

"[A]n affidavit supporting a search warrant must contain timely information or else it will fail." <u>United States v. Schaefer</u>, 87 F.3d 562, 568 (1st Cir. 1996). However, "[w]hen evaluating a claim of staleness, [courts] do not measure the timeliness of information simply by counting the number of days that have elapsed." <u>United States v. Morales-Aldahondo</u>, 524 F.3d 115, 119 (1st Cir. 2008). Rather, the court must "consider[ ] various factors, including 'the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information' in assessing the information's ripeness." <u>Trinh</u>, 665 F.3d at 13. Indeed, "it is common ground that drug conspiracies tend to be ongoing operations, rendering timely information that might, in other contexts, be regarded as stale." <u>Id.</u> (citing <u>United States v. Nocella</u>, 849 F.2d 33, 40 (1st Cir.1988)). This is particularly true of entrenched, longstanding drug operations with scope, scale and large profits, and newly acquired assets.

Here, similarly, the Affidavit lays out a large-scale, ongoing narcotics operation with large quantities, numerous members, manufacturing and distinct packaging (pucks), distribution on a significant scale, runners, lieutenants, violence, rules and structure, and bulk cash transportation, which was sufficiently profitable that the loss of $100,000 to law enforcement meant little to the Defendant. <u>See</u> Aff. ¶¶32-33. The numerous controlled purchases of controlled substances that CW-1 made from the DTO, the description of the DTO's scope and scale by Muwakkil, the Defendant's own statements concerning the organization and the vast income he was generating, and his discussions about bulk quantities of cash and a shooting he committed to ensure loyalty, showed that the DTO was engaged in a protracted conspiracy.

The financial investigation also suggested that the Defendant was still engaged in drug trafficking throughout 2019 and 2020, and continued to accrue assets and transact in the proceeds earned from earlier drug trafficking: he was not going to the place of employment he claimed on his rental application; he was not earning sufficient income from the purported employer to support his lifestyle of owning three luxury motor vehicles, frequent trips, and a $3,000 per month apartment; the dozens of trips he took appeared similar to the bulk cash transportation trips he described on the recording; he was depositing tens of

thousands of dollars in cash and promptly withdrawing it; and he continued to communicate with associates involved in drug trafficking.  Records of this activity were also being sought for by the warrants.

Search warrants that seek "business and financial records, cash, and personal property" also are further insulated from staleness claims.  See United States v. Ostrowski, 822 F.Supp. 2d 66, 72 (D. Mass. 2011) (Ponsor, J.).  Because paper trails tend to exist long after the criminal activity it documents, "[b]usiness and financial records tend to defy claims of staleness." Id. (citing United States v. Procopio, 88 F.3d 21, 26 (1st Cir.1996)).  Here, the warrant also sought evidence related to the Defendant's income and the absence of evidence relating to lawful employment. The Defendant's false statements concerning his income were shown to have been made in 2019 and in 2020 in the rental applications.  In those applications, he submitted paystubs in which he claimed to earn over $80,000 per year at an employer where he rarely, if ever, worked.  Records of his employment at KO Stone or the absence of such records (and thereby evidence of the laundering of the drug proceeds), were also reasonably expected to be found (or not) in the residences.  While the Affidavit includes Agent Kenny's experience and training regarding how drug traffickers make, keep, and maintain such records, the magistrate judge did not need to take the agent's word for it. During the August 11, 2017, recording, the Defendant boasted about the accuracy and extent of his recordkeeping with potentially deadly consequences.  See Aff. ¶31, p. 15.[13]  Given that the warrant sought records of the DTO and its activities (including laundering activity such as flight records, and employer documentation), and that the Defendant himself specifically described the existence and enduring importance of such records, the staleness claim rings hollow.

The same is true of the basis to search for firearms, including the firearm used by the Defendant to shoot Gray. Importantly, "firearms, unlike drugs, are durable goods useful to their owners for long periods of time."  United States v. Ponzo, 853 F.3d 558, 573 (1st Cir. 2017).  Here, of course, the Defendant was in possession of at least one firearm that he boasted about using and would inferably be in possession of other firearms in order to ensure the loyalty of his "crew." The Defendant also discussed the nature of the drugs he was selling being in the form of 160-gram "pucks."  The packaging in this "puck" form was

---

[13] Of course, that recordkeeping was for a purpose, and the Defendant warned that violence would ensue, as it did for Gray, if the numbers did not line up: "You ain't turn it in nigga, shits going out but it ain't coming back in, what the fucks going on big dog, you fucking up somewhere, then you being disloyal to the crew." Aff. ¶31.

distinct and used to create hundreds of pucks (a single customer such as CW-1 was to purchase twenty of them per resupply). It was therefore reasonable to believe that the mechanisms and paraphernalia used to package the drugs into these pucks[14] were durable and would continue to be in the Defendant's possession. See Aff. ¶69.

