UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | * | |
| UNITED STATES OF AMERICA, | * | |
| | * | |
| | * | |
| v. | * | |
| | * | Criminal Action No. 20-cr-10300-ADB |
| MUJAB MUBARAK, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS

BURROUGHS, D.J.

Currently before the Court is Defendant Mujab Mubarak's ("Mubarak") motion to suppress evidence obtained during the searches of two residences, an apartment in Everett, Massachusetts (the "Everett apartment") and a house in Lowell, Massachusetts (the "Lowell house"), based on the assertion that the search warrants were not supported by probable cause. [ECF No. 105]. For the reasons set forth below, the motion to suppress is DENIED.

I.      BACKGROUND

A.      Investigation

The following facts are drawn primarily from the Affidavit of Special Agent Timothy R. Kenny ("Agent Kenny") submitted in support of the application for the search warrants and are undisputed unless otherwise indicated. See [ECF No. 105-3 ("Kenny Affidavit" or "Affidavit")].

The Government began investigating the "Mubarak Drug Trafficking Organization" (the "Organization") in 2017. [Kenny Affidavit ¶¶ 5, 13]. From 2017 to 2020, evidence was obtained primarily using physical surveillance, informants, and phone and financial records. [Id. ¶¶ 2, 5]. The investigation revealed that Mubarak was the leader of the Organization, and that

Vito Gray and Abdul Karim Muwakkil assisted him in transporting and distributing large quantities of fentanyl, heroin, and cocaine, and with collecting and laundering the Organization's proceeds. [Id. ¶¶ 13–16]. The Affidavit also asserts that in July 2017 Mubarak shot Gray over an issue related to the loss of drug trafficking proceeds, [id. ¶ 13], although Mubarak disputes that he has been affirmatively identified as the shooter, [ECF No. 105 at 4].

In support of these allegations, Agent Kenny attested that, between June 2017 and January 2018, a cooperating witness ("CW-1") made approximately 25 controlled purchases of heroin, fentanyl, and cocaine, all of which were arranged by Muwakkil or Gray, and in some instances were bought from Muwakkil or Gray directly. [Kenny Affidavit ¶¶ 17–19]. The Affidavit states that the buys were made "[i]n coordination with" Mubarak even if he was not present for the actual transactions. [Id. ¶ 17]. In conversations with CW-1, Muwakkil referred to Mubarak as "my boss" and "the boss" and the two of them also discussed the operations of the Organization more broadly, including its vast profitability. [Id. ¶¶ 55–58].

Additionally, CW-1 met with Mubarak three times, on August 7, 2017, [Kenny Affidavit ¶ 29], August 11, 2017, [id. ¶¶ 30–34[1]], and November 21, 2017, [id. ¶¶ 61–70]. During these meetings, two of which were recorded, they discussed the Organization, including its drug-dealing and money laundering activity, distribution scheme, hierarchy, lucrative profits, quality of drug supply, and how Mubarak secured the drug supply through his own funding. [Id. ¶¶ 29–45, 61–70]; see also [ECF No. 109 at 3–4]. Further, Mubarak identified himself as the boss of the Organization, [Kenny Affidavit ¶ 69], and, at the recorded meeting on August 11, 2017,

---

[1] As Mubarak points out in his motion, there is an error in the sequential numbering of this part of the Affidavit. [ECF No. 105 at 3 n.4]. The relevant section starts at ¶ 30 and continues for about twelve paragraphs. The Court nevertheless identifies the paragraphs as they are numbered in the Affidavit.

admitted to shooting Gray, [id. ¶¶ 30–34].  At this same August meeting, Mubarak referenced a "book" or "books," [id. ¶ 31], which Agent Kenny believed to be ledgers documenting the unlawful activity of the Organization, [id. ¶ 32].  At the November meeting, Mubarak talked about closely "guard[ing]" his drug supply, which Agent Kenny attested indicated that Mubarak "stores his drug supply at a location he feels is secure, such as his residence."  [Id. ¶ 70].[2]

The Government's investigation continued after 2017, but without further use of the informant or additional drug buys.  Instead, investigators employed physical surveillance and focused on Mubarak's finances and phone call records.  [Kenny Affidavit ¶¶ 71–105, 114–125].  The financial investigation revealed a pattern of activity, consistent from 2017 to 2020, indicative of the laundering of drug proceeds, including Western Union transactions, suspiciously structured check and cash deposits to bank accounts, extensive airline travel, and purchases of motor vehicles.  [Id. ¶¶ 79–105].  Further, Mubarak was never observed traveling to or from a place of employment despite being surveilled on over 50 separate occasions from January 1, 2020 up until the date of the warrant application.  [Id. ¶¶ 71, 78].  Although he deposited some checks from an employer, KO Stone, Inc., the Government alleges those checks were fraudulent and the bulk of the deposits into his account were cash consistent with drug proceeds.  [Id. ¶¶ 78, 95–101].  Finally, review of Mubarak's phone records from January 1, 2020 to July 5, 2020 showed frequent contact with individuals involved in drug trafficking.  [Id. ¶¶ 114–25].