The amount of proceeds and cash that the DTO was generating also defeats the Defendant's staleness argument. In Ostrowski the Court noted that "it was reasonable to expect that at least some of [the illicitly obtained] cash would still be at [d]efendant's residence even two years after the withdrawal" because the Defendant had illicitly obtained over $250,000 in cash. Ostrowski, 822 F.Supp. 2d at 72. Here, in the November 2017, recording, the Defendant discussed receiving $120,000 per drug transaction, and also stated that his subordinates should be able to generate up to $20,000 dollars a day. Just as it was in Ostrowski, given the large amounts of cash being generated, it is reasonable to expect that at least some of the cash would still be at the Defendant's residences even three years after his conversation with CW-1. This inference was supported by the recent purchase and financing of the GMC truck, which he bought for approximately $79,000 in November 2019, with $19,500 cash put down and the additional $80,000 in cash being deposited despite never being observed at work. See United States v. McElroy, 587 F.3d 73, 78 (1st Cir. 2009) (three-year-old information regarding payroll tax avoidance scheme refreshed by defendants' continuing withdrawals of large sums of cash).

Because the Affidavit established that (1) a crime had been committed and (2) enumerated why evidence of the offense likely would be found at the place to be searched, the Affidavit contained sufficient information to establish probable cause. Alternatively, in light of the "considerable deference" a court provides to a magistrate's determination that information in an affidavit establishes probable cause, Feliz, 182 F.3d at 86, the Affidavit provided a "substantial basis for concluding that probable cause existed." Gonzalez-Arias, 946 F.3d at 23. Therefore, the evidence should not be suppressed.

## II.    THE SEARCH AND SEIZURE OF MOTOR VEHICLES AT THE TARGET LOCATIONS DID NOT EXCEED THE SCOPE OF THE WARRANT

---

[14] See G.Exs. 1 & 2, Attachment B ("Items, materials, equipment and paraphernalia associated with the manufacturing, ordering, packaging, importation, possession, purchase, storage, distribution, and/or transportation of controlled substances, including, but not limited to, packaging materials, storage bins, containers, cutting agents, and scales.").

The Defendant next challenges the search and seizure of the GMC truck at Target Location 1 and seizure of the two motorcycles at Target Location 2.  He claims that the search of the 2020 GMC truck that was located in the garage at Target Location 1 exceeded the scope of the search warrant.  He further claims that the seizure of the GMC truck and motorcycles exceeded the scope of the search warrants.  Not one of these claims regarding the scope of the search warrants have merit.

In gauging a warrant's scope, "there is some breathing room in [the] analysis, since search warrants and affidavits should be considered in a common sense manner, and hypertechnical readings should be avoided." United States v. Peake, 804 F.3d 81, 87 (1st Cir. 2015). Relatedly, in executing the warrant, officers may search structures and spaces that are not expressly listed in the warrant so long as they "reasonably can be viewed as a part of the described premises", based on the officers' "common-sense evaluation of information contained in the warrant, the layout, and evidence encountered at the scene." United States v. Fagan, 577 F.3d 10, 13-15 (1st Cir. 2009).  The search and seizure of the vehicles at the Target Locations was authorized by the plain language of the search warrant.

## A.    Search of GMC Truck was Lawful

The GMC truck was lawfully searched for the specified evidence in Attachment B. "It is well established that vehicles found within the curtilage of a dwelling are within the scope of a warrant particularly describing the dwelling so long as the vehicles could contain the items sought and described in the warrant." United States v. Caballero, 2018 WL 5281744, at *6, n.7 (D. Mass. 2018) (Mastroianni, J.); United States v. Crooker, 688 F.3d 1, 8 (1st Cir. 2012) (officers may search "any container" "if it is reasonable to believe that the container could conceal items of the kind portrayed in the warrant").[15]  Here, the warrant for Target Location 1 specified that "[t]he search **shall include all… garage spaces**," "owned or under the control of the occupants of such premises." D.Ex. 1 (emphasis added). As the Defendant acknowledges, the GMC truck that he owned in his own name was located in the "garage" of 25 Charlton Street. D.Mot. 2.  Therefore, the search warrant authorized the search of the GMC truck because it was