Despite the Government's frequent physical surveillance, there is no evidence that Mubarak was ever observed engaged in any drug transactions.

---

[2] This statement was "[n]iggas can't be leaving that shit in no bitch's house and she calling the police or her brother stealing that shit, nigga you gotta guard that shit with your life. Man you gonna take that shit, act like your life depend on it[.]"  [Kenny Affidavit ¶ 70].

B.      **Search Warrants and Related Residences**

During the course of the investigation, Mubarak was observed residing at two locations: the Everett apartment (25 Charlton Street, Apartment C-701) and the Lowell house (11 Garden Road).  [Kenny Affidavit ¶ 7].  Agent Kenny attested that the Everett apartment was Mubarak's primary residence and that the Lowell house was his secondary residence.  [Id.].  On August 5, 2020, the Government sought warrants to search both residences with the Kenny Affidavit forming the basis of each application.  [Id. ¶¶ 7–9].

In support of the warrant application for the Everett apartment, Agent Kenny attested that it was his belief that Mubarak primarily resided at the Everett apartment, that he conducted money laundering activity from the residence, and stored evidence of money laundering and drug trafficking there.  [Kenny Affidavit ¶¶ 106–09].  Based on surveillance beginning in approximately December 2019, Mubarak slept at this residence most nights, motor vehicles registered to him (a GMC Truck and two motorcycles) were kept in the parking garage of the residence, and leasing documents obtained by law enforcement confirmed that he had leased the apartment for one year on February 28, 2019 and renewed the leased for another year on February 9, 2020.  [Id. ¶¶ 72–73, 107].  Additionally, Mubarak made numerous cash deposits at ATMs located in Everett, MA and Malden, MA, less than two miles away from the Everett apartment, which, Agent Kenny concluded, was "consistent with [his] continuing residence and storage of funds and cash at [the Everett Apartment]."  [Id. ¶¶ 99, 101].  He further stated that the "pattern of the deposits [was] consistent with [Mubarak] structuring the cash deposits into the accounts to not generate suspicion due to large cash amounts being transacted, and to avoid the requirement of a currency transaction report being filed for transactions in amounts exceeding $10,000."  [Id. ¶ 102].

4

The Lowell house belonged to Djwan Scott, who the Affidavit describes as "one of [Mubarak's] longtime female associates." [Kenny Affidavit ¶ 112]. In support of the application for a warrant to search the Lowell house, Agent Kenny attested that Mubarak had slept at this location "most nights" during 2017 through March 2018, based upon his car being parked there overnight, [id. ¶ 111], and investigators additionally observed Mubarak or his GMC truck at this location on at least seven occasions during July 2020, even when the homeowner was not there, [id.]. Based on this information, Agent Kenny believed that Mubarak stored personal belongings and paperwork at the Lowell location. [Id. ¶ 113].

As support for the search of both residences, the Affidavit emphasized Mubarak's November 2017 statement to the effect that he kept the instruments and objects of his drug activity closely "guard[ed]," [Kenny Affidavit ¶ 70], thereby suggesting that such items would be found at his home or habitual residence. Agent Kenny also relied on his experience and knowledge about how drug traffickers operate in concluding where evidence was likely to be found. [Id. ¶ 127]. Agent Kenny attested that he had worked for the FBI since 2014, with most of that experience involving gang and drug investigations, [id. ¶¶ 1, 5, 13], and that he was familiar with the methods of operation employed by drug traffickers, including those involving the distribution, storage, and transportation of narcotics; the collection of proceeds; and, the common ways in which drug traffickers use cell phones in furtherance of their unlawful activities and to thwart law enforcement surveillance, [id. ¶¶ 1–4, 127, 131–138]. In conclusion, Agent Kenny stated that, "[b]ased on []his training and experience, [his] analysis of consensually recorded telephone calls, meetings, and controlled purchases, and drugs seized from co-conspirators who have been involved in drug trafficking with [Mubarak] and the co-conspirators, [he] believe[d] that drug proceeds, documents, and other evidence of drug trafficking and money

laundering will be found at" both locations, [id. ¶ 128], and that this would specifically include cell phones and other computer equipment with evidence of crimes, [id. ¶ 138].