---

[15] See also United States v. Scott, 2018 WL 2197911, at *6 (E.D. Mich. May 14, 2018) ("Although the warrant did not explicitly authorize the search of vehicles, any vehicles within the curtilage of the residence fall within the scope of the warrant's authorization," so "agents had the authority to search the [defendant's car] under the scope of the warrant which authorized a search of the condo and all of its contents.").

located in the "garage," which is a place that was authorized to be searched, and the GMC truck was capable of containing (and did contain) the items to be searched for. [16]

Furthermore, since agents were able to lawfully access the garage (both under the terms of the warrant and because the Defendant could not expect privacy in the commonly accessible garage),[17] the GMC truck was also lawfully searched under the automobile exception.[18]  Even based on the information recounted in the affidavit, there was probable cause to search the GMC truck for evidence of the Target Offenses.   Indeed, the agents could also properly consider the information they had learned during the earlier search of Apartment C-701 in the probable cause calculus.[19]  This included the discovery of drug paraphernalia, large amounts of cash, ledgers, firearms, and the ammunition but no firearm. Furthermore, agents located some, but not all, of the clothing/accessory items listed in the warrant **before** they accessed the GMC truck. Consequently, this emerging factual picture provided further justification to search the GMC truck for outstanding items, such as the firearm that investigators could reasonably expect to find in proximity to the ammunition.

### B.      Seizure of the GMC Truck and the Motorcycles

The Defendant also claims that the GMC truck and motorcycles could not be lawfully seized (and presumably be subjected to forfeiture) under the warrants because "[m]otor vehicles were not among the types of evidence the agents were permitted to seize." D.Mot. 15.  The Defendant misreads Attachment B,

---

[16] See Fagan, 577 F.3d at 13-15 ("It is clear that structures that are part of the premises specified in a search warrant may validly be searched under the purview of the warrant."); United States v. Ferreras, 192 F.3d 5, 10-11 (1st Cir. 1999) (warrant authorizing search of a premises permits search of appurtenant areas).

[17] The government does not concede that the Defendant could reasonably expect privacy in the common garage for the large apartment complex, or that a warrant was required to make entry into the garage to search and seize the truck.  See United States v. Cruz-Pagan, 537 F.2d 554, 557-58 (1st Cir. 1976) (holding that law enforcement's entry of "parking garage" of condominium building did not violate the Fourth Amendment, as there was no reasonable expectation of privacy in the area); United States v. Coleman, 923 F.3d 450 (6th Cir.), cert. denied, – U.S. –, 140 S. Ct. 580 (2019) (citing United States v. Jones, 893 F.3d 66, 72 (2d Cir. 2018) ("[defendant's] appeal ... fails because the driveway in which [defendant's] vehicle was parked was the shared driveway of tenants in two multi-family buildings and was not within the curtilage of [defendant's] private home."). This argument need not be addressed as the warrant specifically authorized the entry and search of the garage space that the Defendant controlled, where the GMC truck was in fact parked.

[18] See California v. Acevedo, 500 U.S. 565, 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained"); Cruz-Pagan, 537 F.2d at 557-58; United States v. Lopez, 380 F.3d 538 (1st Cir. 2004) (motor vehicle exception applied in condo-complex parking lot).

[19] United States v. Azor, 881 F.3d 1, 8 (1st Cir. 2017) (the relevant issue is "the collective information known to the law enforcement officers participating in the investigation," not what is known by any individual officer).

which authorized the seizure of "records, data, or **tangible objects**, **in whatever form** that constitute **evidence**, **fruits**, or **instrumentalities** of [the Target Offenses]."  D.Exs. 1 & 2.

Here, the Defendant's lack of observed employment while under surveillance, his regular cash bank deposits, his continued frequent contact with serial drug offenders, and his significant spending on vehicles well beyond his documented lawful income—including the GMC truck purchased in November 2019, and two customized motorcycles, one of which purchased around the time of the recordings— demonstrated that the vehicles were themselves "tangible objects," "that constitute[d] evidence, fruits, and instrumentalities of" the Target Offenses. Agent Kenny stated as much.  See Aff. ¶85-89. The GMC truck itself, its presence in the garage, the Defendant's ownership of it and other belongings inside of it, also had evidentiary significance.  The GMC truck proved the Defendant's control over Target Location 1 and the incriminating items found in the Apartment.  Consequently, before and certainly after the discovery of the ammunition, ledger and presses in the Apartment, the seizure of the GMC truck was lawful.