On August 5, 2020, Magistrate Judge Judith Dein issued two search warrants authorizing the search of both locations.  See [ECF Nos. 105-1 (warrant for the Everett apartment); 105-2 (warrant for the Lowell house)].  The warrants identified the "Target Offenses" that were under investigation as:

> felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); use, brandishing and discharge of a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c); manufacturing, importation, distribution and possession with intent to distribute controlled substances, and conspiracy, in violation of 21 U.S.C. §§ 841(a)(1), and 846, and laundering of monetary instruments, in violation of 18 U.S.C. § 1956.

[ECF No 105-1 at 5; ECF No 105-2 at 5]; see also [Kenny Affidavit ¶ 5].

The search warrant for the Everett apartment authorized a search of the premises, as well as "storage areas associated with unit, garage spaces, and containers . . . that are owned or under the control of the occupants of such premises."  [ECF No. 105-1 at 4].  Similarly, the search warrant for the Lowell house also authorized the search of the premises and all "storage areas . . . that are owned or under control of the occupants of such premises[]" and specifically stated that "[t]he search shall include the entirety of the detached garage structure."  [ECF No. 105-2 at 4].

Both warrants incorporated a common Attachment B that permitted the seizure of "[a]ll records, data, or tangible objects, in whatever form that constitute evidence, fruits, or instrumentalities of the 'Target Offenses[,]'" [ECF No 105-1 at 5; ECF No 105-2 at 5], as well as the articles of clothing Mubarak was wearing in the recorded meeting with CW-1, [ECF No. 105-1 at 6–7; ECF No. 105-2 at 6–7].  Finally, both warrants allowed for the seizure of "[a]ll computer hardware, computer software, mobile phones, or storage media" that could contain

items referenced in the warrant and provided for the off-site search of these items.  [ECF No. 105-1 at 7; ECF No. 105-2 at 7].

On August 6, 2020, investigators executed the search warrants.  [ECF No. 105 at 1–2].  At the Everett apartment, investigators seized $24,457 in cash, rounds of ammunition, a drug press, cutting agents, two money counters, cut off plastic bags, a vacuum sealer, multiple cell phones, digital scales containing residue, and suspected drug ledgers, among other items.  [ECF No. 105 at 2; ECF No. 109 at 6].  The search of Mubarak's GMC truck, which was in the building's parking garage, resulted in the seizure of a loaded firearm and another round of ammunition found in a bag in the center console.  [ECF No. 105 at 2; ECF No. 109 at 7].  Articles of clothing identified in the search warrant were also found in the home and car.  [ECF No. 109 at 6–7].  At the Lowell location, investigators seized a bag containing $346,484 in cash, a second bag containing $19,110 in cash, a loaded firearm, 80 rounds of ammunition, and two motorcycles registered to Mubarak.  [ECF No. 105 at 2; ECF No. 109 at 7].  The firearm was registered to Scott, who had an expired license to carry at the time of the search.  [ECF No. 105 at 2 n.1].

On April 11, 2022, Mubarak moved to suppress the evidence from the two searches, asserting a lack of probable cause in violation of the Fourth Amendment.  [ECF No. 105 at 1].  The Government opposed on May 11, 2022.  [ECF No. 109].  A hearing on the motion was held before the Court on June 6, 2022.  [ECF No. 111].

## II.      LEGAL STANDARD

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched—the so-called 'nexus' element."  United States v. Rodrigue,

560 F.3d 29, 32–33 (1st Cir. 2009) (quoting United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005)).  "Probable cause exists when there is a 'fair probability that contraband or evidence of a crime will be found at a particular place.'"  United States v. Torres-Rosario, 588 F. Supp. 2d 128, 131 (D. Mass. 2008) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  "Information supporting probable cause for a warrant is often set forth in an affidavit provided by a law enforcement officer . . . ."  United States v. Gifford, 727 F.3d 92, 98 (1st Cir. 2013).