Similarly, at Target Location 2, the search warrant specified that the "search shall include the entirety of the detached garage structure," where the two motorcycles were located.  The two motorcycles were identified in the affidavit having been obtained by the Defendant with drug proceeds (Aff. ¶89), and were therefore "evidence," "instrumentalities" and suspected "fruits" of the Target Offenses. If there were any question from the information set forth in the Affidavit and the face of the warrant, the ample factual basis justifying the seizure of the two motorcycles only grew once the searches commenced. The Defendant made a false statement to law enforcement post-*Miranda* at Target Location 1, hour before the search at 11 Garden Road, claiming that he had sold the motorcycles the week before the search warrants. See G.Exs. 1, 5, 7. Records related to the motorcycles were also found in Target Location 1, and further substantiated their criminal origin.  Furthermore, once 11 Garden Road was searched and a firearm and over $370,000 in bulk cash were located, the two high-end customized motorcycles and the GMC truck owned by the Defendant found in the garage (G.Exs. 6-7) became independent evidence of the Defendant's dominion and control over Target Location 2.

Lastly, the Fourth Amendment does not require the police to obtain a specific seizure warrant "before seizing an automobile from a public place when they have probable cause to believe that it is

forfeitable contraband." <u>Florida v. White</u>, 526 U.S. 559, 561 (1999).[20] The GMC truck and the two motorcycles were also specifically identified in the affidavit as suspected of having been obtained with drug proceeds.[21] <u>See</u> Aff. ¶89. Agents were in a lawful position to access the vehicles, and therefore could lawfully seize, and inventory[22] them under 18 U.S.C. § 981(b)(2)(B) ("a seizure may be made without a warrant" for purposes of forfeiture "if the seizure is made pursuant to a lawful arrest or search").

## III.    SEARCH OF CELL PHONES FROM TARGET LOCATION 1 WAS LAWFUL

The Defendant next claims that the search of the cell phones seized from Target Location 1 was beyond the scope of the warrant. To the contrary, searching the cell phones was within the plain language of the warrant in Paragraph II of Attachment B, and the categories of evidence to be searched for in the phones were specified in Paragraph I. <u>See</u> D.Ex. 1.

The same precise argument was raised by the defendant in <u>United States v. Mulcahey</u>, 2015 WL 9239755, at *1 (D. Mass. 2015), where the same warrant language was addressed.  <u>Compare</u> D.Mot 16 ("the government should have obtained a separate warrant to search them"). The Court concluded this "argument falls on an examination of the face of the warrant itself. The warrant clearly identifies the property to be searched (and seized) as '[a]ll computers ... and computer storage devices ... located at [defendants' business address].'" <u>Id</u>. (quoting the warrant).  The warrant here contained language essentially the same language as in <u>Mulcahey</u>: it authorized the government to seize "[a]ll computer hardware, computer software, and storage media," including "smartphone, cell/mobile phone" and search

---

[20] <u>See</u> <u>United States v. Brookins</u>, 345 F.3d 231, 235 (4th Cir. 2003) ("[U]nder the relevant forfeiture statutes, the police may seize an automobile without first obtaining a warrant when they have probable cause to believe that it is forfeitable contraband"); 21 U.S.C. §§ 853(a)(1) (statutory authority to criminally forfeit "any property constituting, or derived from, any proceeds ... directly or indirectly" obtained from the distribution of narcotics").

[21] "Numerous cases explain that evidence of drug trafficking combined with lack of legitimate sources of income will support a finding of probable cause that unexplained wealth (i.e., money, automobiles, or other expensive property) are proceeds of that drug trafficking." <u>United States v. Horsley</u>, 2021 WL 1081125, at (W.D.VA 2021) (collecting cases).

[22] Once the GMC truck was lawfully seized under this authority, an inventory search was also lawfully capable of being performed pursuant to the FBI inventory policy. <u>See</u> <u>United States v. Richardson</u>, 515 F.3d 74, 85 (1st Cir. 2008) ("[t]he Fourth Amendment permits a warrantless inventory search if the search is carried out pursuant to a standardized policy."). In the event that the Court reaches this argument, the government can file a copy of that policy as an Exhibit under seal.

them for information set forth Paragraph I "Off-site." D.Ex. 1.[23] Therefore, the searches of the cell phones' contents were authorized by the plain language of the warrant, and this claim fails.

## IV.    THE GOOD FAITH EXCEPTION APPLIES TO THE SEARCH WARRANTS AND ANY CLAIMS THAT AGENTS EXCEEDED THE SCOPE OF THE WARRANTS

Even if the Court finds that the Affidavit or warrants were somehow deficient or the agents exceeded the warrants' scope, the good faith exception renders suppression not warranted on any of the grounds claimed by the Defendant. In United States v. Leon, the Supreme Court held that evidence found to be unsupported by probable cause is nevertheless admissible when obtained by officers acting in good faith reliance on a warrant issued by a detached and neutral magistrate. 468 U.S. 897.[24]  "An officer's decision to obtain a warrant is prima facie evidence that he or she was acting in good faith." United States v. Lickers, 928 F.3d 609, 618 (7th Cir. 2019).