"An affidavit supporting a search warrant is presumptively valid," Gifford, 727 F.3d at 98, and "[a] magistrate's 'determination of probable cause should be paid great deference by reviewing courts,'" Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)).  Where, as here, there are no proven allegations of misstatements or omissions that were intentional or reckless, courts generally owe deference to a magistrate judge's finding of probable cause, see United States v. Roman, 942 F.3d 43, 50 (1st Cir. 2019) (citing Burke v. Town of Walpole, 405 F.3d 66, 82 (1st Cir. 2005)), and will only reverse the finding of probable cause if there is "no substantial basis for concluding that probable caused existed," United States v. Faust, 853 F. 3d 39, 46 (1st Cir. 2017) (quoting United States v. Dixon, 787 F.3d 55, 59 (1st Cir. 2015)).

III.     DISCUSSION

A.      Probable Cause for the Warrants

Mubarak argues that the Kenny Affidavit, which formed the basis of the warrant applications, failed to establish probable cause for the searches because it did not show a sufficient nexus between criminal activity and the two residences, and because the information relied upon was stale.  See generally [ECF No. 105].  The Government responds that Mubarak's arguments "neglect[] the nature of the evidence to be searched, and the fair and reasonable

inferences of where such evidence might be found[]" in a case involving extensive and ongoing drug trafficking and money laundering.  [ECF No. 109 at 9].

Courts "evaluate the nexus element in the familiar way, examining 'whether, given all the circumstances set forth in the affidavit . . . there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place.'"  United States v. Bregu, 948 F.3d 408, 417 (1st Cir. 2020) (alterations in original) (quoting Gates, 462 U.S. at 238).  "Put differently, the application must give someone of 'reasonable caution' reason to believe that evidence of a crime will be found at the place to be searched."  Ribeiro, 397 F.3d at 49 (quoting Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality op.)).  In this case, it is undisputed that there is no direct evidence of criminal activity inside either location, but a "nexus . . . need not, and often will not, rest on direct observation, but rather can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime]."  Roman, 942 F.3d at 51 (alteration in original) (quoting United States v. Feliz, 182 F.3d 82, 88 (1st Cir. 1999) (internal citation marks omitted)).  Such an inference, however, should not be "applied lightly."  Id.

Mubarak contends that the Affidavit relies largely, and improperly, on Agent Kenny's "boilerplate language" alone, and no other evidence to suggest that evidence of any criminal activity would be found at either property on August 5, 2020.  [ECF No. 105 at 9].

The Court agrees with Mubarak that that reliance on Agent Kenny's knowledge and the existence of the drug conspiracy alone would not be enough to support a finding of probable cause to search either residence without something more.  The law in this Circuit is abundantly clear that "membership in a drug conspiracy by itself does not—and cannot—establish automatic

probable cause for a search of person's home for drugs." <u>United States v. Chalas</u>, 478 F. Supp. 3d 143, 150 (D. Mass. 2020).[3]

The controlling case on this topic is <u>Roman</u>, which, in effect, permits an inference of nexus where there is something beyond an affiant's experience and the fact of a residence occupied by a suspected drug dealer.  942 F.3d 43.  In that case, the Court repeated their "skepticism that probable cause can be established by the combination of the fact that a defendant sells drugs and general information from police officers that drug dealers tend to store evidence in their homes[,]" <u>id.</u> at 51–52 (citing <u>United States v. Bain</u>, 874 F.3d 1, 23–24 (1st Cir. 2017)), and made clear that "generalized observations of this type should be combined with specific observations, or facts connecting the drug dealing to the home to permit an inference of nexus to a defendant's residence[,]" <u>id.</u> at 52 (internal quotation marks and citations omitted). "Examples of such 'specific observations' include evidence that drug distribution 'was being organized from [the defendant's] residence,' that the defendant used his home as a communications hub for drug activity, or that the defendant 'move[d] back and forth from his residence in relation to drug transactions[.]'" <u>Id.</u> (citations omitted).  Moreover, the Court explained that even where law enforcement asserts that a large-scale drug organization could keep relevant evidence at multiple locations, that "does not relieve the government of its burden to provide specific evidence as to each 'place [to be] searched.'" <u>Id.</u> at 54 (alteration in original) (citing <u>Dixon</u>, 787 F.3d at 59).

---

[3] Any alternative suggestion by the Government is misplaced.  <u>See</u> [ECF No. 109 at 9–10 (Government's opposition brief citing <u>Dixon</u>, 787 F.3d at 60 as saying that "in drug cases, there is often probable cause to believe that evidence of the crime will be found where the suspected drug dealer lives[]" but omitting the remainder of that quote that continues to recommend at least one additional condition to establish probable cause, specifically the lack of any other "drug-dealing headquarters")].

To be sure, the Kenny Affidavit is thin with regards to such particularized evidence. [ECF No. 105 at 6–7, 9–10]. There is no claim that Mubarak was seen entering or exiting either residence before or after a drug transaction, that he was ever seen at the residences with individuals believed to be involved in drug activity, or that he or his co-conspirators made any statements in person or over the phone that suggested he organized drug activity from either residence. See [id. at 10]; see generally [Kenny Affidavit].

The Affidavit, however, did present enough other evidence to connect the criminal activity with the Everett apartment. First, the facts offered in the Affidavit supported the conclusion that Mubarak "held the top position in an active, violent, and highly profitable [drug trafficking organization] that had amassed—and continued to amass—wealth[,]" [ECF No. 109 at 2]; Mubarak himself described the Organization as a "machine" or "system" that required recordkeeping to track payment and non-payment, [Kenny Affidavit ¶ 31; ECF No. 109 at 10]; and, Mubarak, in a recorded meeting, referenced "books," thus confirming the likely existence of ledgers that would be among the closely guarded items in his home, [Kenny Affidavit ¶ 32; ECF No. 109 at 10 n.10]. Second, and importantly, the Affidavit also referenced total cash deposits well in excess of any legitimately earned income that were deposited at ATMs near the Everett apartment and in amounts of under $10,000, suggesting an intent to avoid the transaction reporting requirements and also evidencing the likely storage of those cash proceeds at the apartment. [Kenny Affidavit ¶¶ 98–102]. Third, Mubarak's November 2017 statement about guarding his drugs—albeit vague—does further evidence the probability that there would be evidence of the crimes in his home. See [id. ¶ 70]. This statement, coupled with the fact that the Everett apartment is his primary residence and thus the location most likely to house evidence, along with the cash transactions and suspicious ATM activity near the Everett apartment was

sufficient additional support to supplement Agent Kenny's testimony and provide probable cause for the search of that location.[4]

 That set of facts, however, does not give rise to the same inference for the Lowell house. The Affidavit again makes no direct connection between the house and any alleged criminal activity.  In contrast to the Everett apartment, the Lowell house was identified as a secondary residence, [Kenny Affidavit ¶ 7], and, unlike his primary residence, there are no additional facts about large amounts of cash, his ATM activity, or any statements from Mubarak that indicate that he typically kept important documents or other evidence of his drug trafficking activity at the residence of a third party, or at Scott's home in particular.  In fact, his November 2017 statement about closely guarding his drug supply could just as easily be understood to mean that he would not keep drugs or related items at the residence of a third party, thereby compromising his privacy and affording the third party access to drugs and other evidence.  [Id. ¶ 70]. Additionally, the fact that he seemingly had not been spending most nights at the Lowell house in the year or two prior to the execution of the warrant makes it even less likely that the items to be seized would be found there.  See [id. ¶¶ 110–13].  Moreover, a familial or similar personal relationship between the suspect and the resident of the home is insufficient to establish probable cause for purposes of a search warrant without more.  Poolaw v. Marcantel, 565 F.3d 721, 730 (10th Cir. 2009), as amended (July 24, 2009); see also Walczyk v. Rio, 496 F.3d 139, 162–64 (2d Cir. 2007) (a warrant inaccurately implying that the defendant had recently lived with his mother did not establish probable cause to search the mother's home).  On the facts before it, the Court cannot conclude that the Kenny Affidavit established that there was a "fair probability"

---

[4] At the hearing before the Court held on June 6, 2022, the Government also suggested that the fact that the apartment itself was likely paid for with the illicit proceeds also supported a finding of probable cause, but did not to provide any law in support of such an argument.

that evidence of drug trafficking or money laundering would be found in the Lowell house.
Rosario, 588 F. Supp. 2d at 131 (quoting Gates, 462 U.S. at 238).

Feliz, an older First Circuit case that allowed, under narrow circumstances, an inference
of nexus without direct evidence does not warrant a different outcome here.  In Feliz, the First
Circuit allowed the inference of nexus where the defendant was "a long-time, successful, drug
trafficker[,]" and it was reasonable to believe that he kept "documents showing the names and
telephone numbers of customers and suppliers as well as accounts showing the monies paid and
collected[,]" and that the money he collected would be in some "safe yet accessible place" like
his home.  182 F.3d at 87–88.  This inference was based on (1) the affiant's "experience and
opinions"; (2) the fact that there was "[n]o other residence or drug-dealing headquarters"
identified, making the known residence "a likely place to seek to find incriminating items"; and
(3) a cooperating witness who identified the defendant "as a long-time, successful, drug
trafficker" and whose information was corroborated by a cooperating defendant.  Id.

Roman did not explicitly overrule Feliz, but sufficiently distinguished its facts from that
case and others, with the result that the Feliz holding has become increasingly narrow.  See
Roman,  942 F.3d at 52–54; see, e.g., United States v. Murray, No. 18-cr-30018, 2020 WL
4904758, at *13 (D. Mass. Aug. 20, 2020) (distinguishing Feliz on the grounds that the affidavit
in Murray identified several other locations where evidence could be stored and there was
conflicting, unreliable witness statements about the defendant's involvement in drug dealing);
United States v. Almonte, 454 F. Supp. 3d 146, 158 n.19 (D.R.I. 2020) (distinguishing its facts
from Feliz because in Feliz "police had reliable detailed information that the defendant had a
twelve-year career in drug trafficking").  Indeed, the Court in Feliz took pains to make clear that
its decision "[did] not suggest that, in all criminal cases, there will automatically be probable

cause to search a suspect's residence[,]" and that "[a]ll factors must be weighed in each case in order to assess the reasonableness of inferring that evidence of the crime can be found at the suspect's home." 182 F.3d at 88. The Court adheres to that guidance in reaching its decision here.

The instant case is distinguishable from the specific circumstances of <u>Feliz</u>. Here, there was only one informant and that informant was not recently corroborated by a cooperating defendant. The Affidavit, additionally, does not provide any evidence of Mubarak's direct involvement in drug dealing, making his role in the organization far more tenuous than that of the defendant in <u>Feliz</u>. Further still and importantly, the Affidavit in this case identified a different primary residence, the Everett apartment, at which the "wares" of drug activity were more likely to be found. <u>Compare</u> <u>United States v. Galloway</u>, No. 19-cr-10162, 2020 WL 4369648, at *3 (D. Mass. July 30, 2020) (finding there was probable cause to believe there would be evidence of defendant's drug activity in his home where he was "engaged in drug trafficking over time, no other drug-dealing location was identified with him and the circumstances showed that it was reasonable for the magistrate judge to rely upon this evidence along with the agent's attestation that drug traffickers commonly keep drug-related items in their residences.") <u>with</u> <u>Roman</u>, 942 F.3d at 50–55 (finding no probable cause for search of defendant's residence where affidavit supported warrant application for six other locations connected to the drug activity, including two other locations that the Government itself characterized as "headquarters") <u>and</u> <u>Murray</u>, 2020 WL 4904758, at *13 (law enforcement affidavit too speculative to support nexus where it identified several other locations where evidence sought could have been found).

Therefore, Feliz alone is not sufficient to confer probable cause to search either location at issue in this case.  The Court finds there was sufficient probable cause to authorize the search of the Everett apartment based on facts beyond Feliz and, to the extent that Feliz is even still good law, distinguishes its facts for purposes of the Lowell house.

Finally, the probable cause for the Everett apartment was not stale.  "[A]n affidavit supporting a search warrant must contain timely information or else it will fail."  United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996).  Mubarak argues that the strongest evidence against him dates back to 2017 and that the Government investigation revealed little in the interim to suggest that any evidence of those crimes would still be in the residences in August 2020.  [ECF No. 105 at 12].  The Government contends that evidence collected since 2017 and through 2020, demonstrated a "large-scale, ongoing narcotics operation" and "protracted conspiracy" up until the time of the warrant application.  [ECF No. 109 at 12].

Mubarak argued at the hearing before the Court that courts have found as little as a two-year lapse in time between the crime and the warrant to be too remote to support a nexus, see United States v. Lopes, No. 20-cr-10244, 2021 WL 6197288, at *2–4 (D. Mass. Dec. 30, 2021), but the First Circuit "has repeatedly refused to assess an affidavit's staleness by counting the number of days between the events described in the affidavit and a warrant's issuance, as a merchant would beads on an abacus[,]" United States v. Tiem Trinh, 665 F.3d 1, 13 (1st Cir. 2011).  Instead, it has advised district courts to "consider various factors, including the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information in assessing the information's ripeness."  Id. (internal quotation marks and citation omitted).

"A primary consideration in evaluating whether an affidavit is sufficiently 'fresh' is whether it 'describes a single transaction or a continuing pattern of criminal conduct.'" Chalas, 478 F. Supp. 3d at 148 (quoting United States v. Tucker, 638 F.2d 1292, 1299 (5th Cir. 1981). In Tiem Trinh, the First Circuit specifically stated that because "drug operations . . . often germinate over a protracted period of time . . . information that might otherwise appear stale may remain fresh and timely during the course of the operation's progression." 665 F.3d at 14.

The Affidavit here alleged a continuing pattern of criminal drug conduct and related financial transactions, evidenced by financial records and phone call analysis right up until the issuance of the warrant. Although the statements from Mubarak and his co-conspirators may have been three years old, those conversations strongly evidenced an expansive, ongoing, and organized drug operation and the financial records from 2020 corroborated that proceeds continued to be generated and laundered. [ECF No. 109 at 10–12; Kenny Affidavit ¶¶ 76–120]. Further still, the warrant for the Everett apartment targeted the types of evidence that typically "defy claims of staleness[,]" United States v. Ostrowski, 822 F. Supp. 2d 66, 72 (D. Mass. 2011), including financial records, books, ledgers, and cash, see id.; firearms, see United States v. Ponzo, 853 F.3d 558, 573–74 (1st Cir. 2017); and hardware and equipment that would be associated with drug activity, see Tiem Trinh, 665 F.3d at 14–15, all of which are likely "to be kept for long periods of time in the place to be searched[,]" id. (quoting United States v. McKeever, 5 F.3d 863, 866 (5th Cir. 1993). Additionally, the Court has taken into account that Mubarak had recently renewed his lease on the Everett apartment and that his vehicles had recently been seen there.

In sum, the passage of time did not eliminate the likelihood that the enumerated items would be found in Mubarak's Everett residence in August 2020 and this, coupled with the

fresher evidence of ongoing money laundering and residence at the address, defeats Mubarak's claim of staleness.

### B.      The Good Faith Exception

The Supreme Court has held that suppression is inappropriate where officers' good faith reliance on a warrant is reasonable.  United States v. Leon, 468 U.S. 897, 922 (1984).  By good faith, the Supreme Court means where law enforcement acted in "objectively reasonable reliance" on the defective search warrant.  Id.  The government bears the burden of demonstrating good faith.  See United States v. Vigeant, 176 F.3d 565, 571–73 (1st Cir. 1999).

Evidence obtained by "officers reasonably relying on a warrant issued by a detached and neutral magistrate" should not be suppressed or excluded if that warrant is later found to be invalid.  Leon, 468 U.S. at 913, 922 (finding the nonexistent deterrence benefits of exclusion did not outweigh the significant costs of otherwise guilty perpetrators gaining bargaining power or remaining free.  There are circumstances when this good faith exception does not apply, including when the magistrate judge was knowingly or recklessly misled by an affiant, id. at 923 (citing Franks v. Delaware, 438 U.S. 154, 155–56 (1978)), when the magistrate judge abandons her judicial role, id. (citing Lo–Ji Sales, Inc. v. New York, 442 U.S. 319, 326–29 (1979) (reversing denial of motion to suppress where local justice actively participated in a search based on a warrant the same justice issued)), and when an affidavit supporting a warrant is "so lacking

in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]" id. (quoting Brown v. Illinois, 422 U.S. 590, 610–11 (1975) (Powell, J., concurring in part)).

Because Mubarak does not claim that the magistrate judge was misled or stepped outside of her judicial role, the only possible reason for not applying the good faith exception would be if the affidavit was lacking in indicia of probable cause.  See [ECF No. 105 at 13–14].

As discussed above, probable cause for a search of a property can be established by an affidavit containing evidence of a long-standing drug operation with no other potential "headquarters," two reliable cooperating witnesses that confirm the role of the defendant in that operation, and an agent's attestation that drug traffickers commonly keep drug-related items in their residences.  See, e.g., Feliz, 182 F.3d at 87–88; Galloway, 2020 WL 4369648, at *3.  The Affidavit here contained evidence of a long-standing drug organization, recorded meetings and controlled buys with a confidential informant, some facts connecting the criminal activity to a residence, and a consistent pattern of money laundering activity related to that drug trafficking. Though the facts connecting that activity to the Lowell house were insufficient to support a probable cause finding, the Court does not find that Affidavit was so obviously deficient as to make the agents' reliance on the warrant unreasonable.  Leon, 468 U.S. at 923; see also United States v. Levin, 874 F.3d 316, 322–23 (1st Cir. 2017) (vacating district court order suppressing evidence in child pornography case where the good faith exception should have been applied because the government submitted a warrant application "containing a detailed affidavit from an experienced officer, describing in detail its investigation, including how [a novel computer investigative technique] works, which places were to be searched, and which information was to be seized.").  The Kenny Affidavit may have fallen short for the purposes of a probable cause showing for the Lowell house, but it did offer more than the hypothetical "bare bones" statement

of conclusory allegations contemplated by <u>Leon</u>.  <u>See</u> 468 U.S. at 926.  Accordingly, the agents in question relied in good faith on the warrant, and the evidence is admissible.

### C.    Scope of the Warrants

1.    <u>Vehicles</u>

Additionally, putting aside the validity of the warrants, Mubarak asks the Court to suppress the firearm seized from the truck at the Everett apartment, and the motorcycles from the Lowell house because those searches and seizures exceeded the scope of the warrants.  [ECF No. 105 at 14–15].  These items will not be suppressed.

First, the warrant application specifically sought authorization to search the garages at both locations and authorized the Government to search containers, including cars, within those areas.  [ECF No. 105-1 at 4; ECF No. 105-2 at 4].  Second, even if the warrants had not specifically authorized the search of the vehicles, "[i]t is well established that vehicles found within the curtilage of a dwelling are within the scope of a warrant particularly describing the dwelling so long as the vehicles could contain the items sought and described in the warrant." <u>United States v. Caballero</u>, No. 16-cr-30034, 2018 WL 5281744, at *6 n.7 (D. Mass. Oct. 24, 2018); <u>see</u> <u>United States v. Asselin</u>, 775 F.2d 445, 447 (1st Cir. 1985).  Finally, Attachment B to both warrants permitted the seizure of "[a]ll records, data, or tangible objects, in whatever form that constitute evidence, fruits, or instrumentalities of the 'Target Offenses[.]'" [ECF No 105-1 at 5; ECF No 105-2 at 5].  This authorized the seizure of the vehicles as the Government had sufficient reason to believe that they were fruits of the criminal activity.  [Kenny Affidavit ¶¶ 85–89; ECF No. 109 at 17].[5]

---

[5] The Government also puts forth additional lawful bases for the search and seizure of the vehicles, including the automobile exception to the Fourth Amendment and an independent basis for probable cause established after the search of each residence, but having already concluded

2.     Cell Phones

Mubarak similarly argues that the searches of the contents of the cell phones seized at the Everett apartment were not authorized by the warrants and therefore require suppression of that evidence, but this argument is equally unsuccessful.  [ECF No. 105 at 15–16].  The plain language of the warrants authorized the agents to seize "all computer hardware" which was defined as "any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device)" that could hold the categories of evidence enumerated in Attachment B to the warrants.  [ECF No. 105-1 at 7; ECF No. 105-2 at 7]; see also [ECF No. 109 at 18–19].  Mubarak's reliance on Riley v. California, 573 U.S. 373 (2014) to support his assertion that an additional warrant was needed to authorize the search of the phones following their seizure ignores Riley's central holding that a search warrant is needed to search a cell phone seized *incident to arrest*, id. at 403, unlike here, where the phones were seized during a warranted search, see United States v. Mulcahey, No. 15-cr-10112, 2015 WL 9239755, at *1 (D. Mass. Dec. 17, 2015) (similarly distinguishing Riley from defendant's challenge to warranted search of smart phone).[6]

IV.     **CONCLUSION**

Because there was adequate probable cause for the issuance of the warrant authorizing the search of the Everett apartment, and because the officers in this case acted in objectively

---

the warrants authorized the search and seizure of the vehicles on their face, the Court need not address these arguments.  See [ECF No. 109 at 17].

[6] Mubarak also offers United States v. Scott, No. 17-cr-20489, 2018 WL 2197911, at *6 (E.D. Mich. May 14, 2018) to support this argument, but Scott not only involved the seizure of a phone incident to arrest, thus squarely aligning it with Riley with regard to the phones, the Scott court also separately affirmed the basic premise that even where a "warrant [does] not explicitly authorize the search of vehicles, any vehicles within the curtilage of the residence fall within the scope of the warrant's authorization."  Id.

reasonable reliance on the search warrant for the Lowell home, the motion, [ECF No. 105], is

<u>DENIED</u>.

      **SO ORDERED.**

July 27, 2022                                     <u>/s/ Allison D. Burroughs</u>
                                                   ALLISON D. BURROUGHS
                                                   U.S. DISTRICT JUDGE