To the extent the Defendant claims the Affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," this claim fails. Leon, 468 U.S. at 923.  As the Supreme Court has noted, "the threshold for establishing this exception is a high one," because "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination." Messerschmidt v. Millender, 565 U.S. 535, 547 (2012).  The test is "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." Leon, 458 U.S. at 922, n. 23. The defendant makes no such argument here.[25]  Rather, for the reasons stated above, there was specific and detailed information establishing that these crimes were ongoing through July and August 2020, that the Defendant had access to both residences, and that he kept proceeds of these crimes

---

[23] The cites two out-of-circuit cases where the government sought separate search warrants to examine the content of cell phones. See Scott, 2018 WL 2197911 at *6 (E.D. Mich. May 14, 2018); United States v. Westley, 2018 WL 3233134 at *5 (D. Conn. July 2, 2018). Both cases involved warrantless seizures of devices and subsequent warrants to search them.

[24] "[The] exclusionary rule is designed to deter police misconduct rather than [] punish the errors of judges and magistrates." Leon, 468 U.S. at 916.  The exclusionary rule is applicable only where the need to deter police misconduct outweighs its substantial costs—that is, where officers "exhibit 'deliberate,' reckless' or grossly negligent' disregard for Fourth Amendment rights." United States v. Levin, 874 F.3d 316, 322 (1st Cir. 2017).

[25] The Defendant cites to United States v. Ricciardelli, 998 F.2d 8 (1st Cir. 1993), which does not support his position. Unlike an anticipatory warrant at issue there, the search warrants here had no constitutionally-required conditions governing its execution Relatedly, Ricciardelli was overruled by the Supreme Court. See Bregu, 938 F.3d at 417 (noting abrogation of Ricciardelli in United States v. Grubbs, 547 U.S. 90, 98 (2006)).

at both residences. Consequently, the affidavit was not so lacking in probable cause that the officers should have known the search was illegal.  See Bain, 874 F.3d at 24 (applying Leon to nexus claim).

The protections of Leon also extend to any errors claimed by the Defendant as to agents exceeding the "scope" of the warrants (D.Mot. 14, 15), if the claimed errors ensued from "a reasonable interpretation of the command of the warrant."  United States v. Pimental, 26 F.4th 86, 96 (1st Cir. 2022).  As described above, all of the agents' actions were in fact reasonable interpretations of the language of the warrants.[26] The Defendant does not even attempt to argue this point, merely claiming the vehicles are not listed in Attachment B. Thus, even if the Court were to find that there was insufficient probable cause to support the warrants or that the execution as technical matter exceeded the scope, the agents' good faith reliance on the warrants, and reasonable interpretations of the warrants' commands were not "entirely unreasonable."  Leon, 468 U.S. at 923. This is especially true in the context of the expansive affidavit submitted in support of the warrant applications. Accordingly, under the good faith exception, the evidence should not be suppressed.

## CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court deny the Defendant's Motion to Suppress.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:    */s/ Philip A. Mallard*
        Philip A. Mallard
        Assistant U.S. Attorney

---

[26] The warrants plainly authorized the search of "garage spaces" at Target Location 1 and "the entirety of the detached garage structure" at Target Location 2 for "records, data, or tangible objects, in whatever form that constitute evidence, instrumentalities and fruits of" the crimes (D.Exs. 1 & 2). See e.g., United States v. Biles, 100 Fed.Appx. 484, 494 (6th Cir. 2004) ("[T]he Leon exception may save a search that exceeds the scope of a warrant if officers reasonably mistake what may be found within a home's curtilage."). Therefore, it was "a reasonable interpretation of the command of the warrant," Pimental, 26 F.4th 86, 96, for the agents to search the GMC truck and two motorcycles that were at the locations authorized by the warrant, and were containers where additional evidence might be stored. Similarly, it was reasonable under the warrants terms for the agents to seize cellular phones pursuant to Paragraph II of Attachment B and search those phones for the types of evidence set forth in Paragraph I, as the warrant specifically commands. See D.Ex. 1. Lastly, it was also a reasonable interpretation for agents to seize the vehicles under the warrant because they were "evidence" of the drug crimes and money laundering, laundered "instruments", and "fruits" of the crimes.

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>*/s/ Philip A. Mallard*</u>
Philip A. Mallard
Assistant U.S. Attorney

Date: May 11, 2